UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | No. C 19-05822 WHA |
| | No. C 19-05831 WHA |
| GLUMETZA ANTITRUST | No. C 19-06138 WHA |
| LITIGATION. | No. C 19-06156 WHA |
| | No. C 19-06839 WHA |
| This Document Relates to: | No. C 19-07843 WHA |
| | No. C 19-08155 WHA |
| ALL ACTIONS. | No. C 20-01196 WHA |
| | No. C 20-01198 WHA |
| | (Consolidated) |

**ORDER RE MOTIONS TO DISMISS**

**INTRODUCTION**

In this antitrust action arising from an alleged reverse-payment settlement of a patent infringement suit between brand and generic marketers of the diabetes drug Glumetza, defendants move to dismiss the complaints as untimely. Because defendants actively continued and fraudulently concealed their conspiracy, plaintiffs' complaints are timely, at least at the pleading stage. Defendants' remaining standing, merits, and joinder arguments partially succeed. Thus, the motions are **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

1.    **THE REGULATORY FRAMEWORK.**

This case arises from the combined patent and pharmaceutical-regulatory framework established by the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, 21 U.S.C. § 301 *et seq.*, 35 U.S.C § 156 *et seq.* More commonly known as the "Hatch-

Waxman Act," it implements a scheme of interlocking incentives to encourage timely introduction of low-cost generics into the pharmaceutical market yet still drive new drug development. Several prior cases summarize the Hatch-Waxman scheme. *See, e.g.*, *FTC v. Actavis*, 570 U.S. 136, 142–144 (2013); *In re Aggrenox Antitrust Litigation*, 94 F. Supp. 3d 224, 233–34 (D. Conn. 2015) (Judge Stefan R. Underhill); *In re Niaspan Antitrust Litigation*, 42 F. Supp. 3d 735, 740–41 (E.D. Pa. 2014) (Judge Jan. E. DuBois). A few elements become relevant here.

To start, all pharmaceutical drugs require FDA approval to enter the market and undergo a long and costly testing process. Only approved drugs reach the market. *See* 21 U.S.C. § 355(a), (b)(1). To encourage *generic* pharmaceutical drugs, the Hatch-Waxman Act eases the approval process. A proposed generic manufacturer may submit an Abbreviated New Drug Application (ANDA), rely on testing data for the corresponding, already-approved brand-name drug, and avoid "the costly and time-consuming studies" needed for approval. *See Actavis*, 570 U.S. at 142 (quotation omitted); 21 U.S.C. §§ 355(j)(2)(A)(ii), (iv).

But piggybacking on a brand drug's testing removes only one barrier to entry, the FDA, for the patent barrier remains. New brand-drug applicants must list the patents (if any) covering the new drug, and generic applicants must certify to the FDA either that no patents cover the brand drug, that the relevant patents have expired, or that such patents are invalid or will not be infringed by the new drug. A certification of invalidity or noninfringement — usually called the "Paragraph IV certification" — is deemed a statutory act of patent infringement. And, if the brand manufacturer sues within 45 days, the FDA must stay the generic's approval for thirty months (or until the end of the suit, whichever comes first). *Actavis*, 570 U.S. at 143; 21 U.S.C. §§ 355(j)(2)(A)(vii)(I)–(IV), (5)(B)(iii); 35 U.S.C. § 271(e)(2)(A); *see also In re Aggrenox*, 94 F. Supp. 3d at 233–34.

To encourage patent-challenging ANDAs with Paragraph IV certifications, the Hatch-Waxman Act grants the "first filer" 180 days of generic exclusivity, *i.e.* the first generic gets six months as the only generic to compete against the brand. This can be "worth several hundred million dollars" to the generic manufacturer, thus outweighing the risk of infringement suit.

2

*Actavis*, 570 U.S. at 143–44; 21 U.S.C. § 355(j)(5)(B)(iv).  Significantly, however, the 180-day exclusivity does not bar the brand manufacturer itself from marketing an "authorized generic" to recoup some of those millions.  *See Teva Pharms. v. Crawford*, 410 F.3d 51, 55 (D.C. Cir. 2005).  And, the first filer can forfeit the 180-day exclusivity if it fails to market its generic within 75 days of *another* generic successfully challenging the brand's patents — but in that case, the 180-day exclusivity period vanishes; it does not transfer to any other manufacturer.  21 U.S.C. § 355(j)(5)(D)(i)(I)(aa), (iii).

### 2. *FTC V. ACTAVIS.*

So, the Hatch-Waxman scheme aims to bring generic drugs to market sooner.  But, as the Supreme Court recognized in *Actavis*, sometimes that scheme can backfire.  There, Solvay Pharmaceuticals marketed the brand-drug, AndroGel, and held a patent covering the drug. When Actavis filed a Paragraph IV certification of noninfringement and invalidity along with an ANDA to market a generic AndroGel, Solvay sued.  When the thirty-month stay expired, the FDA approved Actavis' first-filer ANDA.  But then the parties settled.  Solvay would pay millions of dollars to Actavis, who would delay its generic market entry for several years, but still enter before the patent expired.  570 U.S. at 144–45.

The Federal Trade Commission then sued everyone involved, arguing the settlement unlawfully shared in a monopoly.  But the district court and the Court of Appeals for the Eleventh Circuit, following the weight of decision from other circuits, rejected the suit.  Up to that point, the Courts of Appeals for the Second and Federal Circuits had held such patent settlements generally immune from antitrust attack.  Only the Court of Appeals for the Third Circuit had held the reverse-payment settlement presumptively unlawful.  *Id.* at 145–47.

The Supreme Court reversed, ruling largely for the FTC.  To start, the Supreme Court held that patent settlements were *not*, and never had been, beyond the reach of antitrust scrutiny. Then, for several reasons, the Supreme Court found a reverse-payment settlement *could* violate antitrust law.  Of particular note, Justice Stephen Breyer explained for the Court that buying off patent challengers could be tantamount to simply buying a patentee's right to exclude, instead of earning that right from the Patent and Trademark Office and maintaining it against challenge

3

on the merits. And, the reverse payment might indicate skewed interests, *i.e.* the brand manufacturer wasn't just fending off a patent challenge, but instead ushering the challenger *into the monopoly* by dangling a share of the profits. Last, the Court noted that "where only one party owns a patent, it is virtually unheard of outside of pharmaceuticals for [the patentee] to pay an accused infringer to settle a lawsuit." *See id.* at 147–53, 153–58.

But the Supreme Court did not go so far (as had the Third Circuit) as to hold reverse-payment settlements presumptively unlawful. Rather, the Court said such a settlement should be evaluated under the antitrust rule of reason. *Id.* at 158–60.

### 3.    THE CHALLENGED CONSPIRACY.

Our complaint alleges a variation of the *Actavis* scheme. Instead of a cash payment, however, the patent owner gave something else of great value, a promise not to compete. Here are our facts, as alleged.

In 2002, one of defendant Bausch Health Companies Inc.'s predecessors, Depomed, Inc. (later Assertio Therapeutics, Inc.), developed a new controlled-release version of the classic diabetes medication, metformin. The FDA approved Assertio's NDA for 500 mg and 1000 mg formulations of Glumetza in June 2005. Assertio held several patents on their new drug (Consolid. Amd. Compl., Dkt. No. 53 at ¶¶ 77, 79, 81).

In July 2009, defendants Lupin Pharmaceuticals, Inc. and Lupin Ltd. (Lupin) filed an ANDA seeking approval to market generic versions of Glumetza. Lupin filed a Paragraph IV certification of noninfringement or invalidity against the four relevant patents: U.S. Patent Nos. 6,340,475; 6,635,280; 6,488,962; and 6,723,340. Lupin had successfully designed around the patents, which had claimed only a subset of the controlled-release technology that Glumetza employed. Assertio used, and had claimed, a polymeric "matrix" system, wherein the active drug was distributed throughout a polymer and formulated into a pill to time the release. Lupin, however, employed a "reservoir" system, wherein the active drug core was coated in an acrylic polymer to extend the drug's release (Consolid. Amd. Compl. at ¶¶ 82–99, 107–08, 113–14).

Assertio (the brand) sued Lupin (the proposed generic) in November 2009, triggering the thirty-month stay against FDA final approval. In January 2012, with the suit still going, the

FDA tentatively approved the ANDA, meaning Lupin's generic had passed the review process and was finally approvable *but for* the thirty-month stay. One month later, Assertio and defendant Santarus, Inc., who now owned the commercialization rights to Glumetza (though Assertio retained the patents), settled with Lupin (Consolid. Amd. Compl. at ¶¶ 103–04, 110–11, 116–17, 121).

Lupin promised to walk away from the lawsuit, to no longer challenge the patents' validity, and to not market a generic version of Glumetza for four years. As payment for Lupin's delay, Assertio and Santarus promised to not market or permit another to market an authorized generic for at least 180 days following Lupin's generic market entry in 2016 (Consolid. Amd. Compl. at ¶¶ 121–24). *See Depomed, Inc. v. Lupin Pharms., Inc.*, No. C 09-05587 PJH, Dkt. No. 152 (N.D. Cal. Mar. 27, 2012).

A distinction must be made. Two *separate* "180 day" periods hovered over Lupin's market entry: (1) the FDA-granted 180-day period during which the FDA would not permit any other generics to market (which, by statute, would run from Lupin's market entry); and (2) the settlement agreement 180-day period during which Assertio and Santarus would not market an authorized generic (which, by contract, would also run from Lupin's market entry) (Consolid. Amd. Compl. at ¶ 123). *See* 21 U.S.C. § 355(j)(5)(B)(iv). Lupin presumably gave up its statutory 180-day exclusivity period in favor of a contractual 180-day exclusivity period, enforced by Assertio and Santarus's assertion of patent rights against other generics (as detailed below).

To protect Lupin, the "no-authorized generic" clause allegedly included two more provisions. The "most-favored-entry" subclause expressly provided that if any other generic succeeded in marketing a generic Glumetza before February 2016, Lupin could market immediately. In addition, the "most-favored-entry-plus" subclause stated that Assertio and Santarus would not license any other generic Glumetza manufacturers until 180 days following Lupin's market entry (Consolid. Amd. Compl. at ¶¶ 151–52).

Defendants allegedly designed these provisions (collectively the "no-AG" provision) to undercut any incentive for other manufacturers to file a Paragraph IV certification, litigate an

infringement suit to final decision, and (if successful) beat Lupin to market. If defendants' scheme worked, Lupin could keep *both* the FDA-granted exclusivity against other generics and Assertio and Santarus's promise to not market an authorized generic and, thus, be the *only* competitor to brand Glumetza for at least 180 days. The complaint calculates the added value of this provision to Lupin, looking prospectively from February 2012, at over fifty million dollars (Consolid. Amd. Compl. at ¶¶ 126–37, 148, 153–56).

The scheme worked. No generic manufacturers marketed a version of Glumetza before Lupin. Sun Pharmaceuticals filed an ANDA for generic Glumetza around May 2011. In June, Assertio and Santarus sued Sun, and by January 2013 those parties settled. Allegedly informed of Assertio, Santarus, and Lupin's no-AG scheme, Sun agreed not to market a generic Glumetza until August 2016. And when Watson Pharmaceuticals filed its ANDA for generic Glumetza in March 2012, Assertio and Santarus again sued in April, then settled in November 2013. Also allegedly informed of the no-AG scheme, Watson agreed to delay its market entry until August 2016. Ultimately, Sun and Watson (by then Teva Pharmaceutical Industries Ltd.) did not market any generic Glumetza until mid-2017 (Consolid. Amd. Compl. at ¶¶ 157–72, 192–94).

Assertio and Santarus milked their four-year preserved monopoly. In 2012, Glumetza sales yielded about $150 million. In November 2013, defendant Salix Pharmaceuticals bought Santarus for $2.6 billion and Bausch paid $14.5 billion for Salix (and the Glumetza machine) in April 2015 (Consolid. Amd. Compl. at ¶¶ 129, 176–79). Then Glumetza prices to diabetes patients skyrocketed, as shown in the figure below.

**Glumetza 500 mg Tablets: Actual and Projected Prices**

Glumetza 500mg Extended-Release Tablet
Projected Price of Glumetza 500 mg Absent Defendants' Pay-for-Delay Agreement

(Consolid. Amd. Compl. at ¶ 10).

In February 2015, a 500 mg Glumetza tablet cost $5.72 — by July, purchasers paid more than $51. The 1000 mg tablet jumped the same 800% from $12 to $111 in the same time period. Glumetza is one of the primary glucose regulation drugs for the more than thirty million diabetes patients in the United States, and it appears the ill had little choice but to pay the new prices. Glumetza produced $145 million in the first two quarters of 2015. In the latter two, Bausch reaped $818 million (Consolid. Amd. Compl. at ¶¶ 75–77, 184).

In February 2016, Lupin joined in the bonanza, charging $44 for a single 500 mg tablet of Glumetza. When Teva's generic Glumetza entered the market in May 2017, the price of a 500 mg tablet dropped to $23, and when Sun's generic entered in July the price dropped to $16, still approximately *three times* the early-2015 cost (Consolid. Amd. Compl. at ¶¶ 186–88, 192–94).

Beginning on August 29, 2019, plaintiffs began suing. As of now, ten suits have been filed in this District. Following a case management conference, nine remain active. The first, *FWK Holdings, LLC v. Bausch Health Companies Inc. et al.*, No. C 19-05426 WHA, was dismissed without prejudice (Dkt. No. 68 at ¶ 3). Plaintiffs divided into three groups: (1) the direct-purchaser plaintiffs and putative class (Consolid. Amd. Compl., Dkt. No. 53); (2) the

end-payor plaintiffs and putative class (EPP Consolid. Amd. Compl., Dkt. No. 164); and (3) the retailer plaintiffs, who sue as the assignees of absent direct purchasers (Walgreen Compl., Dkt. No. 162; Rite Aid Compl., Dkt. No. 163). One defendant, PDL Biopharma left the case by voluntary dismissal in January (Dkt. No. 116). The remaining defendants have moved to dismiss all the complaints (Dkt. Nos. 76, 79, 80, 98). This order follows full briefing and oral argument. This order does not address the latest two additions, Nos. C 20-01196 WHA and C 20-01198 WHA, as they were filed after the present briefing completed.

### ANALYSIS

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege sufficient factual matter, accepted as true, to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Such a facially plausible claim requires sufficient factual allegations to draw a reasonable inference that defendants are liable for the misconduct alleged. A court must take all of the factual allegations in the complaint as true, but need not accept as true legal conclusions merely styled as facts. The factual allegations must raise a plaintiff's right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

#### 1. THE SHERMAN ACT AND THE STATUTE OF LIMITATIONS.

Private plaintiffs must file an antitrust action within four years. 15 U.S.C. § 15b; *Samsung Elecs. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014). "A claim may be dismissed as untimely pursuant to a 12(b)(6) motion only when the running of the statute [of limitations] is apparent on the face of the complaint." *United States ex rel. Air Ctrl. Techs. v. Pre Con Indus.*, 720 F.3d 1174, 1178 (9th Cir. 2010) (alteration in original) (quotation omitted).

An antitrust claim accrues when a defendant commits an unlawful act and injures a plaintiff. *Zenith Radio Corp. v. Hazeltine Res.*, 401 U.S. 321, 337–38 (1971). In this context, the injury accrues "on the date that the generic firm would have entered the market but for the unlawful settlement." *See* II AREEDA & HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES & THEIR APPLICATION ¶ 320b (2014).

Plaintiffs allege that absent the unlawful agreement, Lupin would have marketed generic Glumetza: (1) "at risk" following the expiration of the thirty-month stay (May 6, 2012); (2)

8

following Lupin's victory in the patent suit; or (3) earlier than February 1, 2016, on a date to be determined by the jury (Consolid. Amd. Compl. at ¶ 143).

The consolidated complaint plausibly alleges that Lupin did not infringe the patents because it designed around the patents using a "reservoir system" to "extend the drug's release" rather than use Assertio's "claimed polymeric matrix system" (Consolid. Amd. Compl. at ¶¶ 82–99, 112–13). So, at this stage, the complaint plausibly alleges Lupin would have won the patent suit and would have launched generic Glumetza in the summer or fall of 2012 after FDA final approval following the expiration of the thirty-month stay.

The problem is that this action commenced on August 29, 2019, so the limitations period only reaches back to August 29, 2015. Plaintiffs offer two counterarguments: (1) that defendants' continuing violations reset the statute of limitations; and (2) defendants' fraudulent concealment tolled the statute of limitations, both considered now.

### A.    THE COMPLAINT PLAUSIBLY ALLEGES CONTINUING VIOLATIONS.

To start, in play are all sales made by any defendant of Glumetza after August 29, 2015. Though the original sin occurred back in 2012, these later sales are continuing violations, not barred by the statute of limitations, because of both the defendants' maintenance of the Glumetza monopoly following the February 2012 settlement agreement and their careful February 2016 partition of the Glumetza market, between the brand drug and Lupin's sole generic.

In a conspiracy to violate antitrust laws, "each time a plaintiff is injured by an act of the defendant[,] a cause of action accrues to him to recover the damages caused by that act." *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014). A continuing violation: (1) "must be a new and independent act that is not merely a reaffirmation of a previous act;" and (2) "must inflict new and accumulating injury on the plaintiff." *Samsung*, 747 F.3d at 1202; *Oliver*, 751 F.3d at 1086.

Generally, "the passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations." *Eichman v. Fotomat*, 880 F.2d 149, 160 (9th Cir. 1989). After all, "[t]he mere possession of monopoly

9

power, and . . . charging of monopoly prices" is not unlawful.  *Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  Thus, the "unabated inertial consequences of some pre-limitations action" that are "irrevocable, immutable, permanent[,] and final" are not continuing violations.  *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 72 (9th Cir. 1979).

But the continuing violation "standard is meant to differentiate those cases where a continuing *violation is ongoing* — and an antitrust suit can therefore be maintained — from those where all of the harm occurred *at the time of the initial violation*."  So, "action taken under a pre-limitation contract [can be] sufficient to restart the statute of limitations so long as the defendant had the ability not to take the challenged action, even if that would have required breaching the allegedly anti-competitive contract."  *Samsung*, 747 F.3d at 1202–03 (emphasis added).

*First*, it is true that the sulphorous agreement occurred in 2012, but the *conduct taken* to cause competitive harm continued well into the later four-year period.  *See Oliver*, 751 F.3d at 1086; *Samsung*, 747 F.3d at 1202.  This order notes most other cases to address this question have concluded that continued overcharges constitute a continuing violation.  *See In re Aggrenox*, 94 F. Supp. 3d at 239; *In re Niaspan*, 42 F. Supp. 3d at 747; *In re Nexium (Esomeprazole) Antitrust Litigation*, 984 F. Supp. 2d 6, 9 (D. Mass. 2013) (Judge William G. Young); *In re Skelaxin (Metaxalone) Antitrust Litigation*, No. C 12-02343, 2013 WL 2181185 at *6 (E.D. Tenn. May 20, 2013) (Judge Curtis L. Collier); *In re K-Dur Antitrust Litigation*, 338 F. Supp. 2d 517, 551 (D.N.J. 2004) ((now Circuit) Judge Joseph A. Greenaway, Jr.); *In re Buspirone Patent Litigation*, 185 F. Supp. 2d 363, 378 (S.D.N.Y. 2002) (Judge John G. Koeltl).

*Second*, in February 2016, defendants carefully converted the Glumetza monopoly into a brand-versus-generic duopoly with a new round of conduct, a new form of antitrust violation, and *new harm to plaintiffs*.  Plaintiffs may recover for overcharges flowing from defendants' split of the market.  Assertio and Santarus describe their February 2016 conduct not as overt, but instead as inaction reflecting continued adherence to the 2012 settlement.  Yes, they *defined* their duties in the 2012 settlement, but the price gouging anticipated by the agreement extended

for years, well into the later four-year period.  *See Multidistrict Vehicle*, 591 F.2d at 72; *Samsung*, 747 F.3d at 1202.

That said, a continuing violation did not, by itself, reset the statute of limitations for prior acts.  Rather, each continuing violation (*i.e.*, each new sale) merely triggered the statute of limitations anew for *that act*.  *See Oliver*, 751 F.3d at 1086.  Thus, while plaintiffs' challenge to the Glumetza sales since August 29, 2015 — including the February 2016 conduct and its results — are timely, all earlier conduct and sales can only be reached via fraudulent concealment.[*]

## B.  THE COMPLAINT PLAUSIBLY ALLEGES FRAUDULENT CONCEALMENT.

Plaintiffs contend defendants' fraudulent concealment of their settlement agreement, specifically the no-AG provision, tolled the statute of limitations.  This order agrees.

"A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence."  Plaintiffs "must plead facts showing that [defendants] affirmatively misled [them], and that [plaintiffs] had *neither actual nor constructive knowledge* of the facts giving rise to [their] claim despite [their] diligence in trying to uncover those facts."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012).  Diligent inquiry is required where "facts exist that would excite the inquiry of a reasonable person."  The circumstances of concealment and plaintiffs' diligent search must be plead with particularity.  *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499, 502, 504 (9th Cir. 1988).

The thrust of the complaint is that Assertio and Santarus paid Lupin to end its patent challenge and grant them four more years of Glumetza monopoly, during which enormous price gouging occurred (Consolid. Amd. Compl. at ¶¶ 121–24, 184).  As the Supreme Court recognized in *Actavis*, the pay-for-delay scheme is unique to pharmaceutical patents.  570 U.S. at 155.  And, Lupin's *delay* of a generic Glumetza was public knowledge by March 2012

---

[*] Defendants concede direct-purchaser plaintiffs' first operative complaint was filed August 29, 2019, but contest whether that date should apply for the later filed end-payor plaintiffs.  This issue need not be resolved here.

(Consolid. Amd. Compl. at ¶¶ 121, 248.b, fn. 11).  *See Depomed*, No. C 09-05587 PJH, Dkt. No. 152.  So, by then, plaintiffs were on notice of *two* key aspects of the pharmaceutical pay-for-delay scheme: a pharmaceutical patent case; and a settlement delaying generic market entry.

But they had no knowledge of the no-AG provision, Assertio and Santarus's promise to not market an authorized generic for 180 days after Lupin's market entry, to not license any other generics in that time, and that Lupin could market immediately if another generic succeeded in marketing.  So the questions here are: (1) whether knowledge of this further no-AG scheme was required to excite the reasonable plaintiffs' curiosity; (2) whether defendants actually and improperly concealed the no-AG provision; and (3) whether the no-AG provision remained concealed until the current limitations period.  *Cf. Conmar*, 858 F.2d at 503.

*First*, at least at this stage, the complaint plausibly shows that knowledge of the no-AG provision was necessary to excite the curiosity of the reasonable person.  Though two of the relevant Glumetza patents expired in 2016, one allegedly did not expire until June 2020.  And only one valid claim of one patent was necessary to block generic Lupin from the market.  So viewed in February 2012, a proposed February 2016 market entry for Lupin meant halving the remaining patent term.  This 50-50 compromise plausibly conveyed no impropriety to the reasonable observer (Consolid. Amd. Compl. at ¶¶ 81, 121).

*Second*, the complaint plausibly alleges defendants improperly concealed the existence and details of the no-AG provision.  Failure to disclose information does not constitute affirmative concealment absent a duty to disclose.  *Conmar*, 858 F.2d at 505.  But defendants *were* under a duty to disclose.  "[H]alf-truths — representations that state the truth only so far as it goes, while omitting critical qualifying information — can be actionable misrepresentations."  One who *chooses* to speak has a duty to include as much information as necessary to prevent misleading others.  *See Univ. Health Servs. v. United States*, 579 U.S. __, 136 S. Ct. 1989, 2000 (2016).  Defendants sought the district court's blessing of their settlement agreement, yet deliberately failed to disclose a key term (Consolid. Amd. Compl. at ¶ 248).  *See*, *Depomed*, No. C 09-05587 PJH, Dkt. No. 152.  The alleged no-AG provision transformed the settlement from an apparent even split of the remaining patent term between defendants into the challenged

conspiracy. And defendants' continued concealment of the no-AG provision strengthens the inference that the original omission was deliberate. Such deliberate, material omission supports an inference of fraudulent concealment.

*Third*, the complaint plausibly alleges defendants concealed the no-AG provision until within four years of this suit. Specifically, the complaint alleges Lupin did not reveal the no-AG provision until an earnings call on February 5, 2016 (Consolid. Amd. Compl. at ¶ 249). Defendants contend that plaintiffs were on notice of the no-AG provision months earlier, citing (and requesting judicial notice of) an earnings call on July 25, 2015, in which Lupin disclosed "Glumetza launches in February [2016] and we have an exclusivity for six months, *sole exclusivity* on Glumetza" (Dkt. No. 79 at 7, Ex. A) (emphasis added). Generally, however, a motion to dismiss turns on, and *only* on, the complaint. The judicial notice exception under Federal Rule of Evidence 201 permits district courts to consider a fact "not subject to reasonable dispute" because it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Khoja v. Orexigen Therapeutics,* 899 F.3d 988, 999 (9th Cir. 2018).

Defendants contend "sole exclusivity" obviously meant that Lupin's 180 days of exclusivity would not be compromised by an AG launch (*id.* at 7). But, recall, two 180-day exclusivity periods hover over Lupin's market entry: (1) the FDA-granted 180 days of exclusivity against *other* generics; and (2) the settlement-granted 180 days without an authorized generic. So facially, the subject of "sole exclusivity" is open to reasonable dispute.

It is undisputed that before Lupin uttered "sole exclusivity," the public had no knowledge of the no-AG provision. Perhaps, enjoying the facts *now known*, "sole exclusivity" clearly refers to the no-AG provision. But defendants' suggestion must be that the reasonable observer on *July 25, 2015,* would have construed the language as disclosing the *then-unknown* settlement provision, rather than the *known* FDA-granted exclusivity — an improper attribution of hindsight. Because the language was subject to reasonable dispute *when uttered*, judicial notice is improper. The concealment continued into the statutory four-year period, or so a reasonable jury could find.

13

In sum, plaintiffs' claims are timely. Their complaint plausibly alleges defendants' continuing conspiracy to suppress competition, first by propping up the Glumetza monopoly, then by carefully splitting the market between Assertio and Santarus's brand and Lupin's generic. This certainly permits plaintiffs to recover all sales since August 29, 2015. Yet the complaint also plausibly alleges defendants' fraudulent concealment of the conspiracy to undermine competition in the Glumetza market. The concealment started when defendants concealed key portions of their settlement from the district court and it continued until within the four-year limitations period. At this stage, at least, plaintiffs may pursue recovery back to the date our jury finds Lupin would have first marketed its generic Glumetza.

### 2. ASSERTIO SHOULD ANSWER ALONGSIDE ITS CO-DEFENDANTS.

Assertio attempts to disclaim liability in Santarus and Lupin's scheme. It notes that settlements, and accompanying payments, are usually encouraged and that a compromise entry date for the generic drug in pharmaceutical patent settlement is generally lawful. Assertio reads *Actavis* to hold that the "reverse payment" is the *only* unlawful aspect of a patent settlement and proclaims its only part in this story is as the patent holder and as a signatory to the settlement agreement. And, Assertio proclaims that it had already handed Glumetza commercialization over to Santarus by then, so it couldn't have monopolized a market it left, nor did it convey any value to Lupin via the no-AG provision.

These arguments misread *Actavis* and ignore antitrust law. Assertio, Santarus, and Lupin's conduct cannot be so sequestered. *Their conspiracy to maintain a monopoly and then split the Glumetza market means each is liable for the entire course of conspiratorial conduct.* Assertio cannot lay the plans, reap its bargain, and then disclaim responsibility.

*First*, though Assertio is correct that *Actavis* did focus on the "reverse payment" as the primary indicator of an unlawful agreement, *Actavis* did *not* hold that a "reverse payment" is the *only* way to concoct a Sherman Act violation. Indeed, *Actavis* explicitly stated the question it answered: "whether such [a reverse payment settlement] agreement can sometimes unreasonably diminish competition in violation of the antitrust laws." *Actavis* answered clearly. "[R]everse payment settlements such as the agreement alleged in the complaint before us can

sometimes violate the antitrust laws." But the Supreme Court declined to find reverse payment settlement agreements presumptively unlawful. Instead, courts should apply the rule of reason to evaluate the agreements. 570 U.S. at 141, 157–160. So (despite Assertio's protestations) the settlement agreement here needs to go through that evaluation.

*Second*, Assertio may not split off its own allegedly lawful conduct. "The character and effect of a[n antitrust] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." "[I]t is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 707 (1962). Assertio's otherwise legal conduct, if part of an unlawful scheme, became unlawful.

*Third*, here, the complaint alleges not just an unlawful scheme, but an unlawful conspiracy. A complaint plausibly alleges a conspiracy where it pleads "enough factual matter (taken as true) to suggest" the parties "had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *See Twombly*, 550 U.S. at 556; *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946). Here, the complaint doesn't just allege parallel conduct — it alleges the actual *agreement*. In February 2012, defendants laid their plan. They would walk away from the patent suit, Lupin would stop challenging the patent, and Lupin would not market a generic, thus maintaining the brand monopoly. Then, in February 2016, Lupin would market a generic, Assertio and Santarus would not market an authorized generic, and the Glumetza market would be carefully split in two (Consolid. Amd. Compl. at ¶¶ 121–24).

*Fourth*, Assertio, Santarus, and Lupin's performance of the scheme applies to them all. Once a conspiracy is formed, "it remains actionable until its purpose has been achieved or abandoned" and "an overt act of one partner may be the act of all without any new agreement specifically directed to that act." *United States v. Inryco, Inc.*, 642 F.2d 290, 293 fn. 6 (9th Cir. 1981). Thus, a plaintiff need not "show that each defendant or all defendants . . . have participated in each act or transaction. Involvement in but two of ten allegedly conspiratial [sic] situations does not absolve [a defendant] from participation in the entire conspiracy if its

15

involvement in the two was unlawful and knowingly and purposely performed." *Arandell v. Centerpoint Energy Services*, 900 F.3d 623, 634 (9th Cir. 2018) (additions in original) (quotation omitted).

Assertio protests repeatedly that it left the Glumetza market months before the conspiracy, having turned over the drug's commercialization to Santarus. Thus, it had no ability to restrict competition in or monopolize the relevant market. *See Mercy-Peninsula Ambulance v. Cty. of San Mateo*, 791 F.2d 755, 759 (9th Cir. 1986). But as holder of the asserted patents, Assertio was an important signatory to and co-architect of the challenged conspiracy (Consolid. Amd. Compl. at ¶¶ 121–24). Along with Santarus and Lupin, Assertio knew the scheme's purpose and intended the subsequent performance. And, because "a Sherman Act conspiracy is . . . ripe when the agreement to restrain competition is formed," Assertio's part in designing the alleged scheme is enough to hold it liable alongside the more direct market actors, Santarus and Lupin. *Inryco*, 642 F.2d at 293.

Assertio finally appears to contend that criminal and civil antitrust conspiracies are governed by different rules but cites no law for this proposition. Regardless, this argument lacks merit. When our court of appeals evaluated an antitrust conspiracy in the civil context in *Arandell*, it turned to a *criminal* antitrust conspiracy case, *Esco Corporation v. United States*, 340 F.2d 1000 (9th Cir. 1965), and to a *criminal* drug and firearm conspiracy case, *United States v. Reese*, 775 F.2d 1066 (9th Cir. 1985). *See Arandell*, 900 F.3d at 634.

In sum, Assertio's argument that it just stood in the background while Santarus and Lupin did all the wrongs is unavailing. Assertio signed on to the conspiracy, even if its co-conspirators did the heavy lifting, and remains liable for every penny, if liability is established.

### 3. END-PAYOR PLAINTIFFS.

This order now turns to the state law claims and the question of standing.

#### A. END-PAYOR PLAINTIFFS LACK STANDING OUTSIDE OF CALIFORNIA, NEW YORK, AND RHODE ISLAND.

The end-purchaser plaintiffs reside only in California, New York, and Rhode Island (not counting the new plaintiffs), yet they assert claims in nearly all fifty states, and the District of

Columbia and Puerto Rico.  Defendants contend the end-purchaser plaintiffs lack standing to assert claims in states where they do not reside (EPP Consolid. Amd. Compl. ¶¶ 19–21; Dkt. No. 80 at 4–6).  This order agrees.

Article III's "irreducible constitutional minimum of standing" to sue requires a plaintiff to have suffered: (1) an injury-in-fact; (2) that is fairly traceable to the defendant's conduct; and (3) is redressable by a favorable court decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "[A] plaintiff must demonstrate standing for each claim he seeks to press" and "separately for each form of relief sought."  Just because a suit "derive[s] from a common nucleus of operative fact" does not mean "federal jurisdiction extends to all claims sufficiently related to a claim within Article III to be part of the same case."  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 351–52 (2006).

At bottom, "the injury a plaintiff suffers defines the scope of the controversy he or she is entitled to litigate."  *Melendres v. Arpaio*, 784 F.3d 1254, 1261 (9th Cir. 2015).  Here, the injury alleged is the overcharge at each purchase of Glumetza (EPP Consolid. Amd. Compl. at ¶ 224(o)).  So, the scope of standing is limited to the locations of the purchases.  Though it appears clear end-purchaser plaintiffs purchased Glumetza in their states of residence, there are no allegations that they suffered overcharges anywhere else (EPP Consolid. Amd. Compl. ¶¶ 19–21).  Claims for relief under the laws of the several states are *separate* claims for relief and, per *DaimlerChrysler*, require separate proof of standing.  "Standing does not arise simply because illegality is in the air."  *In re Capacitors Antitrust Litigation*, 154 F. Supp. 3d 918, 927 (N.D. Cal. 2015) (Judge James Donato).  End-purchaser plaintiffs did not purchase, lack injury, and therefore lack standing in states other than California, New York, and Rhode Island.

Plaintiffs respond that this reasoning "conflates standing and class certification" and contravenes *Melendres*.  Not so.  There, plaintiffs all raised federal constitutional claims against the Maricopa County Sherriff's Department for conduct all within the District of Arizona.  The short distinction is that *Melendres* did not address the circumstance here, where plaintiffs raise claims under several jurisdictions where they were not harmed.  The legal distinction, though, is that the named plaintiffs in *Melendres* asserted the *same* constitutional injury as the class; they

just alleged different circumstances. But the dissimilarity of circumstances raised *within the same claim* was "relevant only to class certification, not to standing." So, the question whether the named plaintiffs — who defendants conceded had standing — could present the *same* claim "on behalf of others who ha[d] similar, but not identical, interests" was one of "typicality and adequacy." *See Melendres*, 784 F.3d 1257–58, 1261–62. Here, where plaintiffs raise *separate* claims under the laws of several states, the general requirement of standing for *each* claim and mode of relief articulated in *DaimlerChrysler* remains unsatisfied.

Plaintiffs remaining prudential arguments about the scope of discovery are unavailing because standing is a jurisdictional requirement.

## B. END-PAYOR PLAINTIFFS' STATE ANTITRUST CLAIMS ARE TIMELY.

As above, end-payor plaintiffs may proceed only under California, New York, and Rhode Island law. State substantive law applies, including to statutes of limitations. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 110 (1945).

California, New York, and Rhode Island impose four-year antitrust statutes of limitations. Cal. Bus. & Prof. Code §§ 16750.1; N.Y. Gen. Bus. Law § 340; R.I. Gen. Laws § 6-36-23. California permits antitrust recovery "for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period," and recognizes fraudulent concealment. *See Richards v. CH2M Hill*, 29 P.3d 175, 183, 186 (Cal. 2001); *Fuller v. First Franklin Fin. Corp.*, 216 Cal. App. 4th 955, 962 (2013); *Grisham v. Philip Morris U.S.A.*, 151 P.3d 1151, 1159 (Cal. 2007).

The New York Court of Appeals "has not determined if the continuing violations doctrine applies to claims brought under the Donnelly Act." *In re Pre-Filled Propane Tank Antitrust Litigation*, No. 14-02567-MD-W-GAF, 2019 WL 4796528 at *14 (W.D. Mo. 2019) (Judge Gary A. Fenner). But, New York's antitrust law "should generally be construed in light of Federal [antitrust] precedent and given a different interpretation only where State policy, differences in the statutory language[,] or the legislative history justify such a result." *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158, 161 (N.Y. 1994). Here, defendants point

to no distinctions in either the continuing violation or fraudulent concealment doctrines. Thus, the timeliness of end-payor plaintiffs' California and New York antitrust claims merges with the federal-claim analysis above.

The Rhode Island Antitrust Act also appears to contemplate continuing violations and tolling for fraudulent concealment. *See* R.I. Gen. Laws § 6-36-23. Regardless, the Rhode Island Supreme Court has explained that "the Rhode Island Antitrust Act must be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed." *ERI Max Entm't v. Streisand*, 690 A.2d 1351, 1353 (R.I. 1997) (quotation omitted).

Defendants contend Rhode Island law did not permit indirect purchaser antitrust claims until July 2013. Because the challenged conduct was in early 2012, and Rhode Island's new claim is not retroactive, plaintiffs' claims are barred (Dkt. No. 80 at 7).

Defendants are partially correct. According to the only case out of Rhode Island or the District of Rhode Island applying the new statute:

> [T]he [Rhode Island] General Assembly passed an <u>Illinois Brick</u>-repealer statute, effective July 15, 2013, which expressly conveys standing to indirect purchasers. R.I. Gen. Laws § 6-36-7(d). The . . . statute is presumed to apply only prospectively, absent evidence of legislative intent to the contrary. Therefore, the [end-payor plaintiffs'] recovery under the Rhode Island Antitrust Act is limited to damages incurred after July 15, 2013.

*In re Loestrin 24 FE Antitrust Litigation*, 410 F. Supp. 3d 352, 374 (D.R.I. 2019) (Judge William E. Smith) (citation and quotation omitted). But defendants apply this law too far. Rhode Island recognized the claim by 2013 and thus recognized plaintiffs' timely challenge to late 2015 Glumetza monopoly-sales and defendants' February 2016 conduct.

Plaintiffs contend that Rhode Island's new grant of indirect purchaser standing is merely a procedural rule which applies retroactively to permit end-purchasers to challenge the original 2012 conduct (Dkt. No. 118 at 5). While it is true the amendment does not impose new standards of conduct on defendants, it *redefines who was injured* by defendants' conduct. This order will not depart from *Loestrin* — Rhode Island's grant of end-purchaser standing is

prospective only.  Thus, the timeliness of end-payors' Rhode Island antitrust claim merges with the federal-claim analysis above, but with the caveat that no recovery will be permitted before July 15, 2013, when Rhode Island first recognized the indirect antitrust claim.

### C.  END-PAYOR PLAINTIFFS' OTHER STATE CLAIMS.

End-payor plaintiffs also raise state consumer protection and unjust enrichment claims. Defendants challenge the timeliness and plausibility of each.

#### (i)  California Claims.

End-payor plaintiffs invoke California Business and Professions Code § 17200 in both their antitrust and consumer protection claims, but the consumer protection arm fails because the complaint does not plausibly allege consumer reliance — the crux of the claim — on any deceptive conduct by defendants.  *See Kwikset v. Sup. Ct.*, 246 P.3d 877, 890 (Cal. 2011) ("would not have bought the product but for the misrepresentation").  The complaint admits that diabetic patients had little choice but to buy Glumetza, even with the existence of competing medications, because "Glumetza was . . . uniquely positioned in the market to offer patients with Type 2 diabetes an ability to reach their optimal dose of metformin with fewer GI side effects" (*see, e.g.*, EPP Consolid. Amd. Compl. at ¶¶ 90, 198).  So, while end-payors' § 17200 antitrust prong proceeds, the consumer protection prong fails.

But plaintiffs' unjust enrichment claim may proceed.  Defendants contend California does not recognize unjust enrichment as a distinct claim (Dkt. No. 118 at 23).  Yes, it does.  "When a plaintiff alleges unjust enrichment, a court may construe the cause of action as a quasi-contract claim seeking restitution."  *See Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 762 (9th Cir. 2015) (quotation omitted).

Unjust enrichment has a three-year statute of limitations.  Cal. Civ. Proc. Code § 338(d). This claim is timely as to conduct after August 29, 2016.  Absent binding precedent to the contrary, this order will apply the continuing violations doctrine to this claim.  Bausch did not market an authorized generic, and thus the scheme plausibly continued, until February 2017. For the reasons stated above, plaintiffs may recover for unjust enrichment upon Glumetza overcharges beginning on August 29, 2016.

20

California also recognizes fraudulent concealment. *Fuller v. First Franklin Fin. Corp.*, 216 Cal. App. 4th 955, 962 (2013); *Grisham v. Philip Morris U.S.A.*, 151 P.3d 1151, 1159 (Cal. 2007); *Cmm'ty Cause v. Boatwright*, 124 Cal. App. 3d 888, 900 (1981). But plaintiffs concede notice of the no-AG provision by February 2016, so the chain of concealment was broken (EPP Consolid. Amd. Compl. at ¶ 211). This doctrine does not permit earlier recovery.

### (ii)     New York Claims.

The consumer protection law has a three-year statute of limitations. *Morelli v. Weider Nutr. Grp.*, 275 A.D.2d 607, 608 (2000). And in New York, a continuing violation "may only be predicated on continuing unlawful acts and not on continuing effects of earlier unlawful conduct." *Selkirk v. State,* 249 A.D.2d 818, 825 (1998). But, as above, the continuing violation here is based upon defendants' *maintenance* of the precarious Glumetza monopoly, not the lingering effects of a final decision. On these grounds, plaintiffs' consumer protection claim remains timely as to overcharges since August 29, 2016. But, as above, because plaintiffs learned of the no-AG provision by February 2016, fraudulent concealment does not enable earlier recovery.

Moreover, the claim is plausibly alleged. Defendants contend the complaint does not allege any deceptive act or practice within the state of New York (Dkt. No. 80 at 10). New York's § 349 requires an "act or practice" that was "misleading in a material way." But "reliance is not an element" — a plaintiff need only show the "defendant's material deceptive act caused the injury." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000) (quotation omitted). Section 349 has continually been interpreted to cover antitrust violations. *See, e.g.*, *Loestrin*, 410 F. Supp. 3d at 378; *In re Effexor Antitrust Litigation*, 337 F. Supp. 3d 435, 466 (D.N.J. 2018) (Judge Peter G. Sheridan); *Macquarie Grp. v. Pac. Corp. Grp.*, No. C 08-02113-IEG-WMC, 2009 WL 539928 at *9 (S.D. Cal. Mar. 2, 2009) (Judge Irma E. Gonzalez); *New York v. Feldman*, 210 F. Supp. 2d 294, 300–02 (S.D.N.Y. 2002) (Judge Shira A. Scheindlin). And the allegation that one end-payor plaintiff is the largest grocery union in New York with 23,000 plan participants leads to the plausible conclusion that a substantial number of Glumetza

purchases "occur[ed] in New York." *See Goshen v. Mutual Life Ins. Co. of New York*, 774 N.E.2d 1190, 1195 (N.Y. 2002). Thus, plaintiffs' New York consumer protection claim stands.

But plaintiffs' unjust enrichment claim fails. Defendants correctly note New York's unjust enrichment claim requires that: (1) plaintiff conferred the benefit *directly* on defendant; and (2) plaintiff and defendant have a direct relationship (Dkt. No. 80 at 17, 19). In *Georgia Malone & Co. v. Rieder*, the New York Court of Appeals dismissed an unjust enrichment claim where the parties "simply had no dealings with each other" and did not have "any contact regarding the purchase transaction." 973 N.E.2d 743, 747 (N.Y. 2012). So too here. The end-payor plaintiffs, by definition, do not have direct relationships with defendants. Nor do they point to binding precedent tempering the requirement.

### *(iii)* *Rhode Island Claims.*

Plaintiffs' consumer protection claim fails. Defendants contend it fails because: (1) defendants caused no confusion or misunderstanding among consumers; (2) because the end-payor plaintiffs are not "purchasers of products for household or personal purposes" (Dkt. No. 80 at 11–12). Plaintiffs misapprehend the second argument, responding that end-payor plaintiffs are "persons" under Rhode Island's broad definition. R.I. Gen. Laws § 6-13.1-1 ("any other legal entity"). But defendants actually point to § 6-13.1-5.2, which limits the class of private plaintiffs to "[a]ny person who purchases . . . goods or services primarily for personal, family, or household purposes . . . ." Under the plain text, end-payor plaintiffs (not being human) were not using Glumetza for "personal, family, or household purposes" but rather to provide Glumetza to subsequent consumers. As plaintiffs fail to respond to this argument, their Rhode Island deceptive trade practices claim fails.

But plaintiffs' unjust enrichment claim survives. Defendants contend Rhode Island's unjust enrichment claim requires: (1) plaintiff to directly confer the benefit on defendant; and (2) defendant to appreciate the benefit (Dkt. Nos. 80 at 17; 146 at 12). Defendants cite no binding authority — and there appears to be none, at least since *Bailey v. West*, 249 A.2d 414, 417 (R.I. 1969) articulated the elements of quasi-contract — for their narrow view of the relationship between a plaintiff and defendant under Rhode Island unjust enrichment law.

22

Moreover, defendants' assertion that "EPPs do not allege an appreciation by the defendant of the benefit conferred" is perplexing (Dkt. No. 146 at 12). End-payor plaintiffs allege Assertio and Santarus (later Salix, then Bausch) surely appreciated the over one billion dollars in Glumetza sales by 2016 and Lupin surely appreciated the nearly three hundred million dollars in generic sales during the first six months of 2016 (EPP Consolid. Amd. Compl. at ¶ 140(h)–(i)). If, however, defendants' argument is that each sale of Glumetza was, alone, too small to "appreciat[e]," the undersigned looks forward to the jury's reaction. Last, defendants do not contest the timeliness of the Rhode Island unjust enrichment claim (Dkt. No. 80 at 20 fn. 4). The claim stands.

The final question is whether plaintiffs may recover for unjust enrichment before July 15, 2013, when Rhode Island first recognized the indirect antitrust claim. Defendants contend permitting such recovery would circumvent *Illinois Brick*'s holding absent explicit direction to do so (Dkt. No. 146 at 9). This argument is an abbreviated preemption analysis. If defendants wish to argue the Sherman Act so preempts state common law, they may do so. But on the arguments presented, this order will not dismiss the Rhode Island unjust enrichment claim before July 15, 2013.

### 4. RETAILER PLAINTIFFS.

#### A. RETAILER PLAINTIFFS' OWN SHERMAN ACT CLAIMS FAIL.

Defendants challenge retailer plaintiffs' standing to sue on their own behalf under *Illinois Brick*, which bars federal antitrust damages claims by indirect purchasers. *See In re ATM Fee Antitrust Litigation*, 686 F.3d 741, 748 (9th Cir. 2012). Retailer plaintiffs respond, and defendants do not contest, that *Illinois Brick* does not bar indirect purchasers' claims for injunctive relief (Dkt. No. 119 at 14–15). *See In re NFL's Sunday Ticket Antitrust Litigation*, 933 F.3d 1136, 1156 fn. 6 (9th Cir. 2019) (citing *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998) (Judge Wallace Tashima, concurring)). Retailer plaintiffs also contend in their brief that certain of them *did* directly purchase Glumetza or generic Glumetza from defendants (Dkt. No. 119 at 14–15). But retailers' complaints neither allege direct purchase nor pray for injunctive relief. To the extent

retailer plaintiffs seek relief *on their own behalf* under the Sherman Act, these claims are either barred or not alleged.

## B. THE PARTIAL ASSIGNMENTS DO NOT YET WARRANT INTERVENTION OR JOINDER.

Retailer plaintiffs sue as assignees of various direct purchasers, including McKesson Corporation (CVS Compl. at ¶¶ 19–20; Walgreen Compl. at ¶¶ 19–22). Another assignee of McKesson, KPH Healthcare, is currently part of the putative direct-purchaser plaintiff class (Consolid. Amd. Compl. at ¶ 16). Defendants contend these split claims raise the specter of a "multiplicity of suits" and "duplicative recovery" and request dismissal or stay of the separate retailer complaints (Dkt. Nos. 98 at 8–10, 145 at 13).

Defendants do not challenge retailer plaintiffs' rights to opt-out of the direct-purchaser class, rather they argue Rule 19 requires partial claim assignments to be raised in the assignor's complaint (Dkt. No. 145 at 11). They rely on *In re Fine Paper Litigation State of Washington* and *Bailey Lumber & Supply Co. v. Georgia-Pacific Corporation*, where the United States Court of Appeals for the Third Circuit and District Court for the Southern District of Mississippi (respectively) expressed concern that split partial claims would undermine the certainty of judgment or settlement, contravening Rule 19. *See* 632 F.2d 1081, 1091 (3rd Cir. 1980); No. C 08-01394 LG-JMR, 2009 WL 2872307, *6–7 (S.D. Miss. Aug. 10, 2009) (Judge Louis Guirola, Jr.).

The circumstances here have already been persuasively addressed in this District:

> *Bailey Lumber* and *Fine Paper* stand for the principle that antitrust plaintiffs with partially assigned claims may not opt [out] of a class due to concerns that they will circumvent joinder rules or interfere with the rights of the defendant to be free of excessive and repeated suits growing out of same basic facts. They do not stand for the proposition that partially assigned claims must be dismissed or stayed in actions such as this, where there is no "prior history" of litigation of these claims in a different court.

*United Food & Comm. Workers Local 1776 & Part. Empls. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, No. MD 14-02521 WHO, 2015 WL 4397396, at *6–7 (N.D. Cal. July 17, 2015) (Judge William H. Orrick). Indeed, as Judge Orrick noted in *United Food*, both *Fine Paper* and *Bailey Lumber* addressed the scenario where classes had already been certified. And

24

in *Bailey Lumber*, the plaintiff *had* filed a new case in a new venue. *See ibid.*; *Fine Paper*, 632 F.2d at 1091; *Bailey Lumber*, 2009 WL 2872307 at *1.

Defendants' concerns are not ripe. As to defendants' complaint of the uncertainty from multiple suits — regardless of whether some partial assignees filed as direct-purchaser or retailer plaintiffs, all suits arising out of the challenged conduct are consolidated here. This order will not speculate about whether other complaints may be filed elsewhere. And as to defendants' fears of duplicative recovery, the Court is confident that the high-end lawyers in this case, following discovery, will obtain all the information necessary to ensure damages are tailored to each partial assignment. Again, this order will not speculate about harm that has not yet, and may never, occur.

## CONCLUSION

At the pleading stage, plaintiffs' antitrust claims are timely and they may recover on Glumetza sales by any defendant beginning from the date when Lupin otherwise would have entered the market.

But, end-payor plaintiffs lack standing to pursue claims anywhere but California, New York, and Rhode Island. Their consumer protection claims fail in California and Rhode Island, but may proceed under New York law. And their unjust enrichment claims fail in New York, but may proceed under California and Rhode Island law. End-payors' claims raised under the laws of other states or territories are dismissed.

Then, to the extent retailer plaintiffs seek to sue under the Sherman Act on their *own* behalf, these claims are dismissed as not plead. But, at this stage, retailer plaintiffs' separate complaints will not be dismissed as improper partial-claim assignments.

Given the substantial time plaintiffs have had to amend and coordinate complaints since these cases were first filed, leave to further amend will not lightly be granted. Nevertheless, should plaintiffs wish to seek leave to file further amended complaints, they may do so by **MARCH 26 AT NOON**. Any such motions must include as an exhibit a redlined version of the proposed amendment that clearly identifies all changes from the amended complaint. This order highlighted certain deficiencies in the consolidated, amended complaints, but it will not

necessarily be enough to add sentences parroting each missing item identified herein. If plaintiffs move for leave to file yet more consolidated amended complaints, they should be sure to plead their best case and consider all criticisms made by defendants, including those not reached by this order.

This order does not address the two latest complaints, Nos. C 20-01196 WHA and C 20-01198 WHA. Defendants may move to dismiss these two complaints by **MARCH 26 AT NOON** in a single, consolidated motion — addressing only issues not resolved herein — no longer than **15 PAGES**. Plaintiffs may respond in a single brief no more than **15 PAGES** by **APRIL 2 AT NOON**. Defendants may reply in a single brief no more than **5 PAGES** by **APRIL 9 AT NOON**. A hearing will take place on **APRIL 16 AT 8:00 A.M.**

**IT IS SO ORDERED.**

Dated:  March 5, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE