UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

|  |  |
|---|---|
| *In re Glumetza Antitrust Litigation* | Case No.  19-cv-05822-WHA   (RMI) |
|  | **ORDER ON JOINT DISCOVERY LETTER BRIEFS** |
| *This document relates to all actions* | Re: Dkt. Nos. 285, 286, 287 |

In early April of 2020, Judge Alsup referred these consolidated cases to the undersigned for the resolution of any discovery disputes with the caveat that "[t]he deadline for bringing all discovery motions or extension motions based on discovery violations will be 45 calendar days prior to the fact discovery cutoff . . ." *See* Order of April 10, 2020 (dkt. 229) at 1. Under the previously established schedule, the parties' discovery motions were due to be filed by June 2, 2020. *See* Case Mgmt. Order No. 2 (dkt. 71) at 3. However, by order of the court, this deadline was extended to June 16, 2020. *See* Order of June 3, 2020 (dkt. 271) at 6.

Now pending before the court are three jointly filed letter briefs – all filed on June 16, 2020 – setting forth a number of discovery disputes. The first of which ("Ltr. Br. #1") (dkt. 285) sets forth discovery disputes between the direct purchaser class Plaintiffs and retailer Plaintiffs (collectively referred to herein as the "Purchasers," or Plaintiffs), and Defendants Lupin Pharmaceuticals, Inc., and Lupin Ltd. (collectively, "Lupin"). The second ("Ltr. Br. #2") (dkt. 286), pertaining to a number of subpoenas, sets forth disputes between Lupin and nonparties Cardinal Health, Inc. ("Cardinal"), AmerisourceBergen Drug Company ("ABDC"), and McKesson Corporation ("McKesson") – the nonparties shall hereafter be collectively referred to

United States District Court
Northern District of California

as the "Wholesalers." The third ("Ltr. Br. #3") (dkt. 287) sets forth a number of discovery disputes between Purchasers and Defendants Bausch Health Companies, Inc., Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc., and Santarus, Inc. (collectively, "Bausch").

## **INTRODUCTION**

This antitrust case arose following a settlement agreement that resolved certain patent litigation between Defendants. In essence, Plaintiffs contend that the patent litigation was settled pursuant to an agreement in which Lupin agreed to delay the launch of its generic version of the diabetes medication known as Glumetza, while the patent-holder, Depomed, Inc. (now known as Assertio Therapeutics), and its licensee, Santarus, Inc. (now known as Bausch), agreed not to launch an authorized generic ("AG") until one year after the launch of Lupin's generic (the no-AG agreement). *See* Ltr. Br. #3 (dkt. 287) at 1. In bringing this case, Plaintiffs contend that in accordance with that agreement, Lupin refrained from launching its generic until February of 2016, and Bausch did not launch an AG until February of 2017. *Id*. The upshot of which is that Plaintiffs contend that the no-AG agreement was a payment intended to avoid the risks of competition, in violation of the Sherman Act; and, that without the no-AG agreement, Lupin or another company would have launched generic Glumetza prior to February of 2016, while Bausch would have launched an AG at that time. *Id*. Also, it should not go without mention that not every agreement resolving patent litigation between brand-name and generic manufacturers produces the anti-competitive effects the Sherman Act sought to address; rather, only settlement agreements that have "genuine adverse effects on competition" are seen as giving rise to antitrust remedies. *See e.g.*, *In re Zetia Ezetimibe Antitrust Litig.*, No. 2:18-md-2836, 2019 U.S. Dist. LEXIS 59469, at *41 (E.D. Va. Feb. 6, 2019) (citing *FTC v. Actavis, Inc.*, 570 U.S. 136, 154 (2013) ("The payment in effect amounts to a purchase by the patentee of the exclusive right to sell its product, a right it already claims but would lose if the patent litigation were to continue and the patent were held invalid or not infringed by the generic product.")).

## **LETTER BRIEF #1**

The discovery disputes presented in this document are between the Purchasers and Lupin, and fall into three categories: (1) the Purchasers contend, in somewhat general terms, that Lupin

United States District Court
Northern District of California

1    has impeded discovery by improperly asserting privilege where none exists (*see* Ltr. Br. #1 (dkt.

2    285) at 1-4); (2) the Purchasers also take issue with Lupin's responses to four requests for

3    production, RFP Nos. 19, 33, 77, and 78 (*see id*. at 4-5); and, (3) the Purchasers seek an order

4    providing for a 5-hour deposition of Nilesh Gupta, the managing director of Lupin, Ltd. (*see id*. at

5    5-7).

6    ***Issue-1: Lupin's Subject Matter Privilege Waiver***

7          The Purchasers first contend that Lupin rendered a broad subject matter waiver of privilege

8    as to its decision to settle the patent litigation; accordingly, the Purchasers "request an order that

9    Lupin produce all documents regarding the strength[s] and weakness[es] of its patent case, its

10   motivations to settle the patent litigation, its decision to settle the patent litigation, and its decision

11   to offer or accept certain settlement terms." *Id*. at 1-2. By way of example, pointing to Lupin's

12   response to an interrogatory (No. 6), the Purchasers note that Lupin has contended that its fastest

13   path to introducing its generic drug into the marketplace was to settle the infringement lawsuit. *Id*.

14   at 2. The Purchasers add that "Lupin waived the privilege and produced what it views as favorable

15   documents, including communications with its counsel on the merits and settlement of the patent

16   litigation," while refusing to produce purportedly unfavorable documents on the same subjects. *Id*.

17   In short, the Purchasers contend that because Lupin has put its motivations to settle the

18   infringement case at issue in the instant antitrust case, "Lupin must produce *all* documents relating

19   to the underlying [patent] litigation and its eventual settlement with Assertio – not just the ones

20   that serve its narrative now." *Id*. The Purchasers have identified more than 1000 documents that

21   are listed in a 65-page chart (*see* Purchasers' Admin. Mot. to Seal, Exh. A (dkt. 288-3

22   *SEALED*) at 2-66) – most, or all, of which appear to describe email correspondence between

23   Lupin and its counsel in the patent litigation. Further, in an effort to "assist the Court with

24   analyzing the dispute," the Purchasers have identified a sampling of 50 of these documents which

25   are similarly described in a 4-page chart (*see id*., Exh. B (dkt. 288-4) at 2-5). At bottom, the

26   Purchasers seek an order compelling Lupin (and its non-party counsel in the underlying patent

27

28

United States District Court
Northern District of California

litigation)[1] to produce all documents that discuss: (1) the likely outcome of the underlying patent litigation; (2) whether Lupin's "at risk"[2] launch would constitute willing infringement; (3) whether Lupin had a legal path to market before June of 2020; (4) whether Lupin's agreement to launch after 2012 was a delay; and, (5) the terms of the settlement agreement (including the no-AG provision).[3] *See* Ltr. Br. #1 (dkt. 285) at 2-3. In the alternative, the Purchasers request a court order directing Lupin to produce the 50 documents identified in the 4-page chart (Exh. B (dkt. 288-4) at 2-5), as well as any duplicates or near-duplicates of those documents. Ltr. Br. #1 (dkt. 285) at 3.

By way of response, Lupin notes that it has tried to produce all documents within the scope of the waiver; that is, such documents that "reflect its subjective views of the merits of the patent litigation leading up to the settlement." *Id*. at 7. However, Lupin contends that it should not be made to produce documents that do not fall within the scope of the waiver, such as documents pertaining to RMMS's advice about the specific terms of the settlement with Depomed because

---

[1] In the underlying patent litigation – *Depomed v. Lupin Pharm., Inc. et al.*, Case No. 4:09-cv-5587-PJH – Lupin was represented by the law firm of Rakoczy, Molino, Mazzochi & Swiwik LLP ("RMMS"). RMMS is not a party to the instant antitrust action. Several months ago, counsel for Lupin and RMMS filed a letter brief presenting a discovery dispute in which Lupin and non-party RMMS sought to modify a subpoena served by Plaintiffs on RMMS seeking (in part) all documents concerning the negotiation or approval of the settlement agreement in the patent case. *See* Ltr. Br. of April 4, 2020 (dkt. 228) at 2-3. Shortly thereafter, counsel for Lupin submitted a second letter brief in which it was noted that "after a meet-and-confer, the parties have resolved the pending dispute raised in RMMS's motion to modify the subpoena served by Plaintiffs on RMMS . . . [and] [t]his resolution applies to all Plaintiffs, including the Direct Purchaser Class Plaintiffs and Retailer Plaintiffs . . . [and] there is no longer a pending dispute." Ltr. Br. of April 24, 2020 (dkt. 237) at 1. In the period following this filing, the Purchasers made no objection or contrary representation. Thus, in light of the fact that the current letter brief essentially presents a motion brought by the Purchasers to compel Lupin to produce certain documents; and given that RMMS is not a party to this litigation; and given that it was represented that the Purchasers "resolved" their dispute with RMMS over this issue several months ago – any order issued on the Purchasers' motion to compel in this regard would only be addressed to Lupin, not to RMMS.

[2] When a drug maker launches a generic drug before a final court decision in underlying patent litigation, such a launch is characterized as being "at risk," and "the concept requires reference to the status and strength of the patent litigation and necessarily implicates legal advice." *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2016 U.S. Dist. LEXIS 105619, at *90 (N.D. Cal. Aug. 9, 2016) (citing *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1330 (Fed. Cir. 2015)).

[3] An agreement by a branded drug company not to launch an authorized generic drug is a sometimes convenient method for branded drug firms to pay generic patent challengers to delay their entry into the market. *See e.g.*, https://www.ftc.gov/sites/default/files/documents/amicus_briefs/re-effexor-xr-antitrust-litigation/120810effexoramicusbrief.pdf

4

"[o]nce Lupin had decided to settle, further privileged communications about the exact terms of the settlement are no longer relevant to Lupin's subjective views of the of the merits of the case." *Id*. at 8. Lupin's waiver of the attorney-client privilege was originally communicated to Plaintiffs along with its January 31, 2020, production of documents. *See* Letter Br. of April 9, 2020 (dkt. 228) at 2. In this regard, Lupin has maintained that "if an otherwise privileged document concerned the likelihood of winning litigation based on validity or infringement, regardless of whether it came before settlement negotiations *or during the pendency of negotiations*, we agreed to produce that document." *Id*. (emphasis added). Further, Lupin has explained the necessity of rendering its waiver of the attorney-client privilege as being due the fact that "Plaintiffs have trumpeted the theory that Lupin was destined to win the patent litigation, meaning that any agreement to launch after 2012 was a 'delay.'" *Id*. at 1. In order to counter this theory, Lupin claims that it waived the attorney-client privilege in order to use "documents [that] prove Lupin, in fact, launched years earlier *because of the settlement agreement*." *Id*. at 1 (emphases added and omitted).

Also, it should not go without mention that the parties have coupled the fact that they waited until the very last minute to present their discovery disputes with the fact that they each accuse the other of either failing to adequately meet and confer, or of even having properly reviewed the productions or correspondence of the opposing party. The Purchasers claim that they advised Lupin, as early as April of 2020, of their view that Lupin had improperly asserted privilege as to the more than 1000 documents identified in the 65-page chart mentioned above, and that "[w]hile Lupin claims it has re-reviewed these documents and produced some, Lupin has entered two meet and confer[] [sessions] inadequately prepared" to discuss the issues. *See* Ltr. Br. #1 (dkt. 285) at 2. In this regard, Lupin noted that it "is still reviewing Plaintiffs' challenges to more than 19,400 of Lupin's privilege assertions and will provide responses as soon as it is practicable." *Id*. at 8. Adding that Lupin's request of June 11, 2020, asking the Purchasers to identify specific documents that they intended to reference in Letter Br. #1, was rejected and that, instead, the Purchasers' "improper attempt to obtain relief by way of ambush" resulted in Lupin receiving the eight exhibits to Ltr. Br. #1 at 1:24 a.m. on June 16th. *See id*. Consequently, Lupin

1    contends that it was unable to substantively respond with respect to the particular documents

2    identified in either of the charts in the Purchasers' exhibits. *Id*. This degree of unproductive

3    bickering is always disappointing, let alone when it occurs in the context of last minute filings –

4    the undersigned will simply note that a substantially greater degree of collegiality and

5    professionalism is expected from counsel appearing in this court.

6           Substantively, Lupin contends that the Purchasers reliance on Judge Orrick's opinion in the

7    *Lidoderm* litigation is misplaced. *Id*.[4] Lupin submits that the holding in *Lidoderm* is unpersuasive

8    in the present context because that case involved the finding of "an implied waiver because a

9    defendant tried to rely on its subjective beliefs about the merits of prior patent litigation without

10   any affirmative waiver . . . [whereas] [h]ere, Lupin effected its affirmative [w]aiver for that very

11   reason: to provide Plaintiff with evidence of Lupin's contemporaneous subjective beliefs about the

12   merits of the patent litigation." Ltr. Br. #1 (dkt. 285) at 8. For the following reasons, Lupin's

13   position in this regard is meritless.

14          At the heart of the complaints in this antitrust case are the allegations that a particular

15   provision involved in the settlement of the underlying *Depomed* patent litigation constituted a

16   "continuing anticompetitive scheme" wherein "[t]he defendants repeatedly made public reference

17   to Lupin's agreement to delay [its] entry [into the market] until February 2016, but consistently,

18   consciously, and actively omitted the fact that Lupin had agreed to that delayed date in exchange

19   for a no-AG payment." *See* Consol. Class Action Am. Compl. (dkt. 53) at 57-58; *see also*

20   Walgreen's Am. Compl. (dkt. 202) at 48-49; *see also* CVS and Rite Aid's Am. Compl. (dkt. 203)

21   at 47-48; *see also* First Am. Consol. Class Action Compl. (dkt. 226) at 59-62. In short, the

22   Purchasers have alleged that the no-AG payment that is said to have induced Lupin's delay into

23   the market was initially hidden within redacted portions of the settlement agreement that resolved

24

25   [4] *See Lidoderm*, 2016 U.S. Dist. LEXIS 105619, at *36 ("Attorney-client privilege issues lie at the heart of

26   litigation over a settlement alleged to be anticompetitive when a party's lawyers are the principal
     negotiators and advisors regarding the agreement. That party cannot testify to its subjective beliefs about

27   the reasons for entering into the settlement and preclude its adversaries from discovering the content of the
     lawyers' advice by simply asserting that the attorney-client advice was irrelevant to those subjective

28   beliefs. Instead, when the record shows that attorney-client advice played a significant role in formulating a
     party's subjective beliefs on central issues in the case, the adversaries are entitled to disclosure of the
     otherwise privileged material to test the credibility of those subjective beliefs.").

United States District Court
Northern District of California

the *Depomed* litigation. *See e.g.,* Consol. Class Action Am. Compl. (dkt. 53) at 58; *see also* First Am. Consol. Class Action Compl. (dkt. 226) at 60. To couch the matter in Lupin's own words, Lupin's express waiver of the attorney-client privilege – pertaining to the advice it received in the *Depomed* litigation – was rendered so as to make use of otherwise privileged documents because "[t]hese documents prove that Lupin, in fact, launched years earlier because of the [*Depomed*] settlement agreement." Ltr. Br. of April 9, 2020 (dkt. 228) at 1 (emphasis removed). Accordingly, the undersigned agrees with the Purchasers that Lupin is splitting hairs and is indeed attempting to rely on the attorney-client privilege as both a sword and a shield. On one hand, Lupin claims to have expressly waived the privilege *only* as to such documents that "reflect its subjective views of the merits of the patent litigation *leading up to the settlement*." Ltr. Br. #1 (dkt. 228) at 7. It appears to the undersigned that Lupin's attempt to use the attorney-client privilege as both a sword and a shield is reliant on the obfuscation of the very clear line between two things – a decision to *seek* a settlement, versus a decision to *effect* a settlement – which are not the same. That is, Lupin's "subjective views of the merits of the patent litigation leading up to the settlement," would necessarily include the settlement negotiations themselves, up to and including the day that the final version of that agreement was signed and executed by Lupin. On the other hand, there is Lupin's contradictory contention that it should not be made to produce documents pertaining to RMMS's advice about the specific terms of the settlement with Depomed because "[o]nce Lupin had decided to settle, further privileged communications about the exact terms of the settlement are no longer relevant to Lupin's subjective views of the of the merits of the case." *Id.* at 8. Therein lies the obfuscation – it cannot be said that "Lupin had decided to settle," until *after* it had communicated with RMMS about "the exact terms of the settlement."

Thus, because it is within the parameters of the express waiver already rendered by Lupin – or at the very least because it is a necessarily implied component of Lupin's expressed desire to rely on its subjective intent in accepting the settlement terms that were ultimately effected in *Depomed* – the Purchasers' motion to compel in this regard is **GRANTED**, and, unless Lupin wishes to be precluded from relying on its subjective beliefs regarding the *Depomed* settlement, Lupin shall forthwith produce all documents that discuss: (1) the likely outcome of the underlying

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    patent litigation; (2) whether Lupin's at-risk launch would constitute willing infringement; (3)

2    whether Lupin had a legal path to market before June of 2020; (4) whether Lupin's agreement to

3    launch after 2012 was a delay; and, (5) the terms of the settlement agreement (including the no-

4    AG provision).

5    ***Issue-2: Lupin's Assertions of Privilege for Purportedly Non-Privileged Documents***

6           The Purchasers contend that Lupin's privilege log also contains other improper assertions

7    of privilege. *See id.* at 3-4. As described in greater detail below, once again – but to an even

8    greater extent – the animus between counsel for the parties has prevented this court's meet and

9    confer requirement from even having a chance at functioning to narrow or eliminate disputed

10   issues. The Purchasers claim that these other perceived deficiencies in Lupin's privilege logs were

11   brought to Lupin's attention in May of 2020 by way of correspondence to which "Lupin never

12   responded." *Id.* at 3. The Purchasers then add that while "Lupin [] agreed to meet and confer in

13   advance of filing this letter brief, [it] refused to discuss these issues in any detail." *Id.* Thus,

14   according to the Purchasers, "[b]ecause Lupin failed to confer in good faith, the contested log

15   entries are voluminous," therefore, the Purchasers seek "a general ruling" on a number of

16   "privilege principles." *Id.* Specifically, the Purchasers request that the undersigned render general

17   rulings to the following effect: (1) that communications where in-house counsel is not providing

18   legal advice are not privileged; (2) that internal drafts of documents "intended to be [later] made

19   public" are not privileged; (3) that the court should enter "an order compelling Lupin to produce

20   routine business documents, even if Lupin's business personnel forwarded them in bulk to

21   counsel"; (4) that documents sent to or received from third parties are not privileged by virtue of

22   being "forwarded to counsel in a bulk email"; and, (5) that the court should find that "[o]perating

23   within a regulated industry does not give Lupin *carte blanche* to assert privilege where none

24   exists." *Id.* at 3-4.

25          Lupin responds that Plaintiff's five generalized objections, pertaining to more than 19,400

26   items, were not articulated "until mere hours before this letter was due," thus, Lupin contends that

27   Plaintiff's "ambush" has operated to render it "unable to address the volume of documents

28   Plaintiffs challenge in the abbreviated timeframe in which Plaintiffs seek to engage." *Id.* at 8, n.32.

1    Then, in a series of brief and equally generalized responses, Lupin asserts: (1) that it has only

2    asserted privilege over in-house communications that were legal in nature; (2) that documents

3    such as draft declarations by employees or experts that were prepared by its litigation counsel are

4    in fact covered by the attorney-client and work-product privileges, and that "iterative drafts

5    reflecting attorney mental impressions are still privileged"; (3) that Lupin categorically disagrees

6    with what the Purchasers refer to as "routine business documents"; (4) that the 808 examples,

7    highlighted in the Purchasers' May 13th letter, "appear overwhelmingly to be attachments to

8    emails between Lupin and its counsel, which are unambiguously privileged"; and, (5) that

9    documents containing legal advice regarding regulatory issues are properly withheld as privileged.

10   *Id.* at 8-9.

11       The undersigned finds that these disputes are not amenable to resolution in this fashion.

12   First, both sides have spoken only in such general terms that the undersigned is unable to

13   determine with any degree of certainty the exact nature of any of these 5 categories of dispute –

14   nor is the undersigned willing to render such generalized rulings as requested by the Purchasers.

15   Second, the Purchasers contend that Lupin has ignored their correspondence and stonewalled the

16   meet and confer process, while at the same time Lupin contends that the Purchasers have

17   concealed the substance of the dispute until the very last minute such as to "attempt to obtain relief

18   by way of ambush." Because each side has pointed at the other's lack of good faith in the meet and

19   confer process, the parties should be reminded that "[t]he Court will not entertain a request or a

20   motion to resolve a disclosure or discovery dispute unless, pursuant to Fed. R. Civ. P. 37, counsel

21   have previously conferred for the purpose of attempting to resolve all disputed issues." Civ. L.R.

22   37-1(a). In this regard, it is incumbent on counsel for the parties "to communicate directly and

23   discuss in good faith the issue(s) required under the particular Rule or order . . . The mere sending

24   of a written, electronic, or voice-mail communication, [] does not satisfy a requirement . . .

25   [instead] this requirement can be satisfied only through direct dialogue and discussion – either in a

26   face to face meeting or in a telephone conversation." Civ. L.R. 1-5(n). This requirement is not a

27   meaningless formality, nor is it optional; instead, the purpose of a meet and confer requirement is

28   for the parties to engage in a meaningful dialogue about their respective positions on disputed

United States District Court
Northern District of California

9

issues to see whether they can resolve (or at least refine) the disputes without court intervention, saving time and money for the litigants as well as the court system. *See Fireman's Fund Ins. Co. v. Hartford Fire Ins. Co.*, 2013 U.S. Dist. LEXIS 147020, at *9 (N.D. Cal. Sep. 30, 2013) ("The purpose of the meet and confer requirement is to ensure that the particular relief requested in a motion, in fact, requires judicial intervention.") *see also Wong v. Astrue*, 2008 U.S. Dist. LEXIS 111133, 2008 WL 4167507, at *2 (N.D. Cal. 2008) ("The purpose of the [meet and confer] requirement is to encourage settlement, resolve disputes which need not involve the Court, and avoid unnecessary litigation, thus saving the parties', the Court's, and the taxpayers' limited time, money, and resources."); *California v. Iipay Nation of Santa Ysabel*, 2015 U.S. Dist. LEXIS 67415, 2015 WL 2449527, at *6 (S.D. Cal. May 22, 2015) ("A purpose of a meet and confer requirement is to resolve issues without the need for further action."); *Eusse v. Vitela*, Case No.: 3:13-cv-00916-BEN-NLS, 2015 U.S. Dist. LEXIS 167660, 2015 WL 9008634, at *3 (S.D. Cal. Dec. 14, 2015) ("This process, when successful, 'obviates the need for unnecessary motion practice, which, in turn, conserves both the Court's and the parties' resources.'") (internal citation omitted). Thus, in order to effectuate this purpose, "parties must 'treat the informal negotiation process as a substitute for, and not simply a formal prerequisite to, judicial review of discovery disputes.'" *U-Haul Co. of Nevada v. Gregory J. Kamer, Ltd.*, 2013 U.S. Dist. LEXIS 132795, 2013 WL 5278523, at *2 (D. Nev. Sept. 17, 2013) (internal citation omitted).

In this case, as in all cases, the court expects to be able to rely on the candor, the learning, and the industry of counsel who appear in this court in order to facilitate and simplify the decision-making process. However, because the parties' disputes as to the five categories of complaints articulated by the Purchasers, enumerated above, are indeterminate and disorganized, and because each side accuses the other of failing to meet and confer in good faith, it is clear that both sides treated the meet-and-confer requirement as a mere formality and little more than a prerequisite to dumping an unrefined and undeveloped series of difficult-to-comprehend disputes on the court's doorstep. Accordingly, counsel for the Purchasers and Lupin are **ORDERED** to immediately meet and confer in a *meaningful* fashion, putting forth a good faith effort to resolve, or at least to substantially refine, these issues. Thereafter, if any issues remain in dispute such that court

United States District Court
Northern District of California

1   intervention continues to be necessary, the Parties are **ORDERED** to present those issues not later

2   than 12:00 noon on Monday, July 6, 2020, in a jointly filed letter brief (not to exceed two pages

3   per side, or four pages total) wherein both sides are to present clear and cogent arguments relating

4   to clearly identifiable documents or information such that the parties are not arguing at cross

5   purposes or in such abstract and generalized terms as is currently the case. If the parties are

6   successful in resolving these five categories of dispute, they shall promptly file a notice to that

7   effect; and, in the meantime, any ruling in this regard is **DEFERRED**.

8   ***Issue-3: Disputes Regarding Lupin's Responses to RFP Nos. 19, 33, 77, and 78***

9       The Purchasers characterize the documents that are responsive to RFP Nos. 19 and 33, as

10  "promised but missing productions." Ltr. Br. #1 (dkt. 228) at 4. Through RFP No. 33, the

11  Purchasers seek documents concerning "Lupin's ability to manufacture, market and distribute

12  generic Glumetza earlier than it did." *Id*. Adding that Lupin promised to produce responsive

13  documents from its facility in Goa, India by May 20, 2020, the Purchasers maintain that a batch of

14  documents received only on June 15, 2020, "remains woefully deficient." *Id*. As to RFP No. 19,

15  the Purchasers maintain Lupin had agreed, as early as January of 2020, to produce corporate

16  meeting minutes and summaries concerning the patents, the patent litigation, and the settlement

17  agreement at issue, but that these documents, likewise, remain outstanding. *Id*. at 4-5. The

18  Purchasers add that while they "are sympathetic to disruptions caused by COVID-19, they cannot

19  simply forgo this discovery while Lupin reserves the right to press its related defense, and time in

20  the discovery schedule is running out." *Id*. at 5 n.22. Thus, the Purchasers seek an order requiring

21  the above-described production within five business days or, alternatively, an order barring Lupin

22  from claiming that it was unable to manufacture and distribute generic Glumetza earlier than it

23  did. *Id*. at 5.

24      Lupin's responses once again reveal that the parties are arguing at cross purposes, and that

25  the resolution of these disputes has been rendered unnecessarily convoluted due to the parties'

26  failure to engage each other in good faith during the meet and confer process. As to RFP No. 19,

27  "Lupin considers this issue resolved," because "[o]n June 15, Lupin informed Plaintiffs that Lupin

28  personnel will collect and scan the Board minutes to counsel this week, who will then review and

United States District Court
Northern District of California

1  produce any responsive non-privileged documents by the end of next week." *Id*. at 10.

2  Accordingly, based on that representation, the Purchasers motion to compel materials responsive

3  to RFP No. 19 is **DENIED as MOOT**. Regarding documents that are responsive to RFP No. 33,

4  Lupin asserts that its attempts to complete this batch of production have been frustrated by the fact

5  that "Lupin Ltd. stores hard-copy documents responsive to RFP No. 33 in filing cabinets in Goa,

6  India . . . [and that] [i]t was impossible for Lupin to produce those documents before now because

7  Goa was subject to a strict lockdown." *Id*. at 9-10 n.39.  Lupin adds that "[a]s the lockdown was

8  slowly lifting, Lupin was finally able to gain access to these documents . . . [and] [o]n June 15,

9  Lupin produced responsive documents sufficient to show the agreed upon information from its

10  Goa offices . . . [but,] [w]ithout even reviewing the produced documents, Plaintiffs told Lupin

11  hours after receiving Lupin's production that it was not sufficient." *Id*. at 9-10.

12       It is unclear why Lupin believes that the Purchasers never reviewed the documents which

13  they contended were insufficient. *See id*. at 9-10. It is equally unclear why the Purchasers maintain

14  that whatever Lupin did produce "remains woefully deficient." *See id*. at 4-5. Because the parties

15  are once again arguing at cross purposes, speaking in generalities, and because they seem more

16  interested in launching attacks against one another than going about the unified task of

17  cooperatively framing the parameters of discrete disputes that might lend themselves to judicial

18  resolution, the undersigned finds – again – that the parties have prematurely brought an unripe and

19  unrefined dispute into court without having first engaged in a *meaningful* process of meeting and

20  conferring as required by the rules of this court.

21       Accordingly, as was the case with *Issue-2*, counsel for the Purchasers and Lupin are

22  **ORDERED** to immediately meet and confer in a meaningful fashion, putting forth a good faith

23  effort to resolve or refine their dispute as to the document production relating to RFP No. 33.

24  Thereafter, if any issues remain in dispute such that court intervention continues to be necessary,

25  the Parties are **ORDERED** to present those issues no later than 12:00 noon on Monday, July 6,

26  2020, in a jointly filed letter brief (not to exceed two pages per side, or four pages total) wherein

27  both sides are to present clear and cogent arguments relating to clearly identifiable documents or

28  information such that the parties are not arguing at cross purposes or in such abstract and

1    generalized terms as is currently the case. If the parties are successful in resolving this dispute,

2    they shall promptly file a notice to that effect. In the meantime, any ruling relating to the parties'

3    dispute pertaining to RFP No. 33 is **DEFERRED**.

4         Regarding RFP Nos. 77 and 78, the Purchasers seek documents and information related to

5    Lupin's readiness, willingness and ability to launch a generic version of a different anti-diabetic

6    medication that is not involved in the instant case. *Id*. at 5. The Purchasers submit that Lupin

7    introduced its generic Fortamet product, at-risk, a number of months before the *Depomed*

8    settlement was effected and Lupin agreed to forgo its launch of generic Glumetza. *Id*. While the

9    relevance of Lupin's launch of generic Fortamet is not immediately apparent, the Purchasers argue

10   that "Lupin's history of launching products at-risk is highly relevant because, *inter alia*, it speaks

11   to whether Lupin would have launched generic Glumetza at-risk absent the challenged pay-for-

12   delay agreement and, like Glumetza, Fortamet was an important product for which Lupin had first-

13   to-file exclusivity." *Id*. The Purchasers add that "Lupin's conduct with respect to Fortamet is thus

14   relevant to show what Lupin could have done with generic Glumetza if not for its unlawful

15   agreement." *Id*. Further, while Lupin has already produced some Fortamet documents, the

16   Purchasers contend that a broader production should be compelled, including documents

17   concerning: (1) the development and FDA approval of generic Fortamet; (2) the manufacture or

18   commercial launch quantities of generic Fortamet for the at-risk launch; (3) Lupin's consideration

19   of whether to launch at-risk; (4) the potential settlement of the Fortamet patent litigation, including

20   any discussion of an agreement to delay a generic launch in exchange for a no-AG promise; and

21   (5) statements by Lupin concerning the launch and distribution of generic Fortamet, including

22   statements to investors and courts. *Id*.

23        In response, Lupin argues that the Purchasers have failed to offer any persuasive reasoning

24   as to why Lupin's decision to launch generic Fortamet bears any relevance to its decision not to

25   effect an at-risk launch of Glumetza. *Id*. at 10. As Lupin puts it, the two decisions concerned

26   different patents, different allegations of infringement, different litigation, and different degrees of

27   strengths and weaknesses in the parties' positions in that litigation. *Id*. Specifically, Lupin points

28   to the fact that its patent counsel in the *Depomed* case informed Lupin that it would lose the patent

United States District Court
Northern District of California

13

litigation and, therefore, if Lupin had effected an at-risk launch of Glumetza, it would have been exposed to enhanced damages and an injunction due to what would have been considered a willful act of infringement – thus, Lupin contends that the Purchasers' theory in this regard "juxtaposes two events that have nothing to do with each other." *Id.* Further, Lupin adds that even if the Purchasers had managed to establish some degree of relevance, the responsive production pertaining to RFP Nos. 77 and 78 would be so onerous that "producing them would be disproportionate to the needs of the case . . . [such as would] impose unreasonable burdens on Lupin." *Id.* at 10-11. In short, Lupin argues that producing Fortamet documents relating to everything from FDA approval, through manufacturing and launch, to patent litigation and the ultimate decision to launch Fortamet at-risk, "would require Lupin to engage in full-fledged discovery on Fortamet." *Id.* Lastly, Lupin adds that it has identified a number of documents already produced "that address these issues with respect to Fortamet," which Lupin again contends that the Purchasers have not reviewed. *Id.* at 11.

A party seeking to compel discovery has the initial burden of establishing that the request satisfies the relevancy requirements of Fed. R. Civ. P. Rule 26(b)(1). *See e.g., Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995). While it is true that the standard for relevance is not very demanding (*see* Fed. R. Evid. 401, "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action"), the rule still requires that any evidence that is to be offered must "logically advance a material aspect of the party's case." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal quotation marks and citation omitted). "In turn, the party opposing discovery has the burden of showing that the discovery should not be allowed" due to, for example, an assertion that the information is privileged. *See e.g., DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002)). In order to succeed on a motion to compel, the moving party bears the burden of demonstrating that it is entitled to the requested discovery and that it has satisfied proportionality and other requirements of Rule 26. *See Rodriguez v. Barrita, Inc.*, No. 09-04057 RS-PSG, 2011 U.S. Dist. LEXIS 134079, at *4 (N.D. Cal. Nov. 21, 2011). Thus, courts are required to limit discovery if the burden or expense of the

United States District Court
Northern District of California

14

proposed discovery outweighs its likely benefit; such is "the essence of proportionality," an all-too-often ignored discovery principle. *Apple Inc. v. Samsung Elecs. Co.*, No. 12-cv-0630-LHK (PSG), 2013 U.S. Dist. LEXIS 116493, at *34-36 (N.D. Cal. Aug. 14, 2013).

In the instant case, the Purchasers' argument for relevancy is thin, at best, in that there appears to be no articulated logical connection or similarity between the course of events leading up to the at-risk launch of generic Fortamet and what the Purchasers characterize as the unlawful pay-for-delay agreement underlying the launch of Glumetza. Indeed, the farthest that the Purchasers' arguments reach in this regard is to essentially say that Lupin maintains that the two courses of events (that is, the launches of Fortamet and Glumetza) were effected under wholly dissimilar circumstances and that the "Purchasers must be able to test Lupin's assertions regarding any alleged differences through proper discovery." Ltr. Br. #1 (dkt. 285) at 5. However, this argument seems to put the cart before the horse as it seeks to place the burden of *disestablishing* relevance on Lupin. Furthermore, the undersigned finds merit in Lupin's argument that the Purchasers' proposal for Fortamet-related document production is wildly disproportionate to the needs of this case. As Lupin submits (*see id*. at 10-11), even if the Purchasers had made some sort of a plausible argument to establish a degree of similarity between the development and launch history of Fortamet and Glumetza (which has not been the case), any order compelling Lupin to produce all Fortamet documents, pertaining to everything from FDA approval to its ultimate at-risk launch, would be so unreasonably burdensome and disproportional to the needs of the case that the Fortamet document production would potentially eclipse the Glumetza document production. Accordingly, the Purchasers' request to compel document production responsive to RFP Nos. 77 and 78 is **DENIED**.

### *Issue-4: Deposition of Nilesh Gupta*

The Purchasers seek to compel the deposition of Nilesh Gupta, the managing director of Lupin Ltd., arguing that Mr. Gupta authorized and executed the very agreement that gave rise to this lawsuit. *Id*. at 5. Submitting that Mr. Gupta is in exclusive possession of relevant knowledge,

United States District Court
Northern District of California

the Purchasers maintain that the "apex witness doctrine"[5] has no application here. Ltr. Br. #1 (dkt. 285) at 6. As to the "unique knowledge" possessed by Mr. Gupta, the Purchasers note that he was the ultimate decision-maker regarding the execution of the alleged pay-for-delay agreement, and that only he can competently testify as to "why he caused Lupin to settle; what he understood the settlement terms to mean; and why he felt Lupin 'need[ed] this one' when discussing the Glumetza ANDA." *Id.* at 6 (alteration in original). The Purchasers add that they have unsuccessfully tried to obtain this information through other means such as written discovery but that they have been stonewalled by Lupin. *Id.* Further, "the Purchasers have agreed to accommodate Mr. Gupta by limiting his deposition to five hours and conducting it, remotely, toward the end of discovery." *Id.*

Once again, this portion of the parties' joint letter brief demonstrates how the parties have been arguing at cross purposes to one another. Whereas the Purchasers claim that Mr. Gupta (the second highest ranking executive at Lupin, Ltd.) needs to be deposed because he possesses *unique* knowledge about the *Depomed* settlement because he was the ultimate decision-maker who "authorized and executed *the very agreement giving rise to this lawsuit*" (*id.* at 5) (emphasis in original), Lupin's portion of the joint letter brief paints a radically different picture. Lupin opposes and maintains that Mr. Gupta "should not be deposed, [because doing so would] divert[] his attention from the life and death work of managing a drug company during a pandemic, especially when he has no unique knowledge of relevant facts." *Id.* at 11. While devoting much energy to describing the importance of Mr. Gupta's time, Lupin does also present the following assertions: (1) Mr. Nilesh Gupta did not sign or approve the *Depomed* settlement agreement, instead, those tasks were performed by his sister, Ms. Vinita Gupta, the CEO of Lupin, Ltd., and its *highest ranking* corporate officer – as Lupin submits, it was "Ms. Gupta [who] signed the settlement agreement and approved the settlement of the litigation"; (2) Lupin has already agreed to make Ms. Vinita Gupta available for a deposition, which was scheduled for June 26, 2020; (3) Lupin has

---

[5] When the party seeks the deposition of a high-level executive (generally known as a so-called "apex" deposition), the court may exercise its discretion under the federal rules to limit discovery such as to prevent the use of depositions for harassment purposes. *See e.g.*, *In re Google Litig.*, No. C 08-03172 RMW (PSG), 2011 U.S. Dist. LEXIS 120905, at *10 (N.D. Cal. Oct. 19, 2011).

also agreed to permit the deposition of Ms. Sophia Mumtaz (Lupin's President for pipeline management and legal affairs), with her deposition being scheduled for July 7, 2020 – as Lupin puts it, "Ms. Mumtaz was the principal negotiator of the settlement and the internal manager of the litigation [and] she recommended that Ms. [Vinita] Gupta approve the settlement"; and, (4) that Lupin has also arranged for the Purchasers to depose Mr. Kevin Walker (one of Lupin's national account directors) who is scheduled to be deposed on July 10, 2020. *Id.* at 12. Thus, Lupin submits that "while Mr. Gupta had some first-hand knowledge about Lupin's work to develop and launch generic Glumetza, Plaintiffs have not come close to showing that he has *any* unique, non-repetitive knowledge that cannot be obtained in the depositions of the Lupin employees already scheduled." *Id*.

A party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied. *See Google*, 2011 U.S. Dist. LEXIS 120905, at *10. When the party seeks the deposition of a high-level executive, courts may exercise discretion to limit such discovery in appropriate circumstances; however, it should be noted that absent extraordinary circumstances, it would be unusual for a court to prohibit the taking of a deposition. *Id*. In determining whether to allow an apex deposition, courts typically consider the following factors: (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case; and, (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods. *Id*. Thus, "when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." *Rolscreen Co. v. Pella Products of St. Louis, Inc.*, 145 F.R.D. 92, 98 (S.D. La. 1992) (quoting *Digital Equipment Corp. v. System Industries, Inc.*, 108 F.R.D. 742, 744 (D. Ma. 1986)); *see also Anderson v. Air West, Inc.*, 542 F.2d 1090, 1092-93 (9th Cir. 1976) (plaintiffs may depose sole stockholder who "probably had some knowledge" regarding substance of plaintiffs' claims); *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (district court erred in granting protective order ordering plaintiff not to depose Herald-Examiner's publisher when plaintiff suggested possible information the publisher might have that others did not); *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 102-06 (S.D.N.Y. 2001) (compelling deposition of CEO of Sony Corporation when plaintiff "presented

sufficient evidence to infer that [the CEO] had some unique knowledge on several issues related to its claims."). A claimed lack of knowledge, by itself, has been found insufficient to preclude a deposition. *See Dig. Equip. Corp.*, 108 F.R.D. at 744; *Amherst Leasing Corp. v. Emhart Corp.*, 65 F.R.D. 121, 122 (D. Conn. 1974); *Travelers Rental Co., Inc. v. Ford Motor Co.*, 116 F.R.D. 140, 143 (D. Mass. 1987). Furthermore, the fact that the apex witness has a busy schedule, by itself, is likewise not a basis for foreclosing otherwise proper discovery. *See e.g.*, *CBS, Inc. v. Ahern*, 102 F.R.D. 820, 822 (S.D.N.Y. 1984). However, when a high-level corporate executive lacks unique or superior knowledge of the facts in dispute, courts have found that good cause exists to prohibit the deposition. *See e.g.*, *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 482 (10th Cir. 1995); *Lewelling v. Farmers Ins. of Columbus, Inc.*, 879 F.2d 212, 218 (6th Cir. 1989); *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); *Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D. 94, 102 (S.D.N.Y. 1997) (citations omitted) ("[w]hen the discovery to be obtained is through the deposition of a senior executive, a court must remain mindful that permitting unfettered discovery of corporate executives would threaten disruption of their business and could serve as a potent tool for harassment in litigation" – placing strict restrictions upon continued deposition of Columbia Picture's Senior Vice President); *see also Holman v. ICN Pharmaceuticals, Inc.*, 1999 U.S. Dist. LEXIS 20017, 1999 WL 1267459 (S.D.N.Y. Dec. 29, 1999) (in product liability case, court permitted deposition of defendant's President, but limited it to four hours and district wherein the President resides or works).

In light of the above-cited authorities, and in light of the disconnect between the factual assertions in each side's portion of the letter brief in this regard, the remedy to be fashioned should be mindful of a few principles. The starting point is that, in general, a party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied, but that, nevertheless, "courts are sometimes willing to protect high-level corporate officers from depositions when the officer has no first-hand knowledge of the facts of the case or where the officer's testimony would be repetitive." *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, No. C 03-5340-JF-RS, 2006 U.S. Dist. LEXIS 67284, at *10 n.3 (N.D. Cal. Sep. 6, 2006) (American Blind sought to depose Google CEO Larry Page *after* learning from Google's designated 30(b)(6) witnesses that Mr. Page

18

may have relevant first-hand information; thus, Judge Seeborg held that "the deposition of Larry Page, not to exceed three hours, may be taken on the limited topic of his knowledge of and involvement in any changes to Google's trademark policies."). Accordingly, courts will regularly require interrogatories, requests for admission, and depositions of lower level employees before allowing the deposition of an apex witness. *See Affinity Labs of Tex. v. Apple, Inc.*, No. C 09-4436 CW (JL), 2011 U.S. Dist. LEXIS 53649, at *17-18 (N.D. Cal. May 9, 2011).

The dispute in the instant case is a bit unusual in that Lupin has agreed to make its highest ranking officer, Ms. Vinita Gupta – Chief Executive Officer of Lupin Ltd., available for a deposition, however, Lupin has resisted the Purchasers' effort to notice a deposition for a lower ranking officer, Mr. Nilesh Gupta – Managing Director for Lupin Ltd., under the theory that *he* is an apex witness. A second reason the dispute is unusual is that the parties – once again – do not address each other's arguments. Neither do the Purchasers explain why they would not be content with deposing Lupin's CEO, Ms. Gupta, as well as its President for pipeline management and legal affairs, Ms. Mumtaz – nor does Lupin clearly address the Purchasers' contentions that Mr. Gupta "was the decision-maker," or that "he caused Lupin to settle," or that it was Mr. Gupta who was "directing whether and when Lupin would manufacture generic Glumetza prior to settlement." *See* Ltr. Br. #1 (dkt. 285) at 6, n.23. Instead, Lupin offers certain tangential facts such as noting that it was Ms. Vinita Gupta who "signed the settlement agreement and approved the settlement of the litigation" (*see id*. at 12), which is not a statement that operates to negate or deny the Purchasers' contention that Mr. Nilesh Gupta "caused Lupin to settle." Further, Lupin's portion of the letter brief does not specifically address the Purchasers' contention that a document tendered in discovery (bates no. LUP-GLUM-AT-00259368) indicates that it was Mr. Nilesh Gupta who was responsible for "directing whether and when Lupin would manufacture generic Glumetza prior to settlement." *See generally id*. at 11-12.

Thus, the Purchasers have presented sufficient evidence to at least infer that Mr. Nilesh Gupta is in possession of some unique knowledge on a number of issues relevant to the Purchasers' claims. *See e.g., Sony Theatre Mgmt. Corp.*, 203 F.R.D. at 102-06 (compelling deposition of CEO of Sony Corporation when plaintiff "presented sufficient evidence to infer that

19

[the CEO] had some unique knowledge on several issues related to its claims"). Accordingly, since the matter is committed to the court's discretion, and based on the above-discussed representations of the parties, the Purchasers' request to compel Mr. Nilesh Gupta's deposition is **GRANTED in part and DENIED in part** as follows: the court will permit the Purchasers to take Mr. Gupta's deposition, but only under the following circumstances, (1) it will be conducted remotely; (2) it will be limited to 3 hours instead of 5 hours; (3) it will be scheduled to take place *after* the completion of the above-described depositions; and, (4) to avoid a time-wasting exercise, the Purchasers' deposition of Mr. Gupta cannot be cumulative or redundant or duplicative to any degree of the other depositions already scheduled. *See Apple Inc. v. Samsung Elecs*. Co., 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("The court therefore has discretion to limit discovery where the discovery sought 'can be obtained from some other source that is more convenient, less burdensome, or less expensive.'") (quoting Fed. R. Civ. P. 26(b)(2)(C)(i)).

### LETTER BRIEF #2

As mentioned, this dispute concerns subpoenas served by Lupin on three non-parties – Cardinal, McKesson, and ADBC – that will be collectively referred to herein as "the Wholesalers." *See* Ltr. Br. #2 (dkt. 286). Contending that while "they are not the named representatives of the putative direct purchaser class," (hereafter, the "DP class") Lupin suggests that the Wholesalers "created this litigation," and that they "are the driving force behind this case." *Id*. at 1. Lupin adds that the Wholesalers are the largest purchasers of both branded and generic Glumetza in the DP class, and that they stand to receive "the lion's share of any recovery from the defendants." *Id*. Given that the Wholesalers' assigned claims are rooted in their purchases of generic and branded Glumetza, which were assigned to the named representatives of the DP class and the retailer Plaintiffs, and given that those Plaintiffs are now pursuing claims based on those assignments, Lupin now seeks certain discovery directly from the Wholesalers "because the named plaintiffs know nothing about the assigned purchases on which their claims are based." *Id*. In this regard, Lupin represents that the named Plaintiffs' corporate designees have testified as to having no knowledge of the circumstances surrounding the Wholesalers' purchases of branded and generic Glumetza that have since been assigned to them. *Id*. Thus, Lupin maintains that without

20

discovery from the Wholesalers, "defendants have no way of obtaining any discovery on the purchases on which the claims against them are based," and that the assignments essentially made the Wholesalers into third parties with a substantial interest in the litigation such that preventing Lupin from taking discovery from them would operate to frustrate the rules of discovery to Lupin's disadvantage. *See generally id.* at 2-4.

Lupin seeks purchase and sales data from the Wholesalers in order to support an unclean hands defense to the charge of fraudulent concealment that Lupin maintains is at the heart of this case. In this regard, Lupin submits that the Wholesalers appear to have bought unusually large volumes of Glumetza prior to an increase in prices, and that they delayed selling their inventory until after the price increases became effective, "permitting them to obtain windfall profits to the detriment of their customers." *Id.* at 2. Lupin contends that the Wholesalers had advanced knowledge of these price increases, that the Wholesalers orchestrated the timing of their purchases and sales "to exploit the increases to their advantage and to the disadvantage of customers," and that Lupin needs this information in order "to expose the Wholesalers' inequitable conduct." *Id.* The now-narrowed subpoenas seek the following three categories of information: (1) Lupin seeks the Wholesalers' purchase and sales data for branded and generic Glumetza as well as related testimony; (2) Lupin seeks documents and testimony pertaining to the Wholesalers' knowledge of the terms of Lupin's settlement with Depomed, as well as the entry of Lupin and other generic drug makers into the marketplace for the sale of generic Glumetza; and, (3) documents and testimony regarding the Wholesalers' assignment of claims pertaining to this litigation. *Id.* Not all three of the Wholesalers is identically positioned in relation to these discovery disputes. While ABDC has agreed to produce any documents it may find in any of the three above-described categories (with the exception of its sales data), Cardinal and McKesson have only agreed to produce the assignments that they have executed. *Id.* Additionally, each of the three Wholesalers have refused to designate a witness for depositions on any of the three categories of information sought by Lupin. *Id.* Accordingly, Lupin seeks an order that would compel ABDC to produce its sales data and to designate a deponent that would be made to testify as to the three topics, as well as an order that would compel Cardinal and McKesson to both produce documents responsive to

United States District Court
Northern District of California

all three categories and to designate deponents that would testify as to all three categories. *Id*.

Lupin submits that the necessity of the discovery sought in relation to the Wholesalers' knowledge of the terms of the *Depomed* settlement and the entry of Lupin's generic and other generics into the market is evident because of "Plaintiffs' claim that Lupin (among other defendants) fraudulently concealed the no-AG clause . . . until February 2016 [such that proof of] Cardinal's and McKeeson's knowledge of the no-AG clause in the Settlement prior to February 2016 would thus vitiate plaintiffs' fraudulent concealment argument." *Id*. at 3. As to the relevance of documentation pertaining to the assignments, Lupin submits that the assignments and documents related to the assignments are relevant "because plaintiffs' claims are largely based on the assignments, which may have violated the Wholesalers' contracts with Lupin, which preclude assigning claims arising out of purchases from Lupin." *Id*. Then, without going into any detail, Lupin adds that "the scope and meaning of the assignments' terms are unclear and thus drafts and internal communications will provide further clarity . . . [such as] non-privileged communications within Cardinal and McKesson discussing the assignments and communications evidencing negotiations surrounding the assignments." *Id*. As to the sales information sought from the Wholesalers, Lupin argues relevance by submitting that "defendants have evidence from which they infer that the Wholesalers may have avoided Valeant's 2015 price increase by front-loading their purchases of branded Glumetza . . . and then re-selling them after the increase at higher prices," and that "these purchase and sales patterns are relevant for three reasons." *Id*. First, Lupin submits that this information could support an unclean hands defense in response to Plaintiffs' theory that Defendants' allegedly anticompetitive agreement was fraudulently concealed; second, Lupin submits that the sales data may reveal that the Wholesalers' manipulation of their purchases and sales in order to benefit from the price increases could support an argument about a fundamental conflict or an antagonistic interest within the DP class, and consequently, an argument against class certification[6]; and, third, Lupin submits that the Wholesalers' purchase and

---

[6] In support of this argument, Lupin relies almost exclusively on the opinion of the Court of Appeals for the Eleventh Circuit in *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1193-94, 1196 (11th Cir. 2003) (vacating a district court order granting class certification and explaining that, ". . . we note that this case has been brought by two regional wholesalers with relatively small claims who do not sell on a cost-

22

United States District Court
Northern District of California

sales information "would further evidence their knowledge of the [*Depomed*] [s]ettlement, and

Lupin's [forth]coming launch, before February 2016." Ltr. Br. #2 (dkt. 286) at 2-3.

In response, and in what appears to be a running theme with Lupin, the Wholesalers note

that "Lupin waited until late May to initiate meet and confers . . . [after which] Lupin went

through the motions and then declared an impasse, blaming the Court's expedited schedule,"

adding also that, in the end, "Lupin has only provided vague and undeveloped bases for their

requests." *Id*. at 6. Further, the Wholesalers negate some of Lupin's representations and note that,

"[t]o the contrary, the Wholesalers have agreed to produce their purchase data, their sales data to

assignee plaintiffs, all relevant assignments, and to answer in writing reasonable questions about

their data." *Id*. at 5. This disconnect between representations made in each side's portion of the

letter brief, once again, appears to be another manifestation of the parties' inadequate meet and

confer efforts. In any event, the Wholesalers submit that they are "mere absent class members,"

and that "discovery [from] absent class members is strongly disfavored." *Id*.

While the Wholesalers have already produced (or agreed to produce) their data for sales of

Glumetza and generic Glumetza to any assignee plaintiff, as well as the relevant assignments, as

well as agreeing to answer reasonable questions about those assignments in writing, what remains

"[a]t issue is Lupin's request for the Wholesalers' 'downstream' sales data to non-plaintiffs." *Id*. at

6. In this regard, the Wholesalers contend that this sort of "[d]ownstream discovery is [] irrelevant,

and the very act of forcing downstream discovery violates the principles of antitrust deterrence

that forms the underpinning of [the Supreme Court's decisions in]" *Hanover Shoe, Inc. v. United

Shoe Machinery Corp.*, 392 U.S. 481 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720

(1977). *See* Ltr. Br. #2 (dkt. 286) at 6. Additionally, the Wholesalers note that Lupin has provided

no authority that might explain "why its purported unclean hands theory is a valid defense to

plus basis, while the three national wholesalers with the bulk of the claims have chosen not to participate in the litigation or have assigned their interests to third-parties. This, along with the other evidence provided in the record, suggests that the interests of the named representatives are not substantially aligned with the interests of all of the class members whom they purport to represent because some of the class members would have experienced a net gain from the conduct alleged to be wrongful in this instance. It is highly likely under such circumstances that the economic interests of these putative class members would be substantially in conflict with the interests of the named representatives who did not experience a net gain from the defendants' conduct.").

United States District Court
Northern District of California

plaintiffs' antitrust theories." *Id*. at 7 n.2. As to Lupin's claim that it has "evidence" that the Wholesalers purchased unusually large quantities of Glumetza prior to price increases, the Wholesalers note that Lupin only references its own statements, made in an Answer and in a brief, instead of actual evidence such as the manufacturers' own sales data. *Id*.

As to Lupin's contention that it needs documents and testimony *related to* the Wholesalers' assignments, the Wholesalers contend that "[t]he assignments are stand-alone agreements specifically related to Glumetza, providing the assignee with the right to bring antitrust claims based on purchases made by the Wholesalers and then subsequently sold to the assignee." *Id*. at 8. Adding that the documents "speak for themselves," the Wholesalers note that they have agreed to produce copies of the assignments but, "[b]ecause the assignments are clear on their face and undisputed by the parties, the negotiations and related documents are not relevant." *Id*. During the meet and confer discussions, when the Wholesalers asked Lupin to identify any ambiguity, "Lupin refused and still refuses." *Id*. Hence, the Wholesalers maintain that they should not be made to provide either documents or testimony related to the assignments. *Id*.

Regarding Lupin's seeking of documents or testimony relating to the Wholesalers' purported knowledge of the terms of Lupin's settlement, the Wholesalers note that, first, only knowledge of the no-AG term of that agreement would have any relevance here; second, because the terms of that agreement were confidential, the only way any of the Wholesalers could have possibly come into possession of such information would have been from Defendants. *Id*. Accordingly, the Wholesalers contend that Lupin's request in this regard constitutes nothing more than "a burdensome fishing expedition," which should be summarily denied because "[t]he Wholesalers should not be obliged to incur this substantial expense and burden without some preliminary showing by Lupin." *Id*. Finally, the Wholesalers submit that Lupin's request for depositions is equally unwarranted for a number of reasons. *Id*. at 8-9. Noting that depositions of absent class members are typically only allowed when they have injected themselves into the litigation as witnesses or declarants in support of class certification, the Wholesalers add that neither of those conditions exist in this case. *Id*. at 9. Further, the Wholesalers submit that they have agreed to answer questions about their data in writing; they also submit that "Lupin has yet to

articulate why it needs testimony relating to the assignments at issue"; and, that Lupin is not entitled to secure testimony from the Wholesalers about their purported knowledge of Lupin's settlement agreement "absent some threshold showing that the Wholesalers knew or should have known about the [confidential] no-AG clause." *Id.*

In short, and for the following reasons, the undersigned finds all of the bases advanced by Lupin in support of the relief it requests from the Wholesalers to be unpersuasive. First, without stating that the Wholesalers have already agreed to provide Lupin with their sales data for the sales they made to Plaintiffs in this case, Lupin seeks an order that would require the Wholesalers to provide Lupin *all* of "their [downstream] sales data for branded and generic Glumetza and [also to provide] testimony related thereto." *Id.* at 2. Lupin provides three reasons why it views this seemingly unrelated information to be relevant. First, Lupin submits that it could use the Wholesalers' downstream data from the last nine years to somehow preclude Plaintiffs from prevailing on the argument that Defendants concealed the allegedly anticompetitive effects of the no-AG provision within their confidential settlement agreement by characterizing this antitrust action as being founded on a "fraudulent concealment argument," which Lupin characterizes as "an equitable doctrine . . . subject to equitable defenses such as unclean hands." *Id.* at 3. The absurdity of Lupin's reasoning here requires very little discussion and is clearly manifest in the inapposite nature of the cases cited in support – none of which are antitrust cases, and none of which suggest anything remotely resembling the argument being advanced by Lupin. First, Lupin cites to *Pincay v. Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001), which, does not once mention the term "unclean hands," and only stands for the proposition that equitable tolling doctrines, including fraudulent concealment, apply when calculating the running of the statute of limitations in civil RICO cases. Next, Lupin misleadingly quotes a fragment from a sentence in *Chiaramonte v. Santa Cruz Big Trees & Pac. Ry. Co.*, No. C 06-01834 JW, 2007 U.S. Dist. LEXIS 115566, at *6 n.1 (N.D. Cal. Nov. 9, 2007) (quoting *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963)); *Chiaramonte*, another case focused on whether a statute of limitations was subject to equitable tolling, noted in a footnote that, "unclean hands is an equitable defense, not a remedy in and of itself, and it does not constitute misconduct in the abstract, unrelated to the

claim to which it is asserted as a defense." Lastly, Lupin cites *Republic Molding Corp.*, 319 F.2d at 349, which was an appeal from three consolidates cases where plaintiffs sought damages for patent and copyright infringement and unfair competition, and the question presented on appeal was whether the district court erred in holding, in all three cases, that the appellant's unclean hands barred relief. *Id.* at 49-51 ("What does seem clear is that misconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands . . . [w]e therefore conclude that upon the present record it was error to dispose of these three cases upon the basis that Republic's conduct amounted to unclean hands. A remand for consideration of the merits of Republic's claims of unfair competition, patent infringement and copyright infringement thus becomes necessary.").

Accordingly, Lupin's attempt to couch the antitrust injury alleged in this case as a suit in equity for fraudulent concealment is unavailing – as is Lupin's attempt to use third party discovery to fish for support for an unclean hands defense to use against Plaintiffs' assignors (the Wholesalers) by proxy. *See e.g., Burlington Indus., Inc. v. Milliken & Co.*, 690 F.2d 380, 388 (4th Cir. 1982) ("It is well settled that [the doctrine of] unclean hands is no bar to antitrust recovery."); *Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 252 F. Supp. 3d 537, 545 (E.D. Va. 2017) (". . . if a plaintiff's misconduct other than direct participation in the antitrust conspiracy is asserted as a defense, defendants can only be understood as raising the equitable defense of unclean hands. It is well settled that unclean hands is no bar to antitrust recovery.") (internal quotation marks omitted); *see also Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 214 (1951) ("The alleged illegal conduct of petitioner, however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured."), *overruled on other grounds by, Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 773 (1984) ("If antitrust liability turned on the garb in which a corporate subunit was clothed, parent corporations would be encouraged to convert subsidiaries into unincorporated divisions. Indeed, this is precisely what the Seagram company did after this Court's decision in *Kiefer-Stewart Co.*").

Lupin's next attempt to justify its demand for the entirety of the Wholesalers' downstream data since 2011 is to state that this sales data *may* reveal the Wholesalers' manipulation of their

26

purchases and sales to avoid, and benefit from, the price increases, which could potentially reveal a fundamental conflict or antagonistic interest within the DP class such as to preclude class certification under Fed. R. Civ. P. 23(a)(4). *See* Ltr. Br. #2 (dkt. 286) at 3-4. As to this argument, Lupin relies almost exclusively on *Valley Drug Co.*, a decision from the Court of Appeals for the Eleventh Circuit that has been met with almost universal criticism. For example, one such case, decided in this district, and also involving one of the three Wholesalers at the heart of this dispute was *Braintree Labs., Inc. v. McKesson Corp.*, 2011 U.S. Dist. LEXIS 121499, at *2-9 (N.D. Cal. Oct. 20, 2011). There, a substantially similar argument was advanced in that Braintree contended that certain documents sought in discovery would show that some large class members, such as McKesson, actually profited from the alleged delay of the introduction of generics to the market because such large wholesale resellers routinely pass on this "overcharge" to their customers, and since these types of class members actually profited from the alleged antitrust injury, the named plaintiffs and absent class members, such as McKesson, were actually at odds with one another and had antagonistic interests. *Id.* at *2-*3. Thus, Braintree argued that these adverse interests between the named plaintiff on one hand, and McKesson and other large wholesalers in the putative class on the other hand, operated to render the named plaintiff an inadequate class representative, because of which class certification was inadvisable under Fed. R. Civ. P. 23(a)(4). *Braintree Labs.*, 2011 U.S. Dist. LEXIS 121499 at *3.

Relying on *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968)[7],

---

[7] "Section 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, provides that any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor, and shall recover threefold the damages by him sustained. We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a *prima facie* case of injury and damage within the meaning of § 4 . . . If in the face of the overcharge . . . the buyer, responding to the illegal price, maintains his own price but takes steps to increase his volume or to decrease other costs, his right to damages is not destroyed. Though he may manage to maintain his profit level, he would have made more if his purchases from the defendant had cost him less. We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower. . . A person whose property is diminished by a payment of money wrongfully induced is injured in his property . . . [and] the possibility that plaintiffs had recouped the overcharges from their customers [is] irrelevant in assessing damages." *Id.* at 488-91 (internal quotation marks and citations omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)[8], as well as *Meijer, Inc. v. Abbott Labs.*, 251

F.R.D. 431, 433 (N.D. Cal. 2008)[9], the court in *Braintree Labs* found the reasoning in *Valley Drug*

*Co.* to be unpersuasive because – despite the teachings of *Hanover Shoe* and *Illinois Brick* – the

Eleventh Circuit's decision nonetheless held that if some absent class members actually profited

from the defendant's alleged antitrust violations, there would be a fundamental conflict between

those class members and the named plaintiffs, making the named plaintiffs inadequate class

representatives. *Braintree Labs.*, 2011 U.S. Dist. LEXIS 121499 at *5. At this juncture, it should

be noted that this is precisely the same argument that Lupin has advanced here. *See* Ltr. Br. #2

(dkt. 286) at 3-4 ("Second, the sales data may reveal the Wholesalers' brazen manipulation of their

purchases and sales to avoid (and benefit from) the price increases and, thus, a 'fundamental

conflict/antagonistic interest[]'" within the DPP Class . . . [which] would preclude class

certification under Rule 23(a)(4)) (citing *Valley Drug Co.*, 350 F.3d at 1193). However, as noted

by the court in *Braintree Labs.*, "[t]he problem with the Eleventh Circuit's reasoning is that it

---

[8] "The principal basis for the decision in *Hanover Shoe* was the Court's perception of the uncertainties and difficulties in analyzing price and out-put decisions in the real economic world rather than an economist's hypothetical model, [] and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom. This perception that the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings applies with no less force to the assertion of pass-on by plaintiffs than it does to the assertion by defendants. However long and complicated the proceedings would be when defendants sought to prove pass-on, [] they would be equally so when the same evidence was introduced by plaintiffs. Indeed, the evidentiary complexities and uncertainties involved in the defensive use of pass-on against a direct purchaser are multiplied in the offensive use of pass-on by a plaintiff [who is] several steps removed from the defendant in the chain of distribution. The demonstration of how much of the overcharge was passed on by the first purchaser must be repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff . . . we understand *Hanover Shoe* as resting on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Id.* at 731-35 (internal quotation marks and citations omitted).

[9] "In reaching its decision, the Eleventh Circuit construed *Hanover Shoe* and *Illinois Brick* narrowly as standing only 'for the proposition that a direct purchaser who passes on overcharges to his own customers nevertheless suffers cognizable anti-trust injury and may sue to recover damages regardless of whether he actually profited from the defendants' conduct.' [] In so doing, however, the court did not give sufficient weight to what the Supreme Court called the 'principal basis' for its decisions: the practical difficulty of determining whether and to what extent a party benefits from one economic arrangement as opposed to another. Just as it is difficult to determine from downstream sales data whether an overcharge has caused a direct purchaser to suffer a financial loss that can serve as a measure of damages, [] it is likewise difficult to determine, as Abbott proposes to do, whether an overcharge has conferred a financial benefit on a direct purchaser." *Id.* at 434 (internal citations omitted) (quoting *Valley Drug Co.*, 350 F.3d at 1192).

ignores [the fact] that if any putative class member would prefer not to participate in a lawsuit which could result in the introduction of a generic into the market that class member can opt out of the lawsuit . . . [and because], the opt out procedure determines 'whether alleged conflicts are real or speculative[,] [i]t avoids class certification denial for conflicts that are merely conjectural and, if [real] conflicts do exist, [it] resolves them by allowing dissident class members to exclude themselves from the action.'" *Braintree Labs.*, 2011 U.S. Dist. LEXIS 121499 at *6 (internal citations omitted) (quoting *Natchitoches Parish Hosp. Service Dist. v. Tyco Intern., Ltd.*, 247 F.R.D. 253, 268-69 (D. Mass. 2008), quoting 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.30 (4th ed. 2002)). In fact, after remand in *Valley Drug Co.*, the parties ultimately moved for a single settlement class – one which *included* the large national wholesalers who were purportedly at odds with the named plaintiffs, and the district court nevertheless approved the settlement class given that the fact of settlement was a change of circumstance post-remand that directly addressed the appellate court's concern that had caused it to vacate the lower court's previous granting of the Sherman Act Plaintiffs' motion for class certification. *See Braintree Labs.*, 2011 U.S. Dist. LEXIS 121499 at *8 (citing *In re Terazosin Hydrochloride Antitrust Litig*. CV No. 99-MDL-1317, 2005 U.S. Dist. LEXIS 46189, Dkt. No. 1543 at 6 (S.D. Fla. March 18, 2005) (order granting certification of direct purchaser class because, in light of the settlement, class members could opt out).

Accordingly, as noted by courts in this district and elsewhere, "[i]t is thus unsurprising that *Valley Drug* has not been followed in this District and others." *Braintree Labs.*, 2011 U.S. Dist. LEXIS 121499 at *7; *see e.g.*, *Meijer, Inc.*, 251 F.R.D. at 434-35 ("Other courts have recognized that *Valley Drug* conflicts with the Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick* in additional respects."); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 246 F.R.D. 293, 303-04 (D.D.C. 2007) ("The Court respectfully disagrees with the Eleventh Circuit's conclusion, however, because it conflicts with the Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick*."); *In re K-Dur Antitrust Litigation*, 2007 U.S. Dist. LEXIS 96066, 2007 WL 5302308 (D.N.J. Jan. 2, 2007); *Natchitoches Parish Hosp. Service Dist.*, 247 F.R.D. at 268-69; *In re Wellbutrin SR Direct Purchaser Antitrust Litig.*, 2008 U.S. Dist. LEXIS 36719, 2008 WL

1946848, at *6 (E.D. Pa. 2008) ("[B]ecause all class members have the right to pursue overcharge

damages, they have the same incentive to do so, and there is no conflict among class members

allegedly harmed by the same antitrust violation. Accordingly, the Court declines to follow *Valley*

*Drug* and will adhere instead to the principles announced in *Hanover Shoe* and *Illinois Brick*.").

Indeed, while Lupin is quite adamant that it does not seek discovery of the Wholesalers'

downstream purchase and sales data for the "undisputed proposition that Defendants may not

assert a pass-on defense" (*see* Ltr. Br. #2 (dkt. 286) at 4), Lupin's attempt to detract from the class

certification decision on this ground amounts to little more than a "subtle variation [of the pass-on

defense], which might be termed the 'otherwise benefitting' defense." *Meijer, Inc.*, 251 F.R.D. at

435 (explaining that *Hanover Shoe* precludes the pass-on defense as well as the otherwise-

benefiting defense which is merely a variation on the same theme); *see also Hawaii v. Standard*

*Oil Co. of Cal.*, 405 U.S. 251, 264 n.14 (1972) ("[D]amages are established by the amount of the

overcharge [and] [u]nder § 4, courts will not go beyond the fact of this injury to determine whether

the victim of the overcharge has partially recouped its loss in some other way.").

Therefore, Lupin's second basis for why it should be entitled to discover the Wholesalers'

downstream purchase and sales data is as unpersuasive as the unclean hands theory that formed

Lupin's first basis for this discovery request. Lupin's third basis for why it believes it is entitled to

this information warrants very little discussion as it boils down to only a single conclusory

sentence with no explanation or supporting authority. *See* Ltr. Br. #2 (dkt. 286) at 4. In this regard,

Lupin claims that the Wholesalers' downstream purchase and sales data "would further evidence

their knowledge of the [s]ettlement, and Lupin's coming launch, before February 2016." *Id*.

Initially, the undersigned should note that Lupin is engaging in hyperbole when it contends that

downstream sales data would "further" evidence the Wholesalers' supposed advanced knowledge

of the no-AG provision in the *Depomed* settlement agreement because, as noted by the

Wholesalers, "Lupin [] cites only to an Answer and a brief, instead of evidence such as the

manufacturer's own sales data." *Id*. at 7 n.2. Nor does Lupin's portion of the brief venture to

identify what Lupin considers to be such "evidence" that it already has on hand, let alone

explaining how this downstream data might constitute "further" evidence. Accordingly, Lupin's

United States District Court
Northern District of California

United States District Court
Northern District of California

1    request for an order directing the Wholesalers to produce documents and deposition testimony

2    regarding their purchase and sales data (beyond that which they have already agreed to produce) is

3    **DENIED**.

4           Regarding Lupin's request for documents that the Wholesalers may possess "relating to"

5    their assignments (*see id*. at 3), while the Wholesalers submit that they have produced the

6    assignments themselves, Lupin suggests (without any explanation whatsoever) that "the scope and

7    meaning of the assignments' terms are unclear and thus drafts and internal communications will

8    provide further clarity." *Id*. Lupin also contends that the assignments themselves "may have

9    violated the Wholesalers' contracts with Lupin, which preclude assigning claims arising out of

10   purchases from Lupin." *Id*. Given that the Wholesalers have already produced (or agreed to

11   produce) the assignments themselves, as well as the fact that Lupin has failed to offer any

12   explanation at all about *how* the "scope and meaning" of the assignments are "unclear," or what

13   might be the import to this antitrust litigation that Lupin had contracts with these Wholesalers that

14   may have been breached by the execution of these assignments – Lupin's request for documents

15   and deposition testimony concerning "information regarding the assignments," and

16   "communications evidencing negotiations surrounding the assignments," is **DENIED**.

17          Lastly, as to Lupin's request for documents and deposition testimony related to Lupin's

18   allegation that the Wholesalers were in possession of information concerning the terms of the

19   *Depomed* settlement agreement, as noted by the Wholesalers, this "is simply a fishing expedition."

20   *Id*. at 8. Given that the essence of Plaintiffs' concealment allegations are focused on the

21   concealment of the anticompetitive effects of the no-AG clause of the *Depomed* settlement, and

22   given that those terms were confidential, neither do the Wholesalers know how or why Lupin has

23   formed the opinion that the Wholesalers had an advance knowledge in this regard, nor does Lupin

24   venture to explain it beyond merely stating it as an allegation. *See generally id*. at 1-4. While the

25   Wholesalers have "requested [that] Lupin provide some/any threshold evidence that the

26   Wholesalers could have known of the no-AG provision prior to February 5, 2016 . . . Lupin has

27   refused." *Id*. at 8. As the Wholesalers put it, for them to engage in a search within their own

28   records for such information, "[a]bsent some threshold evidence, Lupin's request is just a

burdensome fishing expedition." *Id*. The undersigned agrees. Accordingly, Lupin's request for documents or deposition testimony related to the Wholesalers' alleged knowledge of the confidential provisions of the *Depomed* settlement prior to February 2016 is **DENIED**.

**LETTER BRIEF # 3**

This document sets forth a number of discovery disputes between the Purchasers and Bausch wherein the Purchasers take issue with various assertions of privilege, as noted in various iterations of Bausch's privilege logs, as well as with the fact that Bausch has refused to produce certain documents because of the stated reason that they are subject to joint-defense / common-interest ("JD/CI") agreements that the Purchasers contend either do not exist or are inapplicable. *See* Ltr. Br. #3 (dkt. 287) at 1-4. In essence, the Purchasers seek the production of documents relating to four categories of information: (1) business arrangements between Depomed and Santarus concerning Glumetza; (2) discussions between Depomed and Santarus concerning how to handle the Lupin patent litigation that took place before these business partners entered into any JD/CI agreement; (3) the origins of the no-AG agreement; and, (4) communications with third parties (e.g., auditors, management consultants, and investment banks) about "how Bausch could best leverage the Glumetza patents and the no-AG agreement into record and unprecedented profits at the expense of purchasers." *Id*. at 2. To this end, the Purchasers present four principal arguments pertaining to defects in Bausch's privilege logs.

Initially, the Purchasers note that Bausch's revised log includes 132 withheld documents that were neither drafted by an attorney, nor received by an attorney; and, when this was brought to Bausch's attention, a new iteration of the privilege log was produced in which Bausch added a new column entitled, "identified attorney," and even then, aside from the fact that the Purchasers contend that it is unclear what "identified attorney" means in this context, that "Bausch listed such an 'identified attorney' for only 28 of the 132 entries [that] [the] [P]urchasers hereby challenge." *Id*. Aside from the fact that the Purchasers contend that "identified attorney" is, by itself, a meaningless designation in this context, they further contend that "[s]uch an after-the-fact designation cannot turn a non-privileged business communication into a protected, privileged one." *Id*. Furthermore, the Purchasers contend that Bausch's failure in its privilege logs "to

identify by name a single attorney who sent or received the communication[s] [at issue] and instead vaguely refers to unidentified counsel, with descriptions like 'presentation reflecting legal advice' or 'presentation providing information for the purpose of obtaining legal advice' . . . is insufficient to establish a privilege." *Id*. In other instances, the Purchasers contend that while Bausch fails to identify any attorney, and while the description of the document suggests a business purpose, Bausch nonetheless contends that the documents were created or prepared at the direction of some unidentified attorney, which the Purchasers contend is insufficient to establish protection under the work-product doctrine. *Id*. at 2-3.

Second, the Purchasers challenge Bausch's assertion of privilege as to 272 documents that the Purchasers submit were sent to various third parties, which the Purchasers argue operated to waive the privilege. *Id*. at 3. At bottom, the Purchasers contend that any claim of privilege as to these documents was waived when they were included in communications with: adverse parties in patent litigation; opposite sides of the Salix and Santarus merger (both now known as Bausch) before the January 2, 2014, closing of the deal; a licensing partner (Cosmo Pharmaceuticals); an advertising agency (Biolumina); financial statement printers (Bowne and RR Donnelly); a former employee (Paul Maes) who has not been represented by Bausch's counsel; a financial statement auditor (EY, formerly known as Ernst and Young); a variety of non-attorney consultants and service providers; and, various insurance brokers and insurers (including AIG). *Id*. Because of the contention that Bausch has produced no indication (in either the various iterations of its privilege logs or in any of the several meet and confer sessions) that any of the exceptions to third-party waiver are applicable, the Purchasers contend that Bausch should be ordered to produce these 272 documents. *Id*.

Third, the Purchasers challenge Bausch's assertion that various documents are covered by the work-product doctrine on two grounds. *Id*. at 3-4. With respect to 11 entries in Bausch's privilege log, which Bausch contends were either prepared by counsel or provide legal advice from counsel, the Purchasers contend that these documents were neither sent by counsel, nor received by counsel, and that Bausch has failed to identify any actual or potential litigation for which these documents were purportedly prepared – instead, it seems that counsel was merely

1   copied on these communications. *Id*. at 4. In short, the Purchasers maintain that "[d]ocuments

2   prepared and circulated among non-attorneys do not become work-product merely because

3   counsel is copied." *Id*. Additionally, the Purchasers note that Bausch, relying on the work-product

4   doctrine, has withheld an additional 118 documents that appear to be business documents, "most

5   of which" do not identify any litigation for which they were purportedly prepared, and "some of

6   which" were circulated to all employees. *Id*. In essence, the Purchasers submit that Bausch's

7   privilege log entries for these documents "suggest a business purpose unrelated to litigation." *Id*.

8   Also, it should be noted that while the Purchasers appear to hedge their contentions pertaining to

9   some unidentified fraction of these 118 documents by using terms such as, "most of which," and

10   "some of which," they also speak of the same 118 documents using categorical language,

11   maintaining elsewhere that "[n]one of these documents were prepared because of potential

12   litigation and Bausch should be ordered to produce all of them." *Id*.[10]

13        Fourth, the Purchasers contend that Bausch is withholding "hundreds of documents"

14   pursuant to a JD/CI agreement but involving parties with whom Bausch has never established a

15   JD/CI agreement. *Id*. at 4-5. Specifically, the Purchasers contend that, when challenged on this

16   point, Bausch has failed to produce either documentation or a declaration that might establish any

17   JD/CI agreement between any relevant entities prior to a May 9, 2011 agreement between

18   Depomed and Santarus. *Id*. The Purchasers point to three categories of documents they contend

19   _____

20   [10] Once again, it is evident that the Purchasers have not productively used the time leading up the
filing of this letter brief. It is also evident that they have not meaningfully engaged the other party

21   to this letter in the meet and confer process, and thus, the parties have not presented their
discovery dispute in a form and manner that is amenable to resolution. First, when the Purchasers

22   seek an order compelling the production of the 118 documents discussed herein – to which they
claim an entitlement due to certain suggested defects with Bausch's privilege log – they cannot in
seriousness use language such as, "most of which" (when referring to a failure to identify the

23   litigation in connection to which they are claimed to have been prepared), or "some of which,"

24   (when referring to the fact that they have been circulated amongst various employees) and,
therefore, expect the undersigned to dig through privilege logs and bates numbers to ferret out

25   which documents the Purchasers mean to include in their indeterminate categories of "most of
which," and "some of which." *See id*. at 4. Another indication that these parties were ill prepared

26   to present their discovery disputes is manifest in the fact that, at the outset of this letter brief, the
Purchasers relate that "Bausch is still in the process of finalizing an additional log with

27   approximately 2,000 entries," for which the parties appear to ask *the undersigned* to grant an
extension of the June 16, 2020, discovery-dispute presentation deadline already established by

28   Judge Alsup. *See id*. at 2 n.1. The undersigned will construe it as a request for extra time, filed
before the wrong judge, and therefore the parties are advised to seek that relief from Judge Alsup.

have been improperly withheld pursuant to the JD/CI doctrine – namely, documents concerning:
(1) the negotiations of any JD/CI agreement; (2) the negotiations of the Commercialization
Agreement; and, (3) any Depomed, Santarus, and/or Valeant communications after a JD/CI
agreement was reached involving issues *other than* Glumetza patents or the patent litigation." *Id*.
Because documents within these categories do not relate to matters of common legal interest, the
Purchasers contend that Bausch should be ordered to produce them. *Id*.

        Bausch's responses further reveal how woefully unprepared both sides were in the
formulation and filing of this letter brief, meaning that this half-cooked brief was prematurely filed
and is, therefore, not amenable to judicial resolution. *See id*. at 5-8. Yet again, it appears that the
parties have failed to meaningfully meet and confer, resulting in the dumping of an unrefined and
un-resolvable series of disputes onto the court's docket simply because the deadline set by Judge
Alsup for the filing of discovery disputes had approached and the parties needed to 'speak now or
forever hold their peace.' *See* Order of June 3, 2020 (dkt. 271) at 6 (re-setting the already-
extended deadline to June 16, 2020). As a result, the parties did speak, but managed to say nothing
signifying anything. In reading the parties' letter briefs (namely, Letter Brief Nos. 1 & 3), it is
difficult to identify the culpable party responsible for the delays that resulted in the filing of these
inadequately presented discovery disputes – on one hand, it appears that the Purchasers may have
delayed for what they perceived to be tactical reasons, but on the other hand, it is plausible that it
was Lupin and Bausch that dragged their feet for what they perceived to be a tactical advantage.
Either way, when a district judge sets a deadline for the presentation of discovery disputes, the
undersigned expects counsel for the parties to respect that deadline. In any event, at the outset of
its portion of the letter brief, Bausch begins by relating that the parties have stipulated to a joint
request for the undersigned to modify Judge Alsup's deadline for the filing of discovery disputes
in order to allow Bausch to produce yet another iteration of its privilege log, and by extension, to
allow the Purchasers another opportunity for objections and another motion to compel. *See* Ltr. Br.
#3 (dkt. 287) at 5-6, n.18. For the reasons stated above (*see supra* n.10) the stipulated request for
the undersigned to modify a deadline set by Judge Alsup is **DENIED**.

        Bausch then relates that in response to an inquiry from the Purchasers in February of 2020,

United States District Court
Northern District of California

Bausch served a revised privilege log on April 1, 2020. *Id*. at 6. Bausch then contends that the Purchasers waited until June 5, 2020, to present Bausch with their challenges to the April 1st privilege log, and that "[w]ith regard to the June 5 letter, the parties met and conferred on June 11, June 15, and June 16, but it was not feasible to complete meet and confer (sic) over this many issues in the time between June 5 and the filing of this motion." *Id*. at 6. Then, astoundingly, Bausch reveals that "[t]he parties have resolved some of the issues raised in Plaintiffs' letter and will continue to meet and confer about the remaining issues even after this joint submission to the Court." *Id*. As to the 132 withheld items that the Purchasers challenge because Bausch's revised log indicated they were withheld due to privilege but that were neither drafted by an attorney, nor received by an attorney – Bausch's portion of the letter brief casually notes that "Bausch is evaluating these entries and will produce any non-privileged documents inadvertently withheld." *Id*. Otherwise, without making any reference to any particular document or specific set of facts, Bausch engages in some generalized and abstract discussion about the attorney-client privilege, which appears to be nothing more than boilerplate. Likewise, as to the 272 documents that the Purchasers contend were the result of waived privilege due to being communicated to third parties, Bausch again maintains that it is still "evaluating whether any of these documents were inadvertently withheld," followed by another measure of generalized legal boilerplate about the nature of the attorney-client privilege. *Id*. at 6-7. Similarly, as to the Purchasers' challenges of Bausch's assertions under the work-product doctrine, Bausch relates that it "is currently reviewing the entries raised in this section of Plaintiffs' June 5[th] letter, including whether these entries may simply result from inadvertent coding errors," followed by a measure of generalized discussion relating to the work-product doctrine. *Id*. at 7. Lastly, while not attended with a statement to the effect that Bausch is still reviewing something, Bausch's arguments regarding the Purchasers' contention that Bausch has improperly withheld the above-described three categories of documents based on the JD/CI doctrine is similarly unhelpful. *See id*. at 7-8. In this regard, other than more legal boilerplate, Bausch says nothing more than: (1) common interest agreements do not need to be in writing; (2) some documents in Bausch's document production refer to common interest agreements including such an agreement between Depomed and Santarus, dated May 9,

2011; (3) Santarus and Depomed had "aligned interests" in the patent litigation against Lupin as early as November of 2009, and therefore those communications should be protected now because they were made in confidence; and finally, (4) Bausch contends, generally, that it has engaged in privileged communications with third parties "in the course of matters with a shared common interest." *Id.* at 7-8. However, *none* of Bausch's four non-boilerplate statements are helpful to any degree in determining whether the Purchasers are entitled to the three categories of documents they contend have been improperly withheld pursuant to the JD/CI doctrine – namely, documents concerning: (1) the negotiations of any JD/CI agreement; (2) the negotiations of the Commercialization Agreement; and, (3) any Depomed, Santarus, and/or Valeant communications after a JD/CI agreement was reached involving issues *other than* Glumetza patents or the patent litigation." *Id.* at 4-5. In short, as to the dispute over documents withheld pursuant to the JD/CI doctrine, Bausch's responses were nonresponsive.

As to the entirety of the "disputes" presented in Letter Brief #3, the undersigned is not in the habit of issuing either advisory opinions, or opinions that are moot because the parties presented their unripe disputes simply to meet a deadline and then continued to negotiate and resolve the disputes while the court engaged in the time-wasting exercise of preparing rulings on matters that were no longer in dispute. As discussed above, this is due to the failure of the parties to meet and confer in a meaningful manner. Accordingly, counsel for the Purchasers and Bausch are **ORDERED** to immediately meet and confer in a *meaningful* fashion, putting forth a good faith effort to resolve, or at least to substantially refine, these issues. Thereafter, if any issues remain in dispute such that court intervention continues to be necessary, the Parties are **ORDERED** to present those issues not later than 12:00 noon on Monday, July 6, 2020, in a jointly filed letter brief (not to exceed two pages per side, or four pages total) wherein both sides are to present clear and cogent arguments relating to clearly identifiable documents or information such that the parties are not arguing at cross purposes or in such abstract and generalized terms as is currently the case. If the parties are successful in resolving these disputes, they shall promptly file a notice to that effect. In the meantime, any ruling as to these issues is **DEFERRED**.

//

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: June 29, 2020

ROBERT M. ILLMAN
United States Magistrate Judge

United States District Court
Northern District of California