UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re

GLUMETZA ANTITRUST
LITIGATION.

This Document Relates to:

ALL ACTIONS.

No.  C 19-05822 WHA
No.  C 19-06138 WHA
No.  C 19-06839 WHA
No.  C 19-07843 WHA
No.  C 19-08155 WHA
No.  C 20-01198 WHA
No.  C 20-05251 WHA

(Consolidated)

**ORDER RE SUMMARY
JUDGMENT**

### INTRODUCTION

In a secret pharmaceutical-patent infringement settlement agreement, concealed from the district judge, brand and generic manufacturers of the type 2 diabetes drug Glumetza allegedly pledged not to compete with each other by agreeing to not introduce a generic version of the drug for several years.  So, while generic competition should have driven drug prices *down*, the brand manufacturer instead hiked prices *up*.  The generic manufacturer belatedly entered the market at premium pricing, and, as a result, the conspiring manufacturers allegedly extracted huge sums of money from consumers.  In this resulting antitrust action, a certified class of direct purchasers move for partial summary judgment that our defendant brand and generic manufacturers wielded market power.  For their part, defendants move for summary judgment, attacking the underlying antitrust violation and causal injury.  All motions are **DENIED**.

United States District Court
Northern District of California

**STATEMENT**

An estimated thirty million Americans suffer from type 2 diabetes. The condition, "caused by the combination of insulin resistance . . . and deficient insulin secretion," causes an alarming array of complications. Those with diabetes face nearly twice the average risk of stroke and heart disease. They may suffer foot ulcers that take months or years to heal, or may require amputation. Around forty percent suffer some degree of kidney disease, with one percent suffering kidney failure. In fact, "[p]ersons with diabetes make up the fastest growing group of kidney dialysis and transplant recipients in the United States." "Diabetes is the leading cause of new cases of blindness among adults aged 18–64 years." And, in 2017, diabetes was estimated to be the seventh leading cause of death in the United States. CTRS. DISEASE CTRL. & PREV., NAT'L DIABETES STATS. RPT. 12 (2020), https://www.cdc.gov/diabetes/pdfs/data/statistics/national-diabetes-statistics-report.pdf; NAT'L INST. OF DIABETES & DIGESTIVE & KIDNEY DISEASES, DIABETES IN AMERICA, ch. 1, pp. 2–3, ch. 22, p. 1, fact sheet (3d ed. 2018), https://www.niddk.nih.gov/about-niddk/strategic-plans-reports/diabetes-in-america-3rd-edition.

Fortunately, modern medicine offers a battery of remedial medications. One such drug, metformin hydrochloride, helps control blood-sugar levels. Following approval by the Food and Drug Administration in June 2005, defendant Depomed, Inc. launched a new extended-release version of metformin in late 2006. Glumetza, introduced first in 500 mg and later in 1000 mg tablets, extended the release of metformin over a prolonged period by disbursing the active drug into a polymeric matrix. In the stomach, the metformin would more slowly diffuse out of the matrix and ensure its smooth delivery into the bloodstream over time, without the usual initial spike and later lull in drug level, to offer consistent blood-sugar control.

Depomed obtained several patents covering the developments embodied in Glumetza, United States Patent Nos. 6,340,475 and 6,635,280, which expired in September 2016, No. 6,488,962, which expired in June 2020, and No. 6,723,340, which will expire in October 2021. Depomed listed these patents as covering Glumetza in the FDA's "Orange Book." U.S. DEP'T

In 2009, defendants Lupin Pharmaceuticals, Inc. and Lupin Limited filed an Abbreviated New Drug Application with the FDA, seeking to manufacture and market generic versions of both 500 mg and 1000 mg Glumetza. Lupin certified to the FDA that Depomed's patents were either invalid or not infringed, yet Depomed sued anyway in November 2009, asserting several claims from the '475, '280, and '962 patents (it also asserted but later dropped the '340 patent). The case came before the Honorable Phyllis J. Hamilton of our district. Following a year of litigation, Judge Hamilton held a *Markman* hearing in January 2011 and issued a claim construction order in May. The parties fought for the rest of that year, but, before filing dispositive motions, settled in February 2012. As far as the parties told the judge, they would simply go their separate ways and Lupin would launch its generic on February 1, 2016. *Depomed, Inc. v. Lupin Pharms., Inc.*, No. C 09-05587 PJH, Dkt. No. 152 (N.D. Cal. Mar. 27, 2012). This, our plaintiffs now allege, concealed an underlying unlawful conspiracy.

\* \* \*

Congress enacted the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the Hatch-Waxman Act, to lower pharmaceutical drug prices by speeding generics to market. In general, a pharmaceutical drug must undergo a grueling — and costly — testing regimen to obtain FDA approval to market. To ease generic entry, however, the Act permits a generic drug manufacturer to file an Abbreviated New Drug Application (ANDA) to piggyback on the approval efforts of the underlying brand-name drug that uses the same active ingredient and to which the proposed generic is biologically equivalent. The Act then implements a network of interlocking incentives to encourage faster introduction of these low-cost generics into the pharmaceutical market, yet still drive new drug development. *See FTC v. Actavis*, 570 U.S. 136, 142 (2013); 21 U.S.C. §§ 355(j)(2)(A)(ii), (iv).

The ANDA relieves generic drug manufacturers of a significant burden by, in practical effect, placing it on brand manufacturers. So, to ensure generics cannot immediately hop

3

1    aboard and profit from a brand manufacturers' costly investment, the ANDA scheme relies on,

2    among others, patents to temporarily exclude generic manufacturers from use of the novel drug

3    ingredient itself or its new formulation, delivery mechanism, or form of treatment.  H.

4    Hovenkamp, *Anticompetitive Patent Settlements & the Supreme Court's Actavis Decision*, 15

5    MINN. J.L. SCI. & TECH. 3, 10–11 (2014).  Recognizing that the long FDA approval process

6    would otherwise eat into a substantial portion of a patent's twenty-year term, the Act provides

7    for up to a five-year extension of a drug patent's term.  *New York ex rel. Schneiderman v.*

8    *Actavis PLC*, 787 F.3d 638, 644 (2d Cir. 2015).  The Act adds a further layer to drug-patent

9    protection, requiring an ANDA application to certify that the relevant patents have either

10   expired or will expire before the generic reaches the market, or that the patents are either

11   invalid or not infringed.  *Actavis*, 570 U.S. at 143; 21 U.S.C. § 355(j)(2)(A)(vii)(I)–(IV).

12        Balancing this patent protection with its overall goal of expediting generic entry, the Act

13   encourages generic manufacturers to challenge weak validity or infringement cases.  *See King*

14   *Drug Co. v. SmithKline Beecham Corp.*, 791 F.3d 388, 394 (3d Cir. 2015).  The first generic to

15   file an ANDA including a certification of invalidity or noninfringement (the "Paragraph IV"

16   approach) wins 180 days of generic exclusivity, meaning that once it gains FDA approval and

17   enters the market, the FDA can't approve any other generics during that time.  This, however,

18   doesn't stop the brand from launching its own "authorized generic" to win some market share

19   back from the first filer, and the first filer can lose the exclusivity if fails to market promptly

20   after a later generic filer gains FDA approval.  But the exclusivity period can be "worth several

21   hundred million dollars" to the first-filer generic and outweigh the risk of infringement suit.

22   *Actavis*, 570 U.S. at 143–44; *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 144 fn. 7 (3d

23   Cir. 2017); *See Teva Pharm. v. Crawford*, 410 F.3d 51, 55 (D.C. Cir. 2005); 21 U.S.C.

24   § 355(j)(5)(B)(iv), (D).

25        To ease timely judicial resolution of ANDA patent challenges, a Paragraph IV

26   certification operates as a technical act of patent infringement.  And, to encourage prompt

27   commencement, the Hatch-Waxman Act imposes a thirty-month stay against FDA approval of

28   the ANDA if the patent owner sues within forty five days' notice of the certification.  If a court

4

resolves the infringement suit during that time, the FDA follows that result. If not, the FDA will then be free to approve the ANDA at the expiration of the statutory stay. *Actavis*, 570 U.S. at 143; 21 U.S.C. § 355(j)(5)(B)(iii); 35 U.S.C. § 271(e)(2)(A).

With FDA approval, a generic drug may enter the market. Though, if the infringement suit remains ongoing, the launch is commonly referred to as "at risk," given the brand manufacturer might still win a judgment of infringement, damages (perhaps enhanced for willfulness), and, where appropriate, an injunction. *Wellbutrin*, 868 F.3d at 168 fn. 59; 35 U.S.C. §§ 283–84. But once a generic drug makes it to market, the FDA's Orange Book broadcasts its availability to the public as an alternative to the underlying brand drug. All fifty states and the District of Columbia have some form of mandatory or permissive drug substitution law to help shift consumers from expensive brand drugs to their cheaper generics, without another visit to the doctor. *See Schneiderman*, 787 F.3d at 644–45.

This scheme is *supposed* to expedite our access to cheaper generics. But the pharmaceutical industry found a way around it. In some infringement cases, the brand manufacturer (the *patent owner*) pays the generic (the *accused infringer*) to settle. This may seem topsy-turvy but the patent owner actually comes out ahead. In exchange, the first-filer generic manufacturer agrees to stay off the market for a few years. So, instead of expedited generic entry, the brand maintains its monopoly and cuts the supposed-generic a share of the profits.

In 2013, the United States Supreme Court found that these "pay for delay" schemes can violate federal antitrust law. True, a patent gives a brand drug the power to exclude competition within the bounds of the claims for its twenty-year term. But by paying the *accused infringer* to stay out of the market, the brand in essence concedes the weakness of the patent's validity or infringement case against the ANDA. Thus, the settlement suppresses generic competition and does so outside the bounds of the brand manufacturer's patent protection. *See Actavis*, 570 U.S. at 147–49, 153–58.

Our plaintiffs allege just a scheme here. The stipulated dismissal in 2012, which the parties submitted to Judge Hamilton, and which they characterized as permitting Lupin's *early*

generic market entry, in fact *concealed from the judge* an extensive side agreement which preserved the brand monopoly and kept Lupin's generic Glumetza off the shelves for years.

Per the secret *quid pro quo*, dated February 22, 2012, Lupin agreed to walk away, leave the patents alone, and *delay* market entry of its generic Glumetza for four years, until February 1, 2016. Instead of a simple cash payment to stay away, Depomed gave Lupin something else of value — a guarantee that Depomed would not launch an authorized-generic to compete with Lupin for one year, atop the FDA-granted 180 days of market exclusivity from other generic competition. The settlement also included two clauses to protect Lupin from *other* generic competition, providing, first, that if any other manufacturer succeeded in marketing a generic Glumetza before February 2016, Lupin could market immediately, and, second, that Depomed would not license any other generic Glumetza manufacturers until at least 180 days following Lupin's market entry. These provisions undercut the incentive for any other generic manufacturer to enter the market before Lupin. But, as noted above, only the *first* of these terms, Lupin's February 2016 market entry, made it into the parties' stipulated dismissal. Crucially, as alleged, defendants did not disclose the no-authorized generic (no-AG) provision until a February 5, 2016, quarterly earnings call with Lupin executives.

This artificially-prolonged monopoly and synthesized duopoly proved a windfall to our defendants. Depomed had already sold its marketing rights in Glumetza to defendant Santarus, Inc., but then sold its royalty rights, estimated between $140 million and $180 million, to PDL Biopharma in October 2013 (Dkt. No. 464-1). The juiced Glumetza portfolio aided Santarus' sale to defendant Salix Pharmaceuticals for $2.6 billion in November 2013, and Salix's sale to defendant Valeant Pharmaceuticals for $14.5 billion in April 2015.

*Then, in the summer of 2015, Valeant hiked the price of Glumetza on the order of 800%. The wholesale acquisition cost of a 500 mg pill spiked from $5.72 in May to $51.48 by the end of July. In the same time, the cost of a 1000 mg pill spiked from $12.37 to $113.36.* Glumetza accounted for a three hundred fifty million dollar swell in Valeant's profits in the second half of 2015. When Lupin joined the market in February, the supposed affordable generic did so at

around $45 for each 500 mg tablet.  All in all, Lupin reaped to the tune of six hundred million dollars from Glumetza over the next few years.



Note: WACs are per 100-count bottle of 500 mg tablets and 90-count bottle of 1000 mg tablets.

Only adding to their spoils, defendants' scheme apparently dissuaded other generic manufacturers from marketing their own generic versions of Glumetza until after Lupin did. Sun Pharmaceuticals filed its ANDA in March 2011.  But Depomed and marketing-partner Santarus promptly sued, and a January 2013 settlement kept Sun's generic off the market until August 2016.  Watson Pharmaceuticals then filed its ANDA in March 2012.  Another prompt lawsuit resulted in a November 2013 settlement keeping Watson's generic also off the market until August 2016.  In the end, Watson (by then Teva Pharmaceutical Industries Ltd.) did not market its generic Glumetza until May 2017, and Sun not until July 2018.

Glumetza prices have to some extent slowly recovered, but not to pre-hike estimates. The most immediate fallout for our defendants?  Bad press.  So, in 2018, Depomed changed its name to Assertio Therapeutics, Inc., and Valeant changed its name to Bausch Health Companies Inc.

Plaintiffs started suing in August 2019.  Ultimately, twelve cases by both direct and indirect purchasers arrived before the undersigned.  An order dated March 5, 2020, largely denied defendants' motions to dismiss the direct purchasers but granted the motions in part against the indirect purchasers, who all subsequently dismissed.  *In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2020 WL 1066934 (N.D. Cal. Mar. 5, 2020).  The remaining

direct purchasers, several who sued as assignees of absent direct purchasers, have proceeded in two groups: (1) the direct-purchaser class, and (2) the retailer plaintiffs. An August 15 order certified the Rule 23(b)(3) direct-purchaser class comprising:

> All persons or entities in the United States and its territories who directly purchased Glumetza or generic Glumetza from a defendant from May 6, 2012 until the date of [the] order.

*In re Glumetza Antitrust Litig.*, 336 F.R.D. 468 (N.D. Cal. 2020). Days prior, plaintiff Humana Inc. attempted to resurrect the slew of indirect-purchaser claims. Orders dated December 5 and February 2, 2021, rejected that ploy.

Over the past three months, our parties have filed ten *Daubert* motions and four motions for summary judgment. This order resolves the motions for summary judgment, reserves the *Daubert* motions for later, and follows full briefing and oral argument held via videoconference due to COVID-19.

## ANALYSIS

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." Put plainly, it bars (1) concerted conduct which (2) unreasonably restrains trade. *F.T.C. v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020). An unreasonable restraint comes either as a *per se* violation ("when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination") or a violation of the rule of reason, meaning the "restraint's harm to competition outweighs its procompetitive effects" in light of the peculiarities of the business, the nature and history of the restraint, and its reason for being. *NCAA v. Bd. of Regents of Univ. Okla.*, 468 U.S. 85, 103–04 (1984); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001); *United States v. Topco Assocs.*, 405 U.S. 596, 607 (1972). In pharmaceutical reverse-payment cases, such as ours, we apply the rule of reason. *Actavis*, 570 U.S. at 158–59.

Section 2 condemns "[e]very person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." Unlike Section 1's prohibition of *concerted* restraints, Section 2 prohibits *unilateral* (as well a multilateral)

conduct, but only that which threatens to or actually monopolizes. *Alaska Airlines v. United Airlines*, 948 F.2d 536, 541 (9th Cir. 1991). Such violation involves the (1) possession of power in the relevant market following (2) its willful acquisition or maintenance and (3) an injury resulting from abuse or leverage of that market power. This causal-harm element emphasizes the distinction between, on the one hand, the unlawful acquisition of market power and, on the other, its "development as a consequence of a superior product, business acumen, or historic accident." *Qualcomm*, 969 F.3d at 990 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

Our threshold inquiry asks whether defendants wielded power over the relevant market, "the area of effective competition." Section 2 carries this demand on its face; a monopolist unifies the market for a given good and wields the resulting anticompetitive power. Though less obvious a requirement of Section 1, "courts usually cannot properly apply the rule of reason without an accurate definition of the relevant market," as the analysis requires our location of defendants within the market structure to gauge the results of their anticompetitive conduct. *Ohio v. Am. Express Co.*, 585 U.S. ___, 138 S. Ct. 2274, 2285 (2018); *Qualcomm*, 974 F.3d at 989–92; *Rebel Oil Co. v. ARCO*, 51 F.3d 1421, 1434 (9th Cir. 1995).

Plaintiffs establish the antitrust violation itself via a tripart burden shift, beginning with a *prima facie* concerted restraint under Section 1 or willful or attempted monopoly under Section 2. The defendant must then offer a nonpretextual procompetitive rationale for the restraint or the monopolization, which plaintiffs must either rebut or show, under Section 1, that a less anticompetitive means would achieve the same ends, or under Section 2, that the anticompetitive harm outweighs the procompetitive benefit. *See Qualcomm*, 974 F.3d at 991; *Image Tech. Serv. v. Eastman Kodak Co.*, 903 F.2d 612, 618–19 (9th Cir. 1990), *aff'd*, 504 U.S. 451 (1992).

If plaintiffs establish the antitrust violation, they must then prove their causal antitrust injury, *i.e.*, an injury both of the kind the antitrust laws seek to prevent and which flows from the unlawfulness of defendants' conduct, and offer a fair estimate of their damages. *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977); *Bigelow v. RKO Radio Pictures*, 327

U.S. 251, 264–65 (1946); *Qualcomm*, 974 F.3d at 989–92; *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 19 fn. 18 (1st Cir. 2008).

This order denies plaintiffs' motion for partial summary judgment. True, a reasonable trier of fact could find that defendants wielded market power during the relevant time period. Compelling evidence illuminates classic indicators of power in the market for brand and generic Glumetza. In 2015, Bausch profitably hiked prices and reduced consumption. Lupin profitably maintained those supracompetitive prices for several years before competition with the authorized generic, Teva, and Sun finally brought prices back down. But a reasonable trier could reject these considerations in light of defendants' evidence of the cross-elasticity of demand between Glumetza and the many, and more prevalent, variants of metformin hydrochloride available to consumers.

This order also denies defendants' motions for summary judgment. A reasonable trier of fact could conclude that defendants violated the rule of reason. The challenged settlement included cross-covenants not to compete, one from Lupin to pause its generic Glumetza entry for four years, and the other from Assertio and Santarus to forego an authorized generic for one year. These horizontal restraints on competition mirrored classic *per se* antitrust violations. Defendants, however, contend these restraints fell within the scope of their patent rights. But given evidence calling into question the strength of defendants' infringement case, a reasonable trier of fact could find defendants' covenants exceeded those bounds.

A reasonable trier of fact could further conclude that defendants' restraint of the market delayed generic entry, stifled competition, and caused plaintiffs to pay more for brand and generic Glumetza than they would have otherwise. In the absence of the unlawful scheme, Lupin might have marketed its generic earlier via either an at-risk launch, by prevailing in the underlying suit, or by negotiating an earlier market entry date in the absence of the no-AG agreement, and other generics might have followed quickly thereafter. This earlier generic competition would have prevented or mitigated defendants' price gouging. A reasonable trier of fact could also find plaintiffs' suit timely and reject both Assertio and Lupin's solo defenses. Material questions abound. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49, 255 (1986).

1    **1.    DEFENDANTS' MARKET POWER.**

2        A reasonable trier of fact could find that defendants' wielded power in the market for

3    brand and generic Glumetza.  It could also find otherwise.  Up front, no one doubts that the

4    market for brand Glumetza included both its authorized generic and those by Lupin, Sun, and

5    Teva.  Drug substitution laws nationwide permit or even require pharmacies to swap these

6    cheaper generics in place of a brand drug.  *Schneiderman*, 787 F.3d at 644–45, 657; ORANGE

7    BOOK at vii–xvi, 3-284.  If our relevant market stopped there, then defendants' market power

8    would likely follow.  Until the authorized generic joined in February 2017, our defendants

9    retained 100% market share, the FDA approval regime posed a significant barrier to market

10   entry, and others like Sun and Teva proved unable to ramp up production until mid-2017 and

11   2018.  *Rebel Oil Co. v. ARCO*, 51 F.3d 1421, 1434 (9th Cir. 1995).

12       Our parties, however, dispute whether the relevant market also encompassed *other*

13   variants of metformin hydrochloride, such as Glucophage, Glucophage XR, and Fortamet

14   (including their generics).  This question of fact involves a broad inquiry into "the particular

15   structure and circumstances" of the pharmaceutical context and into the cross-elasticity of

16   demand between Glumetza and its proposed substitutes, including empirical study, to

17   determine which, if any, would have been adequate and available enough to constrain prices.

18   *Rebel*, 51 F.3d at 1434–35; *Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540

19   U.S. 398, 411 (2004); *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Times-

20   Picayune Publ. Co. v. United States*, 345 U.S. 594, 612 fn. 31 (1953).

21       In the dysfunctional pharmaceutical market, the doctor who chooses the drug does not

22   pay for it, and the consumer who pays does not choose.  Insurance obfuscates the price the

23   consumer sees.  The prescription requirement, by corollary, limits alternatives.  And, consumer

24   "demand" for pharmaceutical drugs often manifests as degrees of desperation, because we

25   consume these drugs to prevent illness, ease suffering, and even forestall death.  *See*

26   *Schneiderman*, 787 F.3d at 645–47; *Mylan Pharms. v. Warner Chilcot Pub. Ltd. Co.*, 838 F.3d

27   421, 429–30 (3d Cir. 2016); F.M. Scherer, *The Pharmaceutical Industry*, in I HANDBOOK OF

28   HEALTH ECONOMICS 1300–01 (2000).

United States District Court
Northern District of California

1    This all shifts bargaining power to the drug companies, but it only tells part of the story.

2    Defendants' expert testimony indicates that physicians both account for price in prescribing

3    and view Glumetza as therapeutically interchangeable with the numerous, and more prevalent,

4    metformin variants (Glumetza has only ever accounted for about a two and a half percent

5    share).  Drug manufacturers then compete behind the scenes for preferred placement on health

6    plan formularies which govern drug insurance coverage.

7    Both sides' experts also attack cross-elasticity empirically.  Plaintiffs' expert submits

8    studies indicating little to no cross-elasticity between Glumetza and other metformin variants.

9    Defendants' expert presents the contrary.  Plaintiffs' *Daubert* motion may narrow this battle of

10   the experts, but the breadth of this inquiry ensures that sufficient, though perhaps lopsided,

11   disputes will remain.  Ultimately, the balancing of this evidence must be left to our trier of fact.

12   S*ee Primiano v. Cook*, 598 F.3d 558, 564–65 (9th Cir. 2010); *Provenz v. Miller*, 102 F.3d

13   1478, 1490 (9th Cir. 1996).

14   Seeking to bypass this maze, plaintiffs offer direct evidence of defendants' market power.

15   True enough, market power asks "whether an arrangement has the potential for genuine

16   adverse effects on competition."  Under either Section 1 or 2, "proof of actual detrimental

17   effects . . . can obviate the need for an inquiry into market power."  *F.T.C. v. Ind. Fed'n*

18   *Dentists*, 476 U.S. 447, 460–61 (1986); *United States v. Microsoft*, 253 F.3d 34, 51 (D.C. Cir.

19   2001) (en banc).

20   Plaintiffs point to the "hallmarks of market power" — defendants' profitable

21   maintenance of supracompetitive pricing and reduced output for several years.  Bausch's 2015

22   price hike, which plaintiffs characterize as an 800% increase, though defendants would place

23   the number around 275%, drove thousands of consumers from Glumetza to (we infer in

24   defendants' favor) Glucophage and Fortamet, whose producers ably supplied the new demand.

25   Meanwhile, Bausch reaped *three hundred fifty million* dollars more in profit over the latter half

26   of 2015.  Lupin joined the market at a similar premium in February 2016, quickly captured the

27   brand consumer base, and maintained that profitable supracompetitive pricing for several years

28   (Dkt. Nos. 493-79, 493-100).  *Oltz v. St. Peter's Comm'ty Hosp.*, 861 F.2d 1440, 1448 (9th Cir.

1988); *NCAA*, 468 U.S. at 85–86; William M. Landes & Richard A. Posner, *Market Power in*

*Antitrust Cases*, 94 HARV. L. REV. 937 (1981).



**Prices & WAC of Extended-Release and
Immediate-Release Metformin 2010–2019**

Though the Supreme Court approved of direct proof of market power in *Indiana*

*Federation*, there remains a broad gap between affirmance of a direct factual finding of market

power versus plaintiffs' request here to take that question from the jury. Plaintiffs cite, and this

order is aware of, no appellate decision stemming from *Indiana Federation* affirming the leap

plaintiffs seek. Additionally, *Indiana Federation* did, in fact, roughly define the market,

emphasizing the locality of dentistry services and defendants' majority share in two specific

cities. Defendants' evidence of the cross-elasticity of demand between Glumetza and other

metformin variants, particularly given Glumetza's small role in the broader metformin array,

precludes our reliance on even a rough market definition here. 476 U.S. at 460–61; *Oltz*, 861

F.2d at 1448.

A reasonable trier of fact could exclude other versions of metformin and include only

Glumetza and its generics in our market. The reasonable trier could also find that defendants'

have already wielded anticompetitive market power. But as our court of appeals has observed:

13

> The ultimate issue in a rule of reason case is whether a challenged practice will produce adverse effects on price or output. The only *direct* way to answer that question is to introduce evidence of actual price increases or reductions in output after the challenged practice. But even if a plaintiff is lucky enough to gather such evidence, he will face the momentous task of proving that the observed price or output effects were not attributable to any one of an infinite number of independent causes: exhaustion of raw materials, increases in labor costs, increases in the price of substitute goods, tax hikes, etc. Situations will arise where a plaintiff is able to meet this burden. But doubtless those occasions will be rare.

*E.W. French & Sons, Inc. v. General Portland Inc.*, 885 F.2d 1392, 1404 (9th Cir. 1989) (Farris, J., concurring) (cleaned up). On this record, material questions of fact remain.

### 2. DEFENDANTS VIOLATED THE RULE OF REASON.

Armed with a finding that our relevant market encompassed Glumetza and its generics, and that defendants had power therein, a reasonable trier of fact could conclude that defendants' concealed settlement violated the rule of reason. In February 2012, faced with the prospect of Lupin's generic Glumetza entry as early as that May, our defendants conspired to allocate the market for brand and generic Glumetza between them for the foreseeable future. They first agreed to maintain Assertio and Santarus as the sole producer for four more years, delaying Lupin's generic entry until February 1, 2016. And, our brand defendants secured Lupin's assent to this delay with a covenant not to compete, the promise not to launch an authorized-generic version of Glumetza until February 1, 2017.

Following discovery, we've got the actual agreement. The terms of this exchange appear right there on its face. The delay:

> Effective upon the License Effective Date [February 1, 2016], Depomed hereby grants to Lupin, and Santarus hereby consents to and authorizes the grant to Lupin of, a fully paid up, royalty free, non-exclusive (except as otherwise provided herein) license with respect to the Depomed Patents.

And the payment:

> Depomed, Santarus and their Affiliates shall not, and shall not authorize any Third Party to, Market an Authorized Generic any earlier than twelve (12) months after the License Effective Date.

(Dkt. No. 493-12, §§ 3.1, 3.5). Or, in more classic antitrust terms, we have one covenant not to compete, providing four more years of Glumetza monopoly, in exchange for a second covenant

14

not to compete, one year without marketing an authorized generic. In most cases, we could stop right here. Such naked horizontal restraints — an agreement to allocate a market, such as in time or space, between a select few competitors at the same level of the market — are a *per se* Section 1 violation. *See Topco*, 405 U.S. at 607–08. The Court of Appeals for the Sixth Circuit held as much in one of the earliest appellate treatments of a pharmaceutical reverse-payment settlement. *See In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 907–08 (6th Cir. 2003), abrogated by *Actavis*, 570 U.S. at 158–60. Even defendants do not attempt to convince us that their agreement was not such a horizontal allocation.

But, as defendants take care to note, we have a twist. By the patent laws, Congress has expressly sanctioned certain conduct that would otherwise constitute even a *per se* violation. A patent grants its owner the right to exclude others from practicing the claimed invention. Now, a patent owner may let the world make, use, or sell the invention. It may, in exchange for royalty payments, license to as many producers as necessary to create a competitive market. But the patent owner may also monopolize or restrain the market for the invention. It may license only a few producers. Or just one. Indeed, a patent owner may exclude all others from practicing the invention, and may even refrain from practice itself, thereby suppressing the invention from the market entirely. 35 U.S.C. §§ 271, 283. As the Supreme Court recognized in *NCAA*, certain contexts require courts, even those presented with otherwise *per se* violations, to step back to the rule of reason. That is why here, even faced with a naked horizontal restraint, we must step back to evaluate the restraint in context to then determine whether, as defendants urge, it fell within the bounds of their patents. *Actavis*, 570 U.S. at 147–51, 158–59; *NCAA*, 468 U.S. at 100–01.

In arguing that the settlement agreement toed the line their patents drew, defendants would have us presume infringement and place the burden on plaintiffs to show otherwise. This argument runs afoul of patent fundamentals. True, we presume a patent's validity. *See Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 100 (2011). But we also presume noninfringement. The patent owner *always* bears that burden. In other words, we *presume* a

1    producer's right to market a good unless and until shown otherwise.  *Medtronic v. Mirowski*

2    *Family Ventures*, 571 U.S. 191, 198–99, 203 (2014).

3         The ANDA framework doesn't change this baseline; it illustrates it.  The Paragraph IV

4    certification just permits suit.  It tells us nothing about whether the proposed generic, in fact,

5    infringes the listed patent.  *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990); *Glaxo,*

6    *Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997).  The FDA is free to approve a

7    Paragraph IV ANDA one hundred eighty days after filing, and the generic manufacturer will

8    be free to market the drug unless the brand manufacturer sues within the forty five days and

9    triggers the thirty-month stay.  But, if the stay expires without a judgment of infringement, the

10   FDA again becomes free to approve the ANDA, and the generic manufacturer would be free to

11   market.  *See Actavis*, 570 U.S. at 143; 21 U.S.C. § 355(j)(5).  At that point, it would take a

12   preliminary injunction in the shorter term or a judgment of infringement (or the parties' joint

13   assessment of infringement) in the longer term to take the generic off the market.  In other

14   words, the brand patents alone bar nothing.  The stay does at first.  But after that, a judgment of

15   (or settlement admitting to) infringement must do it.

16        These fundamentals fit within the rule of reason's burden-shifting framework.  After

17   plaintiffs establish an antitrust violation, the burden falls to the defendants to offer a

18   procompetitive rationale, which, if non-pretextual, plaintiffs must rebut.  It follows, then, that

19   to traverse a motion for summary judgment raising defendants' patents as the procompetitive

20   justification, plaintiffs, as several courts have held, must show "some evidence" of

21   noninfringement or invalidity.  *See Wellbutrin*, 868 F.3d at 165; *Nexium*, 842 F.3d at 63; *see*

22   *also Teikoku Pharma*, 296 F. Supp. 3d at 1152–55.  *But noninfringement remains our baseline*.

23   Some anticompetitive conduct will fall within the scope of the patent; some will not.  This is

24   why the Supreme Court explained in *Actavis* that "[w]hether a particular restraint lies beyond

25   the limits of the patent monopoly is a *conclusion* that flows from [the antitrust] analysis and

26   not, as [both our defendants and] the Chief Justice suggest[ed], its starting point."  *See* 570

27   U.S. at 149 (quotes omitted); *Medtronic*, 571 U.S. at 198–99; *Qualcomm*, 969 F.3d at 991.

28

As already stated, plaintiffs have carried their initial burden. Defendants' pay-for-delay settlement agreement contained two cross-covenants not to compete within the market for Glumetza. These horizontal restraints place the burden upon defendants to show they go no further than their patents authorized. Our parties appear to agree that direct evidence of the parties' mental states will suffice, given that neither offers a limitation-by-limitation analysis of Lupin's ANDA in their briefs. This, of course, follows from the Supreme Court's recognition that "it is normally not necessary to litigate patent validity" — and infringement, by context — "to answer the antitrust question." *Actavis*, 570 U.S. at 157. It also follows from the pivotal role that intent plays in antitrust violations. A multiparty concerted restraint certainly requires some degree of intent. *Cf. Alaska Airlines*, 948 F.2d at 540–41. And, as the Supreme Court has noted, "no monopolist monopolizes unconscious of what he is doing." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985).

This may seem a difficult logical leap, but patents already provide a common example of an antitrust analysis which avoids any limitation-by-limitation invalidity or infringement analysis, patent licensing. The license to market a good on payment of a royalty is a horizontal restraint on production of that good. But no one would challenge ordinary patent licensing as a violation of the antitrust laws because we understand that the parties' good-faith belief of infringement (or their belief that's a reasonable enough possibility) places the agreement within the scope of the patent. The royalty payment from the licensee to the patent owner flows as expected and, in contrast to most restraints, a patent license *brings* a product to market. This abbreviated rule of reason justifies ordinary patent licensing without a limitation-by-limitation infringement analysis.

So too here, defendants contend, arguing that both parties believed Lupin's ANDA infringed the relevant patents. At first glance, they tell a compelling story. Lupin, defendants say, knew its ANDA infringed the patents early on. Outside counsel said such a result was likely from the beginning, and once Judge Hamilton adopted claim constructions which both undermined Lupin's invalidity argument and made a judgment of infringement very likely, Lupin saw the light and came to the bargaining table. Thus, we are to believe, defendants'

challenged settlement agreement manifested an intent to *accelerate* Lupin's generic entry and ran afoul of no antitrust concerns.

Our jury would be free to reject this narrative as a pretext. Questions of fact appear on its face, starting with the glaring oddity that *only one* of our three defendants involved in the underlying suit, Lupin, has waived attorney-client privilege to tell its tale of certain infringement. Besides, if the patents were so valid and infringed, why did Assertio and Santarus let Lupin practice them royalty free for, depending on the patent, several months to four years? And, if both parties so strongly believed Lupin's ANDA infringed, why did they stipulate that there remained "significant risk to each of them" given Judge Hamilton "ha[d] not adjudicated Depomed's charges of patent infringement or Lupin's defenses and counterclaims[?]" *Depomed*, No. C 09-05587, Dkt. No. 152.

More important, though, defendants' telling forgets a key fact — their *actual* settlement agreement. Defendants would have us believe that *both* parties *knew* Lupin infringed and would be barred from marketing a generic Glumetza for several years. And yet, to settle the suit, our brand defendants agreed to *expedite* Lupin's generic market entry, cede a year's worth of revenue that an authorized generic could recoup from Lupin (recall, the Supreme Court has recognized that even 180 days of generic exclusivity can be worth several hundred million dollars), *and* pay three million dollars in Lupin's legal fees (Dkt. No. 493-12, §§ 2.5, 3.1, 3.5). In other words, defendants would have us believe that they all knew *Lupin* was going to lose — yet Lupin emerged far and away the settlement victor? Our jury could reject these facial contradictions outright. *See Kodak*, 903 F.2d at 618–19.

Contrary to *Actavis*, defendants contend that here the large and otherwise unexplained payment to Lupin cannot be taken as suggesting that Assertio and Santarus doubted their infringement case. Their first basis for this argument, that the FTC labors under a lower causation standard than does a private plaintiff, fails to explain how a different burden of antitrust *causation* would change our analysis of whether defendants *violated* the antitrust laws. Indeed, nothing in the rationale of *Actavis* turned on the identity of the FTC as the plaintiff. *In re Cipro Cases I & II*, 61 Cal.4th 116, 142, 348 P.3d 845 (2015); *see also*, *United*

1    *Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund*

2    *v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1154 (N.D. Cal. 2017) (Judge William H.

3    Orrick).  In a similar vein, defendants say that direct evidence of *Lupin's* confidence (recall,

4    Assertio and Santarus did not also waive attorney-client privilege here) in the infringement

5    case displaces the use of the payment as "proxy" for their doubt.  This, however, ignores the

6    plain language of *Actavis*.  An unexplained payment "suggest[s] that the patentee has serious

7    doubts" about its infringement case.  Such evidence probes defendants' states of mind just as

8    their later, direct testimony does.  570 U.S. at 157.

9        Even if our jury does not go so far as to find defendants' justification a pretext, plaintiffs

10   *do* present evidence that defendants doubted their infringement case.  At bottom, we cannot

11   forget defendants' own explicit admission of that doubt to Judge Hamilton, acknowledging in

12   their consent decree that "there [was] significant risk to each of them associated with the

13   continued prosecution of [the case.]"  *Depomed*, No. C 09-05587 PHJ, Dkt. No. 152.  Our jury

14   will be entitled to place a certain amount of weight upon defendants' contemporaneous

15   admissions to a federal judge.

16       Plaintiffs offer several batches of evidence, but sufficient here is the noninfringement

17   testimony of *Lupin's* expert in the underlying litigation.  In a summer 2011 draft

18   noninfringement report, never submitted due to the settlement, Dr. Kinam Park applied Judge

19   Hamilton's claim construction and explained the two different methods of controlling the

20   extended release of metformin.  Assertio's patents claimed the "matrix" form, where dispersion

21   of the active drug within a polymeric matrix controls its release.  Lupin's ANDA used the

22   other form, a "reservoir," which surrounded the active drug in a membrane or coating to

23   control its release.  Indeed, plaintiffs say, evidence of Lupin's settlement negotiation

24   preparations shows Lupin believed and acted upon Dr. Park's noninfringement report.  Earlier

25   in the summer Lupin had drafted an opening settlement offer with a May 2014 entry date in

26   exchange for a royalty to Assertio.  After Dr. Park's initial draft report circulated, Lupin

27   revised its draft settlement offer, deleting the royalty payments and moving up its proposed

28   entry date more than a year to January 2013 (Dkt. No. 493-1 at ¶¶ 14–16).

Instead of responding to the merits of Dr. Park's noninfringement report, defendants attack its weight and admissibility. That Dr. Park's report was unsigned and never tested in the underlying litigation says little. *None* of the infringement or noninfringement arguments were tested in the underlying litigation, as the parties admitted in their settlement stipulation. Defendants' frustrations with Dr. Park's memory of the circumstances surrounding his report go to the weight of his testimony, not its admissibility. And, plaintiffs will be more than welcome to cite Lupin's prior inconsistent statements against it at trial. Fed. R. Evid. 801.

Defendants also contend that plaintiffs misclassified Dr. Park as a Rule 26(a)(2)(C) nonreporting expert. Not so. Rule 26(a)(2)(C) permits certain non-retained experts to testify as percipient witnesses. This usually arises in the context of a "treating physician" who may testify to opinions formed during the course of medical treatment, in contrast to a medical expert retained to review and opine on medical records provided by counsel and who must provide a written report. Here, Dr. Park will act more as a percipient witness, testifying to the circumstances surrounding and the opinions contained in his previous report. Plaintiffs have not retained Dr. Park, and he will not opine on our present record. Rule 26 requires no new report. And, defendants cannot claim prejudice, given they have had Dr. Park's report for nearly a decade. *See Goodman v. Staples*, 644 F.3d 817, 824–26 (9th Cir. 2011).

It's also worth noting the ridiculousness of defendants' attempts to exclude Dr. Park's report. Defendants tout *Lupin's* decision to waive attorney-client privilege in the underlying litigation *ad nauseum*. Aside from the fact that this ploy presents a facially incomplete record (Assertio and Santarus did not also waive attorney-client privilege), defendants cannot both proclaim Lupin's transparency and bury inconvenient portions of Lupin's underlying record.

In sum, on this record a reasonable trier of fact could conclude that defendants unreasonably restrained the production of Glumetza via cross-covenants not to compete and that that these restraints did not fall within the scope of their patents.

### 3.    PLAINTIFFS' CAUSAL ANTITRUST INJURY.

Armed with the findings that defendants' settlement violated the rule of reason and that defendants' wielded market power, a reasonable trier of fact could next conclude that the

settlement caused plaintiffs' antitrust injury. "It is generally sufficient to show with *reasonable probability* some causal connection between the antitrust violation and [the claimed injury.]" *Catlin v. Wash. Ener. Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986). The Supreme Court has long held that a "jury [may] conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the [effects], not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." *Bigelow*, 327 U.S. at 264. In other words, plaintiffs need not rule out "all possible alternative sources of injury," but satisfy the inquiry by showing the illegality "to be a material cause of the injury." *Zenith Rad. Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 fn. 9 (1969).

Plaintiffs' claimed injury is the overcharge they actually paid compared to the price they would have paid absent the unlawful settlement. As detailed at class certification:

> Generic drugs crash brand monopolies, entering the market at significant discounts. Studies show this discount increases over time (*and* as more generics enter the market) and quickly pervades the market as the generics capture the prescription base through permissive or (often, state or locally) mandated generic-substitution at the pharmacy. And, this generic market penetration increases over time.

336 F.R.D. at 476. Delayed generic entry delays the resultant price cuts. So plaintiffs' theory of causation distills to this: defendants delayed Lupin's generic entry. Absent that delay, Lupin would have marketed a generic version of Glumetza earlier. The price-suppressing competition which (as seen above) actually played out over the last several years would have arrived sooner, cutting prices earlier. Thus, at each point in time, plaintiffs paid more for brand or generic Glumetza than they should have.

This certainly counts as a valid antitrust injury; "price cutting is a practice the antitrust laws aim to promote." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 896 (9th Cir. 2008). *Actavis* itself recognized the overcharge as the relevant harm. 570 U.S. at 157. Defendants (with one exception, detailed below) concede this cognizable injury; instead they challenge the causation itself, arguing that generic competition would have come to the market no earlier than it did in reality.

21

Plaintiffs offer three scenarios of earlier generic competition, positing that either Lupin would have prevailed in the underlying suit, entered the market at-risk, that is, upon FDA approval following the expiration of the 30-month stay even as the underlying litigation continued, or that Lupin and our brand defendants would have agreed to an earlier entry date if their settlement agreement had not included the unlawful no-AG provision. Plaintiffs also argue that both Sun and Watson (now Teva) would have entered the market earlier on Lupin's heels, further speeding generic competition and reduced prices.

Defendants' running argument on this front is that plaintiffs can point to no evidence that defendants, or their officers, or any third parties contemplated any of plaintiffs' but-for scenarios. In other words, defendants would premise causation here (and thus their liability) on the notion that they must have contemplated a lawful course of action before abandoning it for the unlawful. This is both wrong on the law — "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created" — and in reasoning — our actors have no reason to contemplate action they might have taken in the but-for world *which never came to pass*. Our jury will craft the but-for world, in which defendants acted rationally and lawfully, based on measured deviation from the record. *See Bigelow*, 327 U.S. at 265; *Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985).

*First*, plaintiffs offer cogent evidence that Lupin may have marketed their generic Glumetza at risk or upon prevailing in the underlying suit. As above, defendants' patents may justify their agreement. But noninfringement remains our baseline. *See, e.g.*, *Nexium*, 842 F.3d at 63; *Medtronic*, 571 U.S. 198–99. With this understanding, then, this order agrees with defendants that "[t]he clear import of Nexium and Wellbutrin is that a plaintiff must offer some evidence of non-infringement or patent invalidity in order to proceed on an at-risk launch theory of causation." *Apotex, Inc. v. Cephalon, Inc.*, 255 F. Supp. 3d 604, 614 (E.D. Pa. 2017) (Judge Mitchell S. Goldberg).

Again, the circumstances of the settlement itself betray defendants' doubts in the infringement case, and plaintiffs have provided direct evidence of noninfringement in Dr.

Park's noninfringement analysis, this without even addressing plaintiffs' expert evaluation of Lupin's noninfringement case. Whether this and plaintiffs' other evidence of noninfringement would have supported a judgment of noninfringement, traversed a preliminary injunction, or encouraged a rational actor to market at risk presents a question of evidence weighing and balancing reserved for the jury.

We also have evidence that Lupin, if it could have outlasted Assertio and Santarus, would have pressed that advantage. Congress *designed* the ANDA scheme to encourage generic entry, especially if Lupin believed in its noninfringement case. The 180 days of generic exclusivity, often worth several hundred million dollars, would have paid Lupin's legal fees and then some. Indeed, here Lupin's actual 12-month exclusivity period generated a gross margin of over one hundred twenty million dollars (Dkt. No. 493-79 at 2).

More important, in thirty seven times as the first filer, plaintiffs count four times that Lupin has launched at risk, including another generic version of metformin, our active drug here. Plaintiffs also highlight that Lupin, to this point, had never quit a patent suit when it was the first ANDA filer. And, as late as *nine days* before the challenged settlement, Lupin had still been internally circulating production calendars listing a generic Glumetza launch for as early as November 2012. Evidence shows that Lupin may have been able to ramp-up its production in time for such a launch. Between October and December 2011, Lupin made three commercial-size batches of generic Glumetza, and only needed three months to produce the validation batches for its February 2016 launch (Dkt. No. 493-1 at ¶¶ 45–51).

Defendants contest this evidence, in their telling Lupin only launched at risk once, and minimize the proffered production calendars as mere placeholders carrying little weigh. But as above, plaintiffs need not show that the Lupin of our world actually contemplated a given scenario within the but-for world. In the end, whether Lupin, looking ahead to those green pastures of profit, would have pressed its contemporaneous noninfringement theory to victory, or at least stood firm behind it long enough to dissuade our brand defendants from further litigation, is a question for our jury.

*Second*, plaintiffs offer competent evidence that if their settlement had not included the unlawful no-AG provision, defendants would have agreed to an *earlier* entry date for Lupin. Defendants' attempt to reject this hypothetical bargain as speculative fails. Contrary to defendants' assertions, the California Supreme Court's discussion of the interplay between an antitrust *violation* under the state's Cartwright Act and federal patent law does not counsel otherwise and, indeed, defendants' oft-cited *Wellbutrin* agreed that juries frequently predict the outcomes of hypothetical scenarios by assessing individual or corporate motive, thought processes, and behavior. 61 Cal. 4th 149–50; 868 F.3d at 167 fn. 57; *Teikoku*, 296 F. Supp. 3d at 1161–62. At bottom, this method requires no speculation. It merely asks the jury to project how rational actors in defendants' shoes would have proceeded in the absence of the unlawful settlement term. *Dolphin*, 773 F.2d at 1511.

Simply put, the February 1, 2016, generic entry date for Lupin, is not, and never was, set in stone. It was always mobile based on (among other factors) defendants' competing evaluations of the patent merits and their projection of the revenue they could extract from the market as Lupin's entry date shifted. If, as our jury could conclude based on the above, doubts about infringement animated our defendants' settlement, then our brand defendants paid Lupin's attorney's fees plus the amount their authorized generic could recoup in the first twelve months of generic entry in exchange for Lupin staying off the market for some amount of time. The value to Lupin of those twelve months without an authorized generic corresponded to the value to Assertio and Santarus of some number of months of their preserved monopoly. Remove the pay, remove the delay.

Though this order doubts whether plaintiffs need to provide evidence that our defendants contemplated or signaled willingness to entertain an earlier entry date (again, given plaintiffs have provided sufficient evidence for a jury to conclude defendants reached an unlawful agreement, it makes little sense to condition recovery on a showing that defendants first contemplated a lawful settlement before pursing their ultimate course) plaintiffs do offer evidence on this point. Lupin's original August 2011 settlement offer sought a January 1, 2013, entry date in exchange for a shorter six-month no-AG period. Our brand defendants

24

countered with a January 1, 2018, entry date. In October, Lupin responded with the twelve month no-AG period and a January 1, 2016, entry, remarkably close to the ultimate agreement. Taken in plaintiffs favor, as we must on summary judgment, this provides direct evidence that the increase in the no-AG period extended Lupin's delay (Dkt. No. 493-1 at ¶¶ 23–24).

Plaintiffs also provide expert testimony to nail down the generic entry date our defendants would have agreed to absent the no-AG provision. Defendants seek to exclude this testimony, and we need not address it here. It suffices that plaintiffs have provided evidence above that defendants could have agreed to an earlier date absent their unlawful conduct; any more detail at this point goes to the measure of damages. *See Zenith*, 395 U.S. at 114, fn. 9.

*Third*, our record offers adequate evidence that other generics would have followed Lupin to market earlier absent the unlawful settlement. Ordinarily, the ANDA scheme encourages a first-filer generic with the prospect of 180-days of market exclusivity, and the later-filer generics follow. A delay by the first-filer creates a bottleneck, discouraging later-filers from leading the charge, as each faces a near certain thirty months of litigation with no exclusivity at the end to defray the risk. *See Actavis*, 570 U.S. at 142–44; *Wellbutrin*, 868 F.3d at 144–45 fn. 7; *Nexium*, 842 F.3d 34 at 41; 21 U.S.C. § 355(j)(5)(B)(iii)–(iv), (D); *Cf.* Hovenkamp, *Anticompetitive Patent Settlements*, 15 MINN. J.L. SCI. & TECH. at 7 fn. 19.

Lupin filed the first ANDA to market a generic form of Glumetza in July 2009. Tentative FDA approval came in January 2012 and Lupin could have expected final approval in (or shortly after) May 2012 on expiration of the thirty-month stay. Instead Lupin settled with our brand defendants and did not market until February 1, 2016. In that time, Sun and Teva had filed their Paragraph IV ANDAs around March of 2011 and 2012, respectively. But after Lupin settled, the two follow-ons promptly settled themselves in January and November 2013, agreeing to August 2016 launches. Teva did not launch until May 2017, Sun not until July 2018. "[A] reverse payment settlement with the first filer . . . removes from consideration the most motivated challenger, and the one closest to introducing [generic] competition." *Actavis*, 570 U.S. at 155 (quotes omitted). The just and reasonable inference being, or so our jury could find, that Lupin's bottleneck contributed to Sun and Teva's delay.

Defendants point to manufacturing and regulatory difficulties that delayed Teva and Sun's market entries. But the facial defect in this argument is that if Lupin marketed when it should have, and Sun and Teva followed when they should have, resolution of their difficulties would move up accordingly. Following up on this point, plaintiffs add that Sun's regulatory issues with the FDA in December 2015 would not have mattered for our purposes if it had succeeded in launching its generic Glumetza before then.

Plaintiffs further offer evidence (including expert testimony) of Sun's strong noninfringement case, arguing that Sun might have attempted to jump the line by winning a judgment of noninfringement and triggering Lupin's 75-day forfeiture clock. Now, the settlement would have let Lupin market immediately to maintain its exclusivity period, posing a major threat to Sun's early market share and ability to recoup its litigation costs. But, as defendants point out, "[p]laintiffs do not and cannot dispute that there is no evidence that either Sun or [Teva] knew about the acceleration terms" (Dkt. No. 500 at 19).

To each of these theories, defendants again fault plaintiffs for not pointing to evidence from Sun or Teva to the effect that either contemplated such action. But as described above, this argument rests upon the befuddling notion that our actors must have contemplated what they would have done in a but-for world which, due to defendants' antitrust violation, *never happened*. Not so. We construct the but-for world not out of whole cloth, but as a matter of reasoned deviation from the actual world based upon our changed assumption of defendants' lawful conduct. Whether those changed circumstances, within the interlocking-incentive scheme of the pharmaceutical-patent regulatory apparatus, would merely have driven rational actors in Sun and Teva's positions through the same course of conduct, just shifted forward in time, or driven one in Sun's position to pursue Lupin more aggressively, remains a question for our jury. *See Bigelow*, 327 U.S. at 264–65.

### 4. PLAINTIFFS' SUIT REMAINS TIMELY.

A reasonable trier of fact could also find plaintiffs' suit timely. Our antitrust laws impose a four-year statute of limitations. 15 U.S.C. § 15b. The March 5 order resolving defendants' motions to dismiss found that plaintiffs had adequately alleged both defendants' continuing

violations of the antitrust laws, permitting plaintiffs to recover (on the pleadings at least) for all Glumetza purchases from August 29, 2015, and defendants' fraudulent concealment of the scheme, permitting recovery back to the beginning. Together, defendants assail only the second finding here.

A limitations period will be tolled where defendants affirmatively concealed their unlawful conduct and plaintiffs, acting reasonably, had neither actual nor constructive knowledge. *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012). Defendants do not contest their affirmative concealment, but contend that facts available to plaintiffs in mid-2015 would have excited the inquiry of a reasonable person and prompted diligent investigation. *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 504 (9th Cir. 1988).

Specifically, defendants argue that Lupin's launch calendars and an earnings call with executives in mid-2015 informed plaintiffs of Lupin's expectation that Bausch would not launch an authorized generic for some time, exciting the line of inquiry in a reasonable person that, if diligently pursued, would have led plaintiffs to discovery of the pay-for-delay scheme. "The determination of whether a plaintiff knew or should have known of a cause of action presents a question for the trier of fact," though "diligence is tested by an objective standard." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987). Summary judgment here will be appropriate "only if uncontroverted evidence irrefutably demonstrates that a plaintiff discovered or should have discovered [the cause of action] but failed to file a timely complaint." *Hexcel*, 681 F.3d at 1063 (quotes omitted). Questions remain.

As early as February 2015, Lupin began distributing launch calendars to several plaintiffs (including at least H-E-B, Kroger, Walgreen, AmerisourceBergen, CVS, Cardinal Health, and Humana), indicating both Lupin's status as the first-ANDA filer on Glumetza, entitling it to the 180-days of generic exclusivity, and the expectation that there would be "no AGx [authorized generic] expected" at launch. Then, on July 5, Vinita Gupta, Lupin's CEO, announced that "Glumetza launches in February and we have a sole exclusivity for 6-months on Glumetza" (Dkt. Nos. 464-22 at 8; 464-31 at 9).

Defendants say this information provided constructive notice of the no-AG provision because plaintiffs admitted that Lupin's expectation that Bausch would not launch an authorized generic for some time was an unusual piece of knowledge. Indeed, defendants note, plaintiff Kroger *did* inquire, asking Bausch about its plans for an authorized generic, albeit within the four year limitations period in December 2015 (Dkt. No. 464-29). No matter, defendants assure us. If the information prompted Kroger to ask later, it should have had the same effect earlier.

A reasonable jury could reject this argument and find that plaintiffs still lacked constructive notice of their claims. Lupin knew good and well that Bausch would not launch an authorized generic for at least one year after Lupin's own generic launch because both had signed the secret side-settlement agreement. It remains difficult to overemphasize that our entire inquiry rests on the baseline that on March 26, 2012, our defendants *concealed* the existence of the no-AG provision from Judge Hamilton. *Deposed*, No. C 09-05587 PJH, Dkt. No. 151 (N.D. Cal. Mar. 26, 2012). "The duty of candor is not simply an obligation to answer honestly when asked a direct question by the trial court. It includes an affirmative duty to inform the court when a material statement of fact or law has become false or misleading in light of subsequent events." *Levine v. Berschneider*, 56 Cal. App. 5th 916, 921 (2020). Defendants' omission of the material no-AG provision from their disclosure to a *federal judge* meant that the term *did not exist*. And, from that angle, the evidence that Lupin only began hinting of the no-AG provision in mid-2015 means that our defendants continued to suppress public knowledge of the no-AG provision for three years. The conceptual leap defendants propose, from "no-AG expected" to "we should investigate whether Bausch secured the Lupin settlement with a no-AG provision," would have required our plaintiffs to conclude that their regular business partners had both *misled a federal judge* and spent three years covering it up. This hazy record does not mandate that jump and, in fact, permits a jury to conclude plaintiffs did not have constructive notice of the no-AG provision.

### 5.    ASSERTIO'S INDIVIDUAL DEFENSES FAIL.

Assertio, on its own, proclaims that it washed its hands of the alleged unlawful scheme long ago, arguing that it withdrew from the conspiracy in 2013, that it committed none of the overt acts contributing to defendants' continuing violation, and that it bears no culpability for Bausch's unforeseeable price hikes.

The story goes that Assertio granted Santarus control of most marketing for Glumetza in July 2008, though the two shared price control.  In August 2011, Assertio transferred all Glumetza commercialization rights to Santarus, including sole price control, though Assertio retained a royalty on sales.  But that link severed in October 2013, when Assertio sold "substantially all its royalty interests for Glumetza" to PDL Biopharma (Dkt. No. 464 at 9–10).  In other words, as Assertio tells us, the last thing it did in service of the conspiracy was sign the settlement agreement in February 2012.

On its face, this story leaves a curious omission, one highlighted by defendants' repeating chorus that the challenged settlement agreement effected no more than the patent rights granted to, who else but, Assertio.  Who lists the patents as covering Glumetza in the Orange Book?  Who must be present in any infringement suit to trigger the thirty-month stay and exclude new generics?  Who grants or withholds licenses?  Who holds the rights which might exculpate defendants' alleged scheme?  The patent owner, Assertio.  *See Lone Star Silicon Innovs. v. Nanya Techs.*, 925 F.3d 1225, 1228–29 (Fed. Cir. 2019); *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 94 (2d Cir. 2017); *Nexium*, 842 F.3d at 63.  If Assertio maintained the patents throughout the conspiracy, and as far as defendants have told us it did, then *Assertio* maintained both the primary regulatory scarecrow against generic competition *and* the primary (indeed only, thus far) justification for defendants' scheme.  In for a penny, in for a pound.

*First*, actions in furtherance of a conspiracy are imputed to all involved "until its purpose has been achieved or abandoned."  *U.S. v. Inryco, Inc.*, 642 F.2d 290, 293 (9th Cir. 1981); *Arandell Corp. v. Centerpoint Ener. Servs.*, 900 F.3d 623, 634 (9th Cir. 2018).  Withdrawal from a conspiracy requires disavowal of the unlawful goal, an affirmative act to defeat its purpose, or "definite, decisive, and positive steps" to show a sufficient disassociation.  *United*

*States v. Lothian*, 976 F.2d 1257, 1261 (9th Cir. 1992) (quotes omitted).  While Assertio covered its coconspirators' exits, even from afar, it cannot be said to have withdrawn, and will answer alongside them.

*Second*, a continuing violation accrues with each overt act, which is both new and independent, not a mere reaffirmation of previous conduct, and which inflicts new and accumulating injury.  *Samsung*, 747 F.3d at 1202–03.  True, as Assertio notes, the Honorable Lucy H. Koh, relying on our court of appeals' language in *Pace Industries v. Three Phoenix Company* that "an overt act *by the defendant* is required to restart the statute of limitations," concluded that the continuing violation doctrine does not impute acts between coconspirators. *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1072 (quoting 813 F.2d 234, 237 (9th Cir. 1987)).  But this appears an unduly literal interpretation of the language in *Pace* given, first, that our court of appeals did not raise the distinction that Judge Koh later raised and, second, because the Supreme Court does appear to approve of imputing a continuing violation across a conspiracy, explaining famously that "[i]n the context of a *continuing conspiracy* to violate the antitrust laws . . . each time a plaintiff is injured by *an act of the defendants*[,] a cause of action accrues to him to recover the damages caused by that act."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (emphasis added).  This order thus respectfully disagrees with Judge Koh's ruling, though, regardless, we have such an overt act here. Assertio provided, and *maintained control of throughout*, the patents, the regulatory leverage that enabled defendants' entire alleged scheme.  *Samsung Elects. v. Panasonic Corp.*, 747 F.3d 1199, 1203 (9th Cir. 2014).

*Third*, "a defendant cannot be held liable for substantive offenses committed before joining or after withdrawing from a conspiracy."  *Lothian*, 976 F.2d at 1262.  But our record supports the conclusion that Assertio, by maintaining the regulatory levers permitting and perhaps justifying defendants' conspiracy, never withdrew from it.  It's also worth noting that if Assertio retained the patents, it too retained, potential contract breaches aside, the power to stop Valeant's apparently unforeseeable price hikes by pulling the patent license or permitting other generics to enter earlier.  *Cf. Samsung*, 747 F.3d at 1203.

### 6.    LUPIN'S INDIVIDUAL DEFENSES FAIL.

Alone, Lupin argues that its distribution contracts insulated distributors AmerisourceBergen, Cardinal Health, and McKesson, whose assignees comprise a large portion of our direct purchasers, from actual injury.  According to Lupin, it sold drugs to the distributors at the wholesale acquisition price and the distributers primarily derived revenue not from any markup they might have added but from nonrefundable service fees Lupin paid.  The distributors made more money as the percentage fees grew with drug prices.

This argument mistakes plaintiffs' cognizable injury, which encompasses the immediate extent of the overcharge without regard to plaintiffs' later profit.  *Hanover Shoe*'s cut-and-dry treatment of the overcharge works no injustice here.  What *Hanover Shoe* takes, *Illinois Brick* has given.  And, to this point Lupin and its codefendants have enjoyed *Illinois Brick*'s shield against indirect-purchaser liability several times over.  *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489–93 (1968); *Illinois Brick v. Illinois*, 431 U.S. 720, 749 (1977) (Brennan, J., dissenting); *Glumetza*, 336 F.R.D. at 480–81 (quoting *In re Skelaxin (Metaxalone) Antitrust Litigation*, No. MD 12-02343 CLC, 2014 WL 2002887, *5 (E.D. Tenn. May 15, 2014) (Judge Curtis L. Collier)).

Lupin also argues that Bausch would have raised the price of Glumetza as it did in 2015 even if generics had already entered the market.  Even taking this as true, the presence of cheaper generic alternatives in 2015 would have both shielded consumers from the full brunt of the price hikes and helped bring the prices back down to a competitive level sooner.  Yet plaintiffs also offer evidence that Bausch had never raised prices to the extent it did with Glumetza on any drug already subject to generic competition.  Of the 206 drugs for which Bausch raised the price over 100%, it did so following generic entry only 15 times, and none of those reached anywhere close to the nearly 800% increases seen in our case (Dkt. No. 493-1 at ¶¶ 67–69).  A reasonable trier of fact could conclude that generic competition would have suppressed the 2015 price hikes.

**CONCLUSION**

All motions for summary judgment are **DENIED**.  This order has trodden carefully to resolve the parties' four dispositive motions without requiring full resolution of the parties' ten pending *Daubert* motions.  Argument on the *Daubert* motions will be set midsummer.  A future order will resolve those motions.  The Court trusts that if resolution of the *Daubert* motions fundamentally undercuts a party's ability to make a certain argument, the party will own up to it and not waste our time at trial.  For that matter, trial remains set for and *voir dire* will commence on **OCTOBER 4 AT 7:30 A.M.**  The Court is looking forward to it.

**IT IS SO ORDERED.**

Dated:  May 6, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE