United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

In re

GLUMETZA ANTITRUST
LITIGATION.

This Document Relates to:

ALL ACTIONS.

No.  C 19-05822 WHA
No.  C 19-06138 WHA
No.  C 19-06839 WHA
No.  C 19-07843 WHA
No.  C 19-08155 WHA
No.  C 20-01198 WHA
No.  C 20-05251 WHA

(Consolidated)

**ORDER RE *DAUBERT* MOTIONS
TO EXCLUDE TESTIMONY**

## INTRODUCTION

In this antitrust action, defendant brand and generic manufacturers of a type-2 diabetes drug allegedly engaged in a reverse-payment scheme and agreed not to compete with each other by delaying the introduction of a generic version of the drug for several years.  The parties seek to winnow the battle of the experts at trial with ten *Daubert* motions to exclude testimony.

## STATEMENT

The order denying summary judgment describes the facts of this action in detail (Dkt. No. 537).  For the purposes of this order, in 2009, pharmaceutical company Depomed, Inc. sued Lupin Pharmaceuticals, Inc. in its various corporate forms for infringing Depomed's

patents on Glumetza — an extended-release version of metformin hydrochloride, a drug that helps control blood sugar levels for individuals suffering from type 2 diabetes.  Lupin entered Depomed's crosshairs because it had filed an Abbreviated New Drug Application (ANDA) with the FDA, seeking to manufacture and market generic versions of Glumetza.  The parties litigated before the Honorable Phyllis J. Hamilton of our district for over a year before a claim construction order prompted the parties to settle in February 2012.

As our plaintiffs allege, this settlement hid an underlying conspiracy from Judge Hamilton — a *quid pro quo* where Lupin would delay market entry of its generic for four years (until February 1, 2016) and, in return, Depomed guaranteed it would not launch an authorized generic to compete with Lupin for one year (atop an FDA-granted 180-day period of market exclusivity) and would also protect Lupin from *other* generic competition.  *First*, if any other manufacturer succeeded in marketing a generic Glumetza before February 2016, Lupin could market immediately.  *Second*, Depomed covenanted not to license any other generic Glumetza manufacturers until at least 180 days following Lupin's market entry.

The agreement resulted in a windfall for defendants.  Depomed had already sold its marketing rights in Glumetza to defendant Santarus, Inc., but then sold its royalty rights to PDL Biopharma in October 2013 (Dkt. No. 464-1).  The juiced Glumetza portfolio aided Santarus' sale to defendant Salix Pharmaceuticals for $2.6 billion in November 2013, and Salix's sale to defendant Valeant Pharmaceuticals for $14.5 billion in April 2015.  Then, in summer of 2015, Valeant hiked the price of Glumetza on the order of 800%.  The wholesale acquisition cost of a 500 mg pill spiked form $5.72 in May to $51.48 by the end of July.  At the same time, the cost of a 1000 mg pill rose from $12.37 to $113.36.  When Lupin joined the market in February, the supposed-affordable generic did so at around $45 for each 500 mg tablet.

Both direct and indirect purchasers started suing in August 2019.  The cases were consolidated before the undersigned, the indirect purchasers eventually exited the case, and a direct-purchaser class was certified in August 2020.  An order dated May 6, 2021, denied all motions for summary judgment but left off ruling on the parties' ten *Daubert* motions to

1   exclude expert testimony.  The paperwork involved in this massive motion practice has taken

2   the court many hours to sort out, and oral argument would be of no assistance in this endeavor.

3   The Court is satisfied that the best way to proceed is to rule based on the papers themselves.

4   This order makes those rulings now.

**ANALYSIS**

6        District courts have a gatekeeping role to ensure that expert testimony admitted into

7   evidence is both reliable and relevant, and to exclude "junk science."  *Messick v. Novartis*

8   *Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014).  Under Rule 702 of the Federal Rules of

9   Evidence, an expert witness may provide opinion testimony if:  (1) the expert's specialized

10   knowledge will help the trier of fact; (2) the testimony is based upon sufficient facts or data;

11   (3) the testimony is the product of reliable principles and methods; and (4) the witness has

12   applied the principles and methods reliably to the facts of the case.

13        Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and its progeny, the admissibility

14   of expert testimony turns on "whether expert testimony proffered in the case is sufficiently tied

15   to the facts of the case that it will aid the jury in resolving a factual dispute."  509 U.S. 579,

16   591 (1993).  The district court's inquiry is flexible and based on the particular circumstances of

17   the case — it "must assure that the expert testimony 'both rests on a reliable foundation and is

18   relevant to the task at hand.'"  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting

19   *Daubert*, 509 U.S. at 597).  "Expert opinion testimony is relevant if the knowledge underlying

20   it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying

21   it has a reliable basis in the knowledge and experience of the relevant discipline."  *Id.* at 565.

22   Ultimately, while the proponent of expert testimony bears the burden of demonstrating its

23   admissibility, the *Daubert* inquiry should be applied with a liberal thrust favoring admission.

24   *Messick*, 747 F.3d at 1196 (quoting *Daubert*, 509 U.S. at 588); *Lust v. Merrell Dow Pharms.*,

25   *Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); Fed. R. Evid. 702 Advisory Comm. Notes.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1. **PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERT DR. JENA.**

First up is plaintiffs' *Daubert* motion regarding Dr. Anupam B. Jena (Dkt. Nos. 435, 473, 486). Dr. Jena, M.D., Ph.D. is a University of Chicago educated economist and physician currently teaching at Harvard Medical School and practicing at Massachusetts General Hospital. In his report, Dr. Jena opines: that Drs. Starr and Leffler take flawed approaches to assessing market power as well as the market definition and that the brand defendants did not possess monopoly or market power over pricing for Glumetza; that there is strong evidence of clinical substitutability between Glumetza and other metformin medications; and that there is strong evidence of economic substitutability as well (Jena Rep. ¶¶ 1–3; 11, Dkt. No. 440-16).

Dr. Jena's market power analysis makes two inquiries. First, he critiques the opinions of defendants' experts and argues that Glumetza's 2015 list-price increases is not evidence of market power, that the (actual or projected) decline in Glumetza's price in light of the entry of generics into the market does not imply market power, and the fact that Glumetza's price exceeded short-run marginal cost also does not imply market power (*id.* at ¶¶ 44–64). Second, Dr. Jena addresses indirect evidence of market power, which requires him to define Glumetza's market structure. Dr. Jena analyzes the clinical and economic substitutability of Glumetza and concludes that the relevant market is not just Glumetza and its generics, but also includes extended-release metformin products, such as brand and generic versions of Glucophage XR and Fortamet, and immediate-release metformin products, such as brand and generic versions of Glucophage (*id.* at ¶¶ 130–32).

In their *Daubert* motion, plaintiffs primarily argue that, as "a matter of law . . . in a generic-suppression case such as this, the generic price is the competitive price," and that Dr. Jena's "denial that the generic price is the relevant competitive price is fatal to his market-power analysis" (Br. 4, 6). To reach this conclusion, plaintiffs rely on *In re Aggrenox Antitrust Litigation*, which limited the scope of discovery in a reverse-payment case, holding that "the only relevant market in this litigation is [] the market of Aggrenox and its generic equivalents." 199 F. Supp. 3d 662, 663 (D. Conn. 2016). *Aggrenox* reasoned that, while a reverse payment is not dispositive of antitrust liability, a resulting imposition of supracompetitive prices is

4

direct (and conclusive) evidence of market power as a matter of law, which obviates any need for an inquiry into a market definition.  Accordingly, charging a supracompetitive price for a patented drug demonstrates at least a degree of market power, so the substitutability of the patented drug with another drug on the market could only limit damages and would have no bearing on liability.  *Id.* at 664–66, 668–69 (citing *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986)).

Plaintiffs' argument in their *Daubert* motion is cut from the same cloth as those denied in the May 2021 summary judgment order:  "Though the Supreme Court approved of direct proof of market power in *Indiana Federation*, there remains a broad gap between affirmance of a direct factual finding of market power versus plaintiffs' request here to take that question from the jury" (Summary Judgment Order 13).  As the summary judgment order stated, no appellate opinions have adopted *Aggrenox*'s reasoning, and *Indiana Federation* did, in fact, roughly define the market.  The *Aggrenox* court recognized the opinion's novel approach and certified it for interlocutory appeal, saying that "district courts have struggled to fill the gaps that *Actavis* left open," and implying that its "effort to provide some of the missing structure" may not be the final word.  *Aggrenox*, 199 F. Supp. 3d at 669–70.

As another court has noted, *Aggrenox* proposed a seductively simple standard.  *See In re Loestrin 24 Fe Antitrust Litig.*, 2017 WL 1491911, at *5 (D.R.I. Mar. 15, 2017) (Judge Patricia A. Sullivan).  *Aggrenox* itself recognized the Supreme Court's missive in *Actavis* that "trial courts can structure antitrust litigation so as to avoid, on the one hand, the use of antitrust theories too abbreviated to permit proper analysis, and, on the other, consideration of every possible fact or theory irrespective of the minimal light it may shed." *Aggrenox*, 199 F. Supp. 3d at 664 (citing *Actavis*, 570 U.S. at 159–60).  Given the present posture of this action — much farther along than *Aggrenox* — and the conclusion at summary judgment that left the finding of direct proof of market power in the hands of the jury, this order will not now withhold from that jury relevant expert testimony on this critical issue.  To do otherwise would unduly abbreviate the market power analysis.

United States District Court
Northern District of California

1    Plaintiffs also briefly argue that Dr. Jena fails to tether his market power analysis to

2    potential anticompetitive effects by neglecting to discuss the reverse-payment scheme (Br. 4–

3    5). *Actavis* held: "In sum, a reverse payment, where large and unjustified, can bring with it the

4    risk of significant anticompetitive effects; one who makes such a payment may be unable to

5    explain and to justify it; such a firm or individual may well possess market power derived from

6    the patent." *Actavis*, 570 U.S. at 158. In light of the summary judgment order, even if his

7    report only tangentially references the reverse payment, Dr. Jena's testimony does not run

8    counter to *Actavis* and is relevant to the inquiries of this action, such as the clinical and

9    economic sustainability of Glumetza. He may leave specific analysis of the reverse payment to

10   other experts without risking exclusion. Plaintiffs' other arguments to exclude Dr. Jena's

11   testimony presuppose, pursuant to *Aggrenox*, that that the competitive price is the generic

12   price, and fail for the reasons previously stated.

13   Because the summary judgment order foreclosed plaintiffs' theory that, in a generic-

14   suppression case, the generic price is necessarily the competitive price, plaintiffs' motion to

15   exclude Dr. Jena's testimony is **DENIED**.

16
         **2.    PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF
17              DEFENDANTS' EXPERTS PROFESSOR HOPFENBERG AND
                PROFESSOR ADELMAN.**

18   Plaintiffs next move to exclude testimony of Professor Harold B. Hopfenberg — a

19   professor of chemical and biomolecular engineering who performs an infringement analysis of

20   the patents at issue in the *Lupin* litigation — and Professor Martin Adelman — a law professor

21   who opines on the likely outcome of the *Lupin* litigation and relies on various aspects of

22   Professor Hopfenberg's opinions (Dkt. Nos. 434, 478, 483).

23   Professor Hopfenberg received his bachelor's, master's and Ph.D. degrees in chemical

24   engineering from MIT, and he is the Camille Dreyfus Professor Emeritus of Chemical and

25   Biomolecular Engineering at the North Carolina State University. Professor Hopfenberg's

26   research has concerned controlled drug delivery systems as well as swellable polymers and

27   their interactions with small molecules. He has testified in a couple dozen patent litigation

28

1    matters, including four cases involving the patents-in-suit on behalf of Depomed (Hopfenberg

2    Rep. ¶¶ 1–3, 7, 12, Dkt. No. 440-7).

3        Depomed previously retained Professor Hopfenberg as an expert for the litigation

4    predicating the instant dispute, *Depomed, Inc. v. Lupin Pharms.*, No.  C 09-05587 PJH (N.D.

5    Cal. filed Nov. 25, 2009) (Judge Phyllis Hamilton).  In his expert report in that case, Professor

6    Hopfenberg opined that Lupin's tablets infringed Depomed's patents.  In the instant action,

7    Professor Hopfenberg opines:

8            each element of claim 1 of the '475 patent and each element of
             claim 1 of the '280 patent as construed by Judge Phyllis J.
9            Hamilton in the Lupin litigation, was present in the 500 mg and
             1000 mg Lupin tablets.  It is also my opinion that each claim
10           element of claim 1 of the '962 patent, as construed by Judge
             Hamilton, was present in the 1000 mg Lupin tablets"
11

12   (Hopfenberg Rep. ¶¶ 16–17, 38).  Professor Hopfenberg also states, "it is my opinion that the

13   asserted claims of the Depomed patents are valid even in light of the prior art cited by Dr.

14   Park," Lupin's expert in the litigation (*id.* ¶ 39).

15       To reach these conclusions here, Professor Hopfenberg compares the patent claims to

16   Lupin's tablets using data from a variety of sources from both the patent owner Depomed and

17   the alleged infringer Lupin.  Sources from Lupin include:  Lupin's ANDA, tests Lupin

18   submitted to the FDA, development data, and testimony from Lupin's technical expert,

19   Professor Kinam Park — which includes both deposition testimony from this action and a draft

20   expert report from the patent litigation (*id.* at ¶¶ 64, 66, 68, 71–72, 89).  Professor Hopfenberg

21   uses a similar collection of data from Depomed, including:  reports from other technical

22   experts Depomed retained for the *Lupin* litigation (Leslie Z. Benet, Linda A. Felton, and Eden

23   Tesfu), tests conducted by Depomed technicians, and his own expert analysis at the time (*id.* at

24   ¶¶ 80, 82, 96, 98, 114).

25       Turning to defendants' patent-law expert, Professor Adelman received his bachelor's

26   degree, master's degree in physics, and law degree from the University of Michigan at Ann

27   Arbor, and clerked for the Honorable Theodore Levin.  In 1973, Professor Adelman became a

28   Professor of Law at Wayne State University Law School, and currently serves as the Co-

United States District Court
Northern District of California

Director of the Dean Dinwoodey Center for Intellectual Property Studies at George Washington University Law School, among other titles (Adelman Rep. ¶ 2–5, 7, Dkt. No. 440-10).

Defendants asked Professor Adelman to opine on the likelihood Depomed would have prevailed on the merits in the *Lupin* litigation absent settlement (*id.* at ¶ 1). He concludes:

> [I]f the parties had not settled, the likelihood that Depomed would have prevailed as to the '475 and/or '280 patents was 80%; and the likelihood that Depomed would have prevailed as to the '962 patent was 60%. I do not think it was likely that any decision by the district court in favor of Depomed would have been reversed on appeal. I further conclude that a reasonable executive at a company such as Depomed who was advised by litigation counsel would have also expected that Depomed would likely have prevailed in the Lupin litigation on any subsequent appeal

(*id.* at ¶ 143). To reach these opinions, Professor Adelman (similar to Attorney Lentz, discussed below) reviews Judge Hamilton's claim construction order and how it would have impacted Depomed's claims. Professor Adelman subsequently compares Depomed's infringement case with Lupin's noninfringement arguments, using analysis from Professor Hopfenberg (*id.* at ¶¶ 56–58, 69–120). Professor Adelman then addresses Lupin's invalidity case by reviewing previous cases where invalidity challenges against the Depomed patents failed, again using on Professor Hopfenberg's technical evaluation. Lastly, to support his ultimate opinions, Professor Adelman reviews contemporary written analysis by Lupin's counsel on the patent litigation as well as retrospective testimony from the same counsel from their despositions in this action (*id.* at ¶¶ 123–42).

Plaintiffs cite the undersigned's order in *Therasense, Inc. v. Becton, Dickinson and Co.* to argue that Professor Hopfenberg's testimony — and, by proxy, Professor Adelman's testimony — should be excluded because they typify "the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion." 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008). *Therasense* held that "no professional should reasonably rely on . . . rigged and biased source[s] of information for any materially important fact to his or her opinion." *Id.* at *2. The order elaborated:

> Given the obvious bias of clients, however, any litigation-driven test must be subjected to heightened scrutiny such that it would be reasonable for a truly independent professional in the field of endeavor to base an important decision on it. The more central the "fact" issue is in the overall opinion and overall trial and the more controverted the "fact" is in the context of the case, the more due diligence an expert should exercise before merely taking a partisan's word

*Ibid.* Defendants contend that the same issues present themselves here because "Dr. Hopfenberg took test results that had previously been prepared by employees of defendant Depomed and/or experts retained by Depomed's counsel in the *Lupin* litigation and relied on them as the basis for his infringement opinions in this case" (Br. 14).

While the principles in *Therasense* hold true, Professor Hopfenberg's role as Depomed's expert in the underlying *Lupin* litigation does not, by itself, raise any red flags.  Just as there may be wisdom in plaintiffs' decision to forgo retaining an expert in molecular biology and having their patent-law expert Attorney Lentz opine using only the technical-expert opinions generated contemporaneously for the *Lupin* litigation, there may also be wisdom in defendants' decision to retain Professor Hopfenberg in this action to again opine on technical infringement and invalidity issues in the *Lupin* litigation due to his familiarity with the underlying technology, which in turn supports Professor Adelman's evaluation of the patent litigation.

To that end, Professor Hopfenberg does not necessarily regurgitate facts orchestrated by counsel and prepared by his current clients — Lupin and Depomed (now Assertio) — for *this* antitrust action.  Rather, he reviews data from when his clients were *adverse* in the *Lupin* patent litigation.  Plaintiffs argue Professor Hopfenberg improperly relies upon testing performed by Depomed's experts and employees (Br. 14–15).  For example, plaintiffs find it problematic that Professor Hopfenberg cited tests performed by Depomed technicians in his analysis of the claim term "releases substantially all of said drug" from the '475 patent (Br. 8).  If this was the sole source of data on the issue, it might indeed be problematic.  But Professor Hopfenberg begins his analysis by reviewing Judge Hamilton's claim construction, after which he:  reviews data Lupin submitted to the FDA as part of its ANDA, examines Lupin laboratory notebooks, and, only then, does he assess tests undertaken by Depomed technicians at the direction of counsel (Hofenberg Rep. ¶¶ 86–93).  By critically evaluating a variety of sources

9

1    to arrive at his conclusion (including data from opposing sides in that litigation), Professor

2    Hopfenberg avoids the nuisance of made-for-litigation facts condemned by *Therasense*.  His

3    general methodology is thus not *per se* unsound and may be admitted.

4          To the extent an *aspect* of Professor Hopfenberg's analysis solely (or unreasonably)

5    relies on data from one test or source in the *Lupin* litigation, plaintiffs will have the opportunity

6    to cross-examine Professor Hopfenberg.  While *Therasense* mandated a higher level of

7    scrutiny for partisan facts it did not hold that an expert can never rely on testing he or she was

8    not involved with — that would contravene Rule of Evidence 703.  For example, it should "be

9    reasonable for a truly independent professional in the field of endeavor to base an important

10   decision on" data Lupin submitted to the FDA as part of its ANDA (*see, e.g.*, Hofenberg Rep.

11   ¶¶ 68, 87, 89).  If, however, for any particular point, Professor Hopfenberg relies on testing

12   from Depomed's experts and employees with less rigorous protocols, plaintiffs may probe

13   Professor Hopfenberg's diligence in incorporating that data in order to determine whether one

14   could rely on the test after the fact.

15         Because this order permits Professor Hofenberg to testify, Professor Adelman's opinions,

16   which rely in part on Professor Hopfenberg's report, will also be permitted.  Plaintiffs argue:

17   "The problem is then compounded by Professor Adelman's reliance on Professor

18   Hopfenberg's opinion in forming his legal opinions on infringement.  By filtering questionable

19   test results through two layers of experts, defendants seek to evade any scrutiny" (Br. 15).

20   While not dispositive on the matter, this order notes that plaintiffs undermine their *Daubert*

21   arguments here by proffering a patent-law expert (Attorney Lentz) who performs substantially

22   the same analysis using substantially the same methodology as Professor Adelman.  Just as

23   Attorney Lentz found the (draft) technical expert report by Professor Park persuasive and

24   distinguishes the arguments made by Deopmed's technical experts, Professor Adelman can

25   find persuasive analysis from Professor Hopfenberg and Depomed's other technical experts

26   from the *Lupin* litigation.  Plaintiffs will be able to cross-examine Professor Hopfenberg

27   similar to how defendants will be able to cross-examine Professor Park, who is on the parties'

28

United States District Court
Northern District of California

joint witness list.  Plaintiffs cannot use an argument regarding filtered opinions as both a sword and a shield.

In sum, plaintiffs' motion to exclude testimony of Professor Hopfenberg and Professor Adelman is **DENIED**.

### 3.     PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF LUPIN'S EXPERT PROFESSOR PHILIPSON.

This order continues next to plaintiffs' motion to exclude the testimony of Lupin's health-economics expert Professor Tomas J. Philipson (Dkt. Nos. 436, 480, 483).  For reasons similar to those underpinning the August 2020 order granting class certification, his opinions run counter to Supreme Court precedent and mistake the cognizable harm here.

Plaintiffs do not question Professor Philipson's credentials.  Professor Philipson currently serves as the Daniel Levin Professor of Public Policy Studies at the Irving B. Harris Graduate School of Public Policy Studies at the University of Chicago, where he also has affiliations with the university's department of economics and law school (Philipson Rep. ¶¶ 1–6, Dkt. No. 440-13).

Professor Philipson asserts three primary opinions:

- Based on their contractual relationships with Lupin, the Wholesalers were not harmed by, and likely benefitted from, the prices charged by Lupin at entry and thereafter.

- Lupin's contractual obligation to the Wholesalers insulated the Wholesalers from any adverse effects of Lupin's prices.

- Implicit credit markets in the Wholesalers' contracts with Lupin served as an additional source to benefits to Wholesalers from high prices

(*id.* at ¶ 11).  His twelve-page expert report reviews the contracts between Lupin and the wholesalers and specifically concludes that "without regard to their downstream sales" the wholesalers benefitted from Lupin "entering at the price at which it entered, compared to having entered at a lower price" (*id.* at ¶ 26).

Plaintiffs argue they claim overcharge damages in this dispute and that Professor Philipson bases his opinions on theories rejected by *Hanover Shoe* and *Illinois Brick*.  This

United States District Court
Northern District of California

order pauses to restate that, in those cases, the Supreme Court rejected the antitrust defense that

a defendant's illegal overcharge does not injure a direct purchaser when that overcharge was

"passed on" to the direct purchaser's customers.  *Hanover Shoe, Inc. v. United Shoe Machinery*

*Corp.*, 392 U.S. 481, 488–89 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728–29

(1977).  Lupin responds (italics added):

> Dr. Philipson opines that Purchasers cannot meet the threshold
> question of harm *in order to arrive at an overcharge calculation*,
> based on the operation of the distribution agreements in place
> between Lupin and the Distributors, which governed the
> Distributors purchases of generic Glumetza from Lupin.

(Opp. 5).  In other words, Lupin says the wholesalers cannot show harm from an overcharge

because the contractual agreements between the wholesalers and Lupin insulate the

wholesalers from the economic effects of higher generic prices.

It's déjà vu all over again.  Lupin has asserted variations of this argument throughout this

litigation.  Magistrate Judge Illman rejected Lupin's request for discovery of the wholesalers'

downstream data since 2011 as contrary to *Hanover Shoe* and *Illinois Brick* in a June 2020

order (Dkt. No. 305 at 26–30).  That order noted the argument that a direct purchaser

"otherwise benefitted" from an overcharge "amounts to little more than a subtle variation of

the pass-on defense" (*id.* at 30, cleaned up, citing *Meijer, Inc. v. Abbott Labs.*, 251 F.R.D. 431,

435 (N.D. Cal. 2008) (Judge Claudia Wilken)).   In their opposition to class certification,

defendants similarly argued that plaintiffs' expert Dr. Leitzinger did not account for the fact

that "wholesalers can *benefit* as a result of generic delay, and the vast majority of claims in this

case are held by class members that likely befitted from such a delay" (Dkt. No. 263 at 18).

The class certification order again rejected this theory, stating that "defendants' argument

incorrectly focuses on the wholesaler's later realized profit margin instead of the actual injury

here, the *overcharge*. . . .  '[An] antitrust injury occurs the moment the purchaser incurs an

overcharge, whether or not that injury is later offset'" (Class Certification Order 17, Dkt. No.

347, quoting *In re Nexium Antitrust Lit.*, 777 F.3d 9, 27 (1st Cir. 2015)).

Lupin here argues at right angles in an attempt to sidestep these issues, insisting that

Professor Philipson opines "without regard to the Wholesalers' downstream activities" (which

he repeats five times in his report, almost every other page) and that the distribution agreements governed the purchase of generic Glumetza (Opp. 5).  Indeed, Professor Philipson filed an errata adding the phrase "for a given quantity of drugs acquired" five times in order to "neutralize any downstream effects" (Br. 9).  But the overcharge precipitated by the delayed entry logically presupposes the distribution agreements, and what do the distribution agreements in this context accomplish other than providing offsets for that overcharge?  Lupin argues that Professor Philipson's opinions do not run afoul of *Hanover Shoes* and *Illinois Brick* because he limits his opinions to the upstream arrangements.  But those upstream arrangements focused on the downstream revenues, such as guaranteeing a chargeback from Lupin of the difference between the wholesale acquisition cost and the price Lupin had negotiated with the retailer and the wholesalers' contractual right to return any amount of product to Lupin for a full refund (Philipson Rep. ¶ 11.2).  Professor Philipson's opinion that the wholesalers likely benefitted from the agreement still focuses on the wholesaler's later-realized profit margin (as contemplated by the distribution agreements) instead of the actual injury — the overcharge. His arguments are just another rhetorical rearticulation of the "otherwise benefitted defense" rejected by Magistrate Judge Illston and the class certification order.

In sum, Lupin's hand-waving does not persuade.  To the extent stated above, plaintiffs' motion to exclude Professor Philipson's testimony is **GRANTED**.

### 4. PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERT PROFESSOR TUCKER.

Plaintiffs next move to exclude two discrete opinions of defendants' expert Professor Catherine Tucker (Dkt. Nos. 438, 476, 483).

Plaintiffs do not generally contest Professor Tucker's qualifications.  She received her Ph.D. in economics from Stanford University and is currently the Sloan Distinguished Professor of Management Science at MIT Sloan School of Management, as well as an editor for several journals (Tucker Rep. ¶¶ 1–4, Dkt. No. 440-11).  Plaintiffs take issue with two aspects of her analysis:  her opinion that the marketing commitments in the Lupin agreement were procompetitive; and her opinion regarding Sun's probability of success in *Depomed, Inc.*

13

*v. Sun Pharma Global FCE*, No.  C 11-03553 JAP (D.N.J. filed June 20, 2011) (Judge Joel A. Pisano) — another patent infringement case Depomed filed against another would-be generic manufacturer of Glumetza that included all the patents at issue in *Lupin* (Br. 1).

*First*, Professor Tucker opines that the marketing commitments in the Lupin agreement were procompetitive.  She reaches this conclusion through an analysis of how the marketing commitments addressed four ways that patients could fail to embrace Glumetza (described in an early internal analysis (Tucker Rep. ¶¶ 120–32).  Plaintiffs argue for exclusion of this testimony on the basis that "a defendant may not claim procompetitive justification for the settlement as a whole," and instead, as part of the rule-of-reason analysis, must demonstrate the no-AG *provision* had procompetitive effects (Br. 2–3).  Plaintiffs adjust this point in their reply brief, arguing that, at minimum, a nexus must exist between the procompetitive benefit and the reverse payment (Reply Br. 3).

Plaintiffs base this argument on a narrow interpretation of *Actavis* and *In re Impax Labs., Inc.*, 2019 WL 1552939, at *31 (F.T.C. Mar. 28, 2019).  Here's the relevant excerpt from *Actavis*:

> That [reverse] payment may reflect compensation for other services that the generic has promised to perform — such as distributing the patented item or helping to develop a market for that item. . . .  An antitrust defendant may show in the antitrust proceeding that legitimate justifications are present, thereby explaining the presence of the challenged term and showing the lawfulness of that term under the rule of reason.

*Actavis*, 570 U.S. at 156 (cleaned up).

This order agrees with defendants that the Supreme Court's language, in context, contemplated a broader review of the agreement than solely the no-AG term in isolation. Regarding the nexus argument in plaintiffs' reply, plaintiffs' expert Professor McGuire *also* acknowledges a connection between the reverse payment and the marketing provisions when he states that "the commitment to a minimum level of promotion expenditures is also a form of pay from the Brand Defendants" (McGuire Rep. ¶ 101 n. 168, Dkt. No. 440-19).  If both the no-AG provision and the marketing provisions in the agreement constitute forms of payment to

United States District Court
Northern District of California

1  Lupin, then a nexus between the no-AG provision and reverse payment would include (or at

2  least be affected by) the marketing provisions with their alleged procompetitive effects.

3  *Impax*, an FTC opinion, crafted a narrow view of *Actavis* when it held:  "[A]n antitrust

4  defendant cannot salvage an anticompetitive reverse payment merely by pointing to unrelated

5  terms in the same settlement agreement," and that "the defendant has the burden to explain and

6  justify the payment itself, not the settlement as a whole."  2019 WL 1552939, at *32.  But even

7  *Impax* does not necessarily forbid Professor Tucker's testimony.  If, as plaintiffs' expert

8  Professor McGuire states, the marketing provisions represent another form of payment, then

9  the provisions are not, per *Impax*, unrelated terms in the same settlement agreement that should

10  not be included in the antitrust analysis.  Regardless, this order will not withhold this testimony

11  from the jury based on *Impax* alone.  How the jury will be instructed on this point will be

12  determined later.

13  Plaintiffs' equivocations undermine their critique of the post-*Actavis* caselaw defendants

14  cite in support of Professor Tucker's position.  *See In re Solodyn Antitrust Litig.*, 2018 WL

15  734655 (D. Mass. Feb. 6, 2018); *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274

16  (D.R.I. 2019); *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734 (E.D. Pa. 2015).  For

17  example, plaintiffs either misread or misrepresent when they assert that "[t]he entire rule-of-

18  reason analysis in *Wellbutrin* . . . was reversed on appeal in an opinion in which the Third

19  Circuit correctly focused on the need to justify the no-AG agreement, not the settlement as a

20  whole" (Reply Br. 5–6).  Rather, as this order reads the opinion, the Court of Appeals for the

21  Third Circuit simply disagreed with an argument from the appellee/defendant that echoed the

22  district court's dictum that the challenged settlements might be beyond the reach of antitrust

23  law.  But the district court explicitly *did not assert that dictum as its holding*, and instead

24  analyzed the settlement using the rule of reason.  *See In re Wellbutrin XL Antitrust Litig.*

25  *Indirect Purchaser Class*, 868 F.3d 132, 161 (3d Cir. 2017).  In fact, the Court of Appeals for

26  the Third Circuit explicitly affirmed the district court on still other grounds:  "Having

27  concluded that the Appellants lack antitrust standing, we do not need to consider the District

28

1   Court's application of the rule of reason." *Id.* at 170 n. 64.  Counsel must remember and honor

2   their duty of candor, including in the description of the caselaw.

3        Plaintiffs' other argument that Professor Tucker fails to consider the brand defendants'

4   preexisting marketing commitments goes to the weight, not relevancy, of her argument.

5   Preexisting marketing commitments and their impact on the marketing clauses in the Lupin

6   agreement may be fodder for cross-examination.  In sum, this order permits Professor Tucker

7   to opine on whether the marketing commitments in the Lupin agreement were procompetitive.

8        *Second*, plaintiffs seek to exclude Professor Tucker's opinion that the plaintiffs' experts

9   but-for world fails to reflect the actual state of information in the *Sun* litigation (Tucker Rep. ¶¶

10  88–91, Fig. 8).  To that end, Professor Tucker performs a sensitivity analysis of the models that

11  Drs. McGuire and Leffler use to predict an alternative settlement date.  Plaintiffs argue that

12  Professor Tucker is not a patent litigator and that she does not articulate a reasonable basis in

13  fact for choosing the variables she selected, and that, without that basis, the obvious changes in

14  the model are meaningless and should be excluded (Br. 7–10; Reply Br. 10–11).

15       This order finds Professor Tucker's methodology clear enough.  As part of her but-for

16  analysis she noted that Attorney Lentz's report relies, in part, on materials that would be

17  unavailable in February 2012, when the parties signed the Lupin agreement.   Next, she cites a

18  pertinent third-party study that found that patent owners succeeded at trial in Paragraph IV

19  litigation over 60% of the time in 2016 and 2017.  She then substitutes Attorney Lentz's 82.5%

20  probability of Sun winning on all patent claims with probabilities of 50, 60, and 70% to probe

21  how it would impact the ultimate alternative settlement date in Professor McGuire's modelling.

22  It does not take a patent expert to construct this sensitivity analysis, and the Paragraph IV study

23  provides a reasonable basis for Professor Tucker to select a 60% baseline (and additional

24  variables at plus/minus 10%, to account for variability and provide greater context) (*see* Reply

25  Br. 10–11, citing *In re Comm. Fin. Servs., Inc.*, 2005 WL 6499290, at *23 (Bankr. N.D. Okla.

26  Sept. 14, 2005)).

27       In sum, plaintiffs' motion to exclude Professor Tucker's opinions is **DENIED**.

28

United States District Court
Northern District of California

16

United States District Court
Northern District of California

**5.** **PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERT DR. STROMBOM.**

Next is plaintiffs' motion to exclude the testimony of Dr. Bruce Strombom (Dkt. Nos. 437, 474, 483).  Dr. Strombom is a managing principal of Analysis Group, Inc., a national economics consulting firm.  In relevant part, Dr. Strombom opines that, assuming the *Lupin* litigation ended with a finding that Lupin infringed Depomed's valid patents, the settlement agreement had procompetitive benefits, as well as that direct purchasers' overcharge damages should be reduced by rebates paid by the manufacturer to indirect purchasers (Strombom Rep. ¶¶ 1–4, 12, 15–33, Dkt. No. 440-12).  Purchaser plaintiffs argue that these opinions must be excluded as contrary to *Actavis*.

Dr. Strombom opines that the procompetitive benefits of the settlement totaled $1.28 billion, and that, contrary to the damages measure put forth by Drs. Leitzinger and Leffler, plaintiffs' damages should be reduced by the rebates paid by manufacturer-defendants to indirect purchasers such as Pharmacy Benefit Managers ("PBMs").  To reach this number, Dr. Strombom's report explains that drug manufacturers have at least three ways to lower prices: "(1) lower the list price (WAC) [wholesale acquisition cost]; (2) provide lower prices to indirect purchasers [*e.g.*, PBMs] through discounts that result in chargeback payments [from the manufacturer] to direct purchasers; or (3) provide discounts and/or rebates to indirect purchasers that bypass direct purchasers or flow through the PBM functions" (*id.* at ¶ 57).  According to Dr. Strombom, regardless of whether the manufacturer chose to use mechanism two or three to adjust the drug list price, all parties are in the same economic position (*id.* at ¶¶ 52–61, Fig. 2).

Dr. Strombom asserts that, in the case of Glumetza, the manufacturers primarily used the third mechanism and provided rebates to indirect purchasers, rather than issuing chargebacks to the wholesalers via the second mechanism.  Thus, while he "understand[s] that the standard measure of damages in a direct purchaser class case is the overcharge paid by direct purchasers," here "substantial payments related to the purchase of Glumetza went between the manufacturers and indirect purchasers" (*id.* at ¶ 54).  Dr. Strombom concludes that, "[a]s a result, the overcharge paid by direct purchasers does not reflect the total amount of the

overcharge paid across the entire supply chain," and that, "the payments made between

manufacturers and indirect purchasers should be included in any estimate of damages" (*ibid.*).

   *First*, plaintiffs argue that Dr. Strombom's reduction of overcharge damages by the

amount of rebates paid by the manufacturers to indirect purchasers contravenes *Hanover Shoe*

and *Illinois Brick*, which, as this order restates, generally precluded the pass-on defense.

*Hanover Shoe*, 392 U.S. at 487–88, 494; *Illinois Brick*, 431 U.S. at 728–29.  Defendants

disagree and assert that the complexities of the pharmaceutical market warrant Dr. Strombom's

calculations (Opp. 10–13).

   This order holds that Dr. Strombom's inclusion of indirect-purchaser rebates in his

damages calculation runs afoul of *Hanover Shoe* and *Illinois Brick*:  "*Hanover Shoe* . . .

rest[ed] on the judgment that the antitrust laws will be more effectively enforced by

concentrating the full recovery for the overcharge in the direct purchasers rather than by

allowing every plaintiff potentially affected by the overcharge to sue only for the amount it

could show was absorbed by it."  *Illinois Brick*, 431 U.S. at 734–35.  Full recovery is

concentrated in direct purchasers, but Dr. Strombom's damages calculation considers

manufacturers' *indirect* rebate to the downstream *indirect* purchaser, a transaction that does not

involve the wholesalers (*see* Strombom Rep. Fig. 2).  Defendants recognize this issue and

argue that *Illinois Brick* never intended the consequence here, nor contemplated "damages in

an amount significantly greater than the overall overcharge" (Opp. 11–12).  But *Illinois Brick*

"reject[ed] . . . attempts to carve out exceptions to the Hanover Shoe rule for particular types of

markets."  *Illinois Brick*, 431 U.S. at 744.  Moreover, as *Illinois Brick* recited:

> The concern in Hanover Shoe for the complexity that would be
> introduced into treble-damages suits if pass-on theories were
> permitted was closely related to the Court's concern for the
> reduction in the effectiveness of those suits if brought by indirect
> purchasers with a smaller stake in the outcome than that of direct
> purchasers suing for the full amount of the overcharge.  The
> apportionment of the recovery throughout the distribution chain
> would increase the overall costs of recovery by injecting extremely
> complex issues into the case; at the same time such an
> apportionment would reduce the benefits to each plaintiff by
> dividing the potential recovery among a much larger group.
> Added to the uncertainty of how much of an overcharge could be
> established at trial would be the uncertainty of how that overcharge

would be apportioned among the various plaintiffs. This additional uncertainty would further reduce the incentive to sue. The combination of increasing the costs and diffusing the benefits of bringing a treble-damages action could seriously impair this important weapon of antitrust enforcement.

*Id.* at 745. Dr. Strombom's consideration of the overcharge across the entire supply chain contravenes the express concerns of *Hanover Shoe* and *Illinois Brick*. This order on *Daubert* motions declines to transgress the explicit bounds of *Hanover Shoe* and *Illinois Brick*. As another court has similarly noted: "*Illinois Brick* suggests . . . the antitrust laws are much more concerned with fully divesting antitrust violators of the benefit of their violation than with any potential windfall to plaintiffs." *In re Skelaxin (Metaxalone) Antitrust Litig.,* 2014 WL 2002887, at *6 (E.D. Tenn. May 15, 2014) (Judge Curtis L. Collier).

The class certification order previously addressed the arguments defendants now proffer in support of Dr. Strombom's opinions. Defendants argued then, "Dr. Leitzinger's damages model 'does not reflect the many discounts and subsequent payments that must be account for to calculate the ultimate *net* price'" (Class Certification Order 17, citation omitted). The class certification order rejected that argument because the injury in question occurred when the manufacturer sold the drug to the wholesaler at the anticompetitive price (*ibid.*). The rebates that Dr. Strombom contemplates here are not directed to the injured party in the antitrust analysis. "*Hanover Shoe* and *Illinois Brick* make clear that courts and juries will not be forced down the rabbit hole of hypothetical issues antitrust violators may raise to minimize their liability." *Skelaxin*, 2014 WL 2002887, at *5. The cases defendants cite in their opposition either recite broad, inapposite, conclusions of law, or involve indirect, not just direct, purchaser claims, and thus do not persuade (*See* Opp. 12–13). Dr. Strombom shall not testify that an overcharge damages calculation should be reduced or otherwise be affected by the amount of indirect-purchaser rebates.

*Second*, plaintiffs argue that *Actavis* precludes Dr. Strombom's opinion that the settlement agreement had procompetitive effects because it assumes that the patents would have been found valid and infringed. *Actavis* recognized that the validity (or invalidity) of the asserted patents need not always be analyzed in a rule-of-reason analysis for a reverse-payment

19

agreement.  570 U.S. at 157, 159.  Besides, Dr. Strombom explicitly conditions his opinion on "assuming that, as [d]efendants contend, the relevant patents asserted against Lupin were valid and infringed," and thus lets defendants' other experts opine on the merits of the patent litigation (Strombom Rep. ¶ 12).  *Actavis* does not preclude Dr. Strombom from cabining off the patent issues and opining on the other aspects of the rule-of-reason analysis.  Indeed, Justice Breyer's opinion in *Actavis* anticipated just that sort of review:  "That is because it is normally not necessary to litigate patent validity to answer the antitrust question . . . .  An unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about the patent's survival."  570 U.S. at 157.

*Third*, plaintiffs say Dr. Strombom's opinion that the settlement agreement had procompetitive effects should be excluded because *Actavis* required him to justify the no-AG provision in isolation, without regard to the rest of the agreement.  This order addresses and rejects this argument in its review of the motion to exclude Professor Tucker's testimony.  *Actavis* held that reverse-payment settlement agreements should be analyzed holistically and is not as narrow as plaintiffs argue.  *Id.* at 156, 159; *see also In re Lidoderm Antitrust Litigation*, 2018 WL 7814761 at *2 (N.D. Cal. Feb. 7, 2018) (Judge William H. Orrick).  Accordingly, plaintiffs' argument fails.

In sum, the motion to exclude Dr. Strombom's testimony is, to the extent stated above, **GRANTED IN PART** and **DENIED IN PART**.

### 6.   PLAINTIFF HUMANA'S MOTION TO EXCLUDE TESTIMONY FROM DEFENDANTS' EXPERT DR. STROMBOM.

Plaintiff Humana separately moves to exclude testimony of Dr. Strombom embodied in a separate report that primarily critiques plaintiffs' damages expert, Professor Rena Conti (Dkt. Nos. 441, 475, 482).  As an initial matter, as this order notes in its analysis of defendants' motion to exclude testimony of Professor Conti and Dr. Leitzinger, a February 2021 order denied Humana leave to file an amended complaint, which renders several of Dr. Strombom's opinions here moot (Dkt. No. 460).  As relevant, then, Humana takes issue with two portions of Dr. Strombom's report.

*First*, Dr. Strombom opines that Dr. Conti's methodology fails to consider "that generic prices might have increased with brand WAC increases" (Strombom Reb. Rep. ¶ 21, Dkt. No. 440-18).  To correct for this alleged deficiency, Dr. Strombom explains that he calculates the "but-for generic prices using the contemporaneous brand price rather than the brand price prior to assumed but-for generic entry, thus assuming that generic prices would have increased when the brand price increased" (*id.* at ¶ 60).  To implement this adjustment, Dr. Strombom assumes that the but-for price of brand Glumetza would have increased by 109% in 2015, and he bases this number on two datapoints:  Fortamet's price increase in 2014 (also 109%), as well as drug pricing data cited by Professor McGuire that show, for example, that Valeant increased the price of 200 drugs by more than 100% annually (*id.* at ¶¶ 60–61 (citing McGuire Rep. ¶ 182)).

Humana argues the comparison falls short because the information Dr. Strombom relies upon did not involve price increases when a new generic entered the market after the end of the exclusivity period.  Humana also argues that the comparison to the Fortamet price increases is unreliable because those price increases are the subject of "allegations of industry-wide price fixing" (Br. 6, citing *Humana v. Actavis Elizabeth, LLC., et al.*, No.  C 19-04862 CMR (E.D. Pa. filed Dec. 15, 2020) (Judge Cynthia M. Rufe)).  Humana's argument regarding its recently-filed action goes to the weight of Dr. Strombom's evidence, not its admissibility — the district court in that action has not even considered a motion to dismiss, let alone adjudicated the merits of the claims.  Regarding the price increases for comparable drugs, Dr. Strombom has built his analysis on seemingly relevant and reliable foundation, and Humana's critiques again go to the weight of the evidence, not its admissibility.

*Second*, Dr. Strombom seeks to undermine three assumed but-for scenarios which Dr. Conti uses as bases for her damages calculations.  For example, counsel instructed Dr. Conti to assume a "Lupin generic, as well as an authorized generic, would have entered the market in or around December 2012.  A third generic would have entered the market before February 2016, and a fourth generic in or around May 2017."  Dr. Conti then calculates Humana's damages under each of the assumed but-for scenarios using a "yardstick methodology" which aims to estimate a but-for price through consideration of a comparable market.

Dr. Strombom impeaches Dr. Conti's calculations not by attacking Dr. Conti's methodology or application, but by questioning the assumptions directly (italics added):

> Dr. Conti provides no explanation of what would have needed to occur in the but-for world in order for Lupin to enter as early as December 2012.  Perhaps this scenario corresponds to an implicit assumption that Lupin would have continued to litigate the patent (rather than settle), would have won the patent litigation, and would have received final FDA approval by December 2012. . . . However, there is *strong evidence* in this case indicating that Lupin believed there was a substantial likelihood that it would have lost the patent litigation. . . .  Similarly, *it is unlikely that Lupin would have entered at risk* given the potential financial liability if they subsequently lost the patent litigation

(Strombom Reb. Rep. ¶ 66).  This order notes, for what it's worth, that Dr. Strombom also relies on similar counsel-dictated assumptions in his report (Strombom Reb. Rep. ¶ 71).  More to the point, as Humana argues, Dr. Strombom is an economist, not a molecular biologist or patent litigator, and the support he cites (his own previous declaration) does not provide a reliable basis for his testimony (Dkt. No. 262-21 at ¶¶ 36–41).  Dr. Strombom has insufficient experience or training to opine on the weaknesses (or strengths) of Lupin's patent case.

This same issue reoccurs several times in Dr. Strombom's report.  In their opposition, defendants defend Dr. Strombom's opinions, saying that, for example, "the undisputed record evidence showed that Lupin would not have continued to litigate the case to verdict or launched at risk because it believed, based on the advice of its qualified outside patent counsel, that it was going to lose" (Opp. 6).  The question of who would have won the underlying patent litigation but-for the settlement is vigorously disputed, and Dr. Strombom is not qualified to opine directly on those issues.  Dr. Strombom's patent analysis will not aid the jury, and he shall not testify regarding the merits of Lupin's patent case, which includes testimony from paragraphs 16, 66, and 68 of his report.

In sum, to the extent stated, the motion is **GRANTED IN PART** and **DENIED IN PART**.

### 7. DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT ATTORNEY LENTZ.

Turning to defendants' *Daubert* motions, this order next considers the motion to exclude the testimony of Attorney Edward T. Lentz, who, similar to Professor Adelman for defendants,

United States District Court
Northern District of California

opined on Depomed's pharmaceutical patent litigation against Lupin and Sun (Dkt. Nos. 442, 470, 489).

Attorney Lentz has a B.A. and an M.A. in biology from Fordham University and Indiana State University, respectively, and earned his J.D. from Villanova University. At GlaxoSmithKline ("GSK"), Attorney Lentz held the position of Senior Vice President and General Counsel-U.S., SmithKline Beecham Corporation. At GSK, Attorney Lentz managed the entire corporate-patent lifecycle, handling everything from patent prosecution to advising on litigation. Attorney Lentz left GSK to work at Morgan Lewis & Bockius and later started his own private practice. He has served as adjunct faculty at Albany Law School and on multiple executive committees for trade associations in the biopharma and intellectual property areas (Lentz Rep. ¶¶ 17–30, Dkt. No. 445-5). He has also recently testified in other reverse-payment cases. *See In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274 (D.R.I. 2019) (Judge William E Smith).

Plaintiffs requested Attorney Lentz to testify regarding the likely outcome in both the *Lupin* and *Sun* litigation — as previously noted, *Sun* is another patent infringement case Depomed filed against another would-be generic manufacturer of Glumetza that included all the patents at issue in Lupin. Plaintiffs also asked Attorney Lentz to opine on the litigation costs avoided by Depomed and Lupin by settling the *Lupin* litigation and the likely timeline to complete the *Lupin* and *Sun* actions absent settlement (Lentz Rep. ¶ 31).

*First*, in his expert report, Attorney Lentz opines that, at the time of the *Lupin* settlement, a reasonable patent attorney would have advised his or her client that Depomed would be unable to meet its burden of proving infringement, either literally or under the doctrine of equivalents, for U.S. Patent Nos. 6,340,475 ("the '475 patent"), 6,635,280 ("the '280 patent"), and 6,488,962 ("the '962 patent"). More specifically, Attorney Lentz states that it was "very likely" that the district court would find in Lupin's favor on noninfringement, but that, regardless of the district court's decision, the Court of Appeals for the Federal Circuit would have ruled in favor of Lupin in the event of an appeal. He then parses this analysis and assigns a numerical value to the probability that Lupin would prevail on the merits: estimating Lupin

to have a 60 to 65% chance of success for the '475 and '280 patents, and a 70 to 75% chance of success for the '962 patent.  Attorney Lentz further opines that the likelihood of prevailing on the '962 patent would jump to 85 to 90% if Lupin prevailed on the '475 and '280 patents (*id.* at ¶¶ 32–38).  He opines that Lupin and Depomed avoided approximately $3–3.5 million and $2.9 million, respectively in litigation costs by settling, and that, if the parties had not settled, the outcome of the trial could have been known as early as November or December 2012, but that a reasonable patent attorney would have expected a decision by February 2013.  Attorney Lentz expects that a Federal Circuit decision, if needed, would have arrived on or before March 2014 (*id.* at ¶¶ 43–45).

*Second*, Attorney Lentz opines on *Depomed v. Sun*, again concluding Depomed would have been unable to prove infringement, either literally or under the doctrine of equivalents, for the '475, '280, and '962 patents, as well as U.S. Patent Nos. 7,736,667 ("the '667 patent") and 7,780,987 ("the '987 patent").  He states that the Court of Appeals for the Federal Circuit would have vindicated Sun regardless of the outcome in the district court and assigns Sun an 80 to 85% probability of winning.  As for a predicted timeline, Attorney Lentz opines that the parties could have known the outcome by January 2014 and, if the Federal Circuit got involved, he expects their opinion to have arrived on or before February 2015 (*id.* at ¶¶ 39–45).

To reach these conclusions, Attorney Lentz performs a multi-part analysis.  He first summarizes the *Lupin* and *Sun* disputes, as well as *Depomed, Inc. v. Ivax Corp.*, an earlier case from 2006 involving the '475 and '280 patent where the Honorable Charles R. Breyer of our district granted Depomed summary judgment of patent infringement.  532 F. Supp. 2d 1170 (N.D. Cal. 2007).  Turning to *Lupin*, Attorney Lentz reviews Judge Hamilton's claim construction order, then uses those constructions in an analysis that reviews the testimony from the parties' various technical experts — including Professor Hopfenberg for Depomed and Professor Kinman Park for Lupin.  In other words, Attorney Lentz seeks to simulate the litigation as it would have happened had the parties not decided to settle.  After he performs this analysis for all three patents at issue in *Lupin*, Attorney Lentz considers, based on the relevant legal standards, the possible outcomes from appeal, and applies numerical values to

the probability that Lupin would prevail as to the various patent claims.  From there, Attorney

Lentz projects the timeline of the *Lupin* litigation using data regarding similar cases from our

district, the District of New Jersey, the District of Delaware, and the Court of Appeals for the

Federal Circuit (*See* Lentz Rep. App. I).  Lastly, using these dates, Attorney Lentz calculates

the litigation costs the parties avoided by settling.  After he completes his evaluation of the

*Lupin* case, Attorney Lentz repeats this analysis for the *Sun* litigation.  Defendants move to

exclude Attorney Lentz's testimony on several grounds.

> *First*, defendants argue Attorney Lentz' opinion on whether Lupin's generic infringes the

patents should be excluded.  In *Sundance, Inc. v. DeMonte Fabricating, Inc.*, the Court of

Appeals for the Federal Circuit held:

> [I]t is an abuse of discretion to permit a witness to testify as an
> expert on the issues of noninfringement or invalidity unless that
> witness is qualified as an expert in the pertinent art. . . .  Indeed,
> where an issue calls for consideration of evidence from the
> perspective of one of ordinary skill in the art, it is contradictory to
> Rule 702 to allow a witness to testify on the issue who is not
> qualified as a technical expert in that art.

550 F.3d 1356, 1363 (Fed. Cir. 2008).  Relying on *Sundance*, defendants argue that Attorney

Lentz is not a person of ordinary skill in the art for the patents at issue in *Lupin* and *Sun*.

Attorney Lentz, in fact, defines a person of ordinary skill in the art in his report:

> [A] person of ordinary skill in the art would have formal education
> of at least a bachelor's degree in the fields of chemistry, chemical
> engineering, pharmaceutical science and/or material science with a
> focus on polymer science, combined with substantial experience in
> development of controlled release drug dosage forms (even more
> desirably controlled release oral dosage forms). Alternatively, if
> the person had obtained a Ph.D. in any of the relevant fields, the
> required amount of industry experience would decline to about two
> years

(Lentz Rep. ¶ 101).  Plaintiffs do not contest that Attorney Lentz fails to qualify as a person of

ordinary skill under this definition.  Rather, they argue that Attorney Lentz is not opining on

technical issues at all and that he offers "his opinion as to how an experienced pharmaceutical

patent attorney at the time of the Lupin settlement would have evaluated the patent litigation"

at issue (Opp. 3).

*Sundance* does not warrant exclusion here.  The patent claims at issue in *Lupin* required consideration of evidence from the perspective of a person of reasonable skill in the art, and Depomed and Lupin's respective experts (including Drs. Park and Hopfenberg) provide that testimony in the underlying patent litigation.  Attorney Lentz's report parses the testimony of those experts regarding noninfringement and validity in order to evaluate the legal merit of the *Lupin* and *Sun* parties' respective cases and predict the outcome of the disputes if they had not settled.  Attorney Lentz reviews this expert analysis through the lens of the *Lupin* and *Sun* courts' respective claim construction orders, *legal* interpretations of the scope of the patents in question.  Attorney Lentz is thus not performing a technical analysis of the "factual predicates" that *Sundance* found inadmissible, he performs exactly the type of *legal* review a party would expect from a seasoned patent litigator.  *See Sundance*, 550 F.3d at 1361–62.  Patent litigation requires technical evaluation, but it remains a legal process, one on which Attorney Lentz is qualified to opine.  Attorney Lentz offers the same analysis now that he has offered GSK and his other clients throughout his career.  To the extent Attorney Lentz analyzes a *particular* factual predicate for validity or infringement without the foundation of a pertinent technical analysis from a person of ordinary skill in the art, it would be fodder for cross-examination, ripe for counsel's objection and possibly for an admonition to the jury that he is unqualified to address issues only a technical expert can address.  With these reasonable limits in place, Attorney Lentz's testimony will not confuse the jury or otherwise cause any "mischief."  *See ibid.*  It will ultimately be up to the jury to weigh how much credibility should be awarded to Attorney Lentz's opinion.

Defendants also argue that it is improper for Attorney Lentz to "adopt" Professor Park's unsigned report from *Lupin* (Br. 12–13).  In other words, defendants contend that plaintiffs needed to engage an expert here qualified to testify on the technical issues relating to Lupin's alleged patent infringement, such as their re-retained expert Dr. Hopfenberg, rather than leaving Attorney Lentz to review the reports from the *Lupin* litigation sans technical assistance.  As previously stated, this philosophical dispute between the parties on the correct methodology for a patent-law expert does not merit exclusion.  This order finds no inherent fault with a

patent-law analysis that primarily relies on contemporary technical expert analysis of the parties from the underlying patent litigation that excludes further *post hoc* input. Indeed, that methodology may have advantages over other approaches because it may more accurately take the particularities and developments of the actual litigation into account. On the other hand, should Attorney Lentz get stuck on a technical point, he does not have a person of ordinary skill in the art to back him up. Nevertheless, these arguments do not expose Attorney Lentz's opinions as unreliable.

In the same vein, defendants also claim that Attorney Lentz exclusively relies on Professor Park's report for many opinions, rendering them inadmissible. The examples provided do not bear out this thesis. For example, defendants contend that Attorney Lentz relies solely on Professor Park for the opinion about the degree of swelling of the Lupin generic (Br. 14). Looking at Paragraph 159 of his report as highlighted by defendants, Attorney Lentz explains that Professor Park's report cited images showing the swelling of the Lupin products, and then explains that "Dr. Park also cited data from the Tesfu swelling study report in support of his opinion." As Attorney Lentz explains earlier in Paragraph 149 of his report, Professor Hopfenberg had also relied on the Tesfu swelling study in his report. Defendants' assertion that Attorney Lentz exclusively adopts Professor Park's perspective is thus not quite accurate, as it appears Attorney Lentz found Professor Park's opinion persuasive in this instance because Professor Park not only had photographic evidence but also support from the data underlying the opposing technical expert's opinions. To the extent Attorney Lentz does not give Professor Hopfenberg's expert report in *Lupin* a fair shake, defendants will have the opportunity to critique that shortfall during cross-examination.

Defendants next seek to exclude Attorney Lentz's opinions on the likelihood that Lupin or Sun would prevail in their respective patent litigation because they are not based on a discernable methodology and because they ignore key facts and data, such as: contemporary documentation by Lupin's attorneys regarding their less-than-favorable outlook on the case; depositions of Lupin's outside counsel and others taken for this case; and other data points such as litigation involving the patents at issue in other fora (Br. 14–19). Plaintiffs argue that

United States District Court
Northern District of California

predicting the outcome to litigation is exactly what lawyers do and cite to an opinion permitting these predictions, *In re Namenda Direct Purchaser Antitrust Litigation*, 331 F. Supp. 3d 152, 186–89 (S.D.N.Y. 2018) (Judge Thomas P. McMahon).

Attorney Lentz does not appear to cherry pick his data.  He addresses the *Ivax* litigation where Judge Breyer found in Depomed's favor on summary judgment.  And Attorney Lentz also considers other data that cuts against his conclusion, including the July 2011 email from Lupin's outside counsel William Rakoczy where he stated "the likelihood of success is significantly less than 50%" — although this order recognizes that Attorney Lentz does not examine that specific email in body of his report (Lentz Rep. App. B at 9).  Moreover, it will be up to the jury to determine how much weight (if any) to give to this email and defendants' *post hoc* testimony on the likely outcome *Lupin* litigation absent settlement.  Taking all this into account, and recognizing he performs a sufficiently rigorous analysis of the *Lupin* and *Sun* litigation, this order finds Attorney Lentz's opinions rests on a reliable foundation that is not contrary to the record and that will prove helpful to a jury.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 923–24 (9th Cir. 2015).  Defendants will have free reign on cross-examination to introduce any evidence they believe undermines Attorney Lentz's opinions (within time limits).

Defendants also argue Attorney Lentz's numerical predictions should be excluded.  In their opposition, plaintiffs point to *Namenda* and its rejection of a similar *Daubert* challenge to a patent attorney's numerical predictions.  As defendants note, however, the expert report in *Namenda* contained a more extensive analysis of the statistical likelihood of success in order to calculate his predictions.  *See* Expert Report of George W. Johnston, Esq. ¶¶ 74–109, *Namenda*, No.  C 15-07488 CM, Dkt. No. 696-9 (S.D.N.Y. Apr. 29, 2019).  While the report in *Namenda* provided a more thorough analysis, it does not set the threshold for the admissibility of a numerical prediction.  Attorney Lentz, as discussed, performed a considered analysis, and did not only evaluate information that supports his opinion.  Relying on his experience, Attorney Lentz translates his analysis into numerical predictions, something patent litigators consistently do for clients.  This order will permit Attorney Lentz to opine on his numerical

predictions and allow the jury to evaluate whether his or Professor Adelman's numbers are more persuasive.

Lastly, defendants' arguments to exclude Attorney Lentz's "narrative testimony" fail for the same reasons described in the analysis of the motion to exclude Professor Leffler, discussed below.  In sum, defendants' motion to exclude Attorney Lentz's testimony is **DENIED.**

### 8.   DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT PROFESSOR MCGUIRE.

Next up is defendants' motion to exclude the testimony of Professor Thomas G. McGuire (Dkt. Nos. 444, 477, 488).  Professor McGuire is an economist who currently serves as a professor of health economics in the Department of Health Care Policy at Harvard Medical School.  He also served as an editor for the Journal of Health Economics for ten years and has served as an expert in several reverse-payment cases (McGuire Rep. ¶¶ 7–10, Dkt. No. 445-8).

In his report Professor McGuire opines on:  whether the Lupin agreement contained an reverse payment and whether its anticompetitive effects outweigh any procompetitive justifications; the competitive circumstances if the parties to the Lupin agreement had not settled; and the Valeant price increases (*id.* ¶¶ 3–4).  Defendants argue that both Professor McGuire's alternative settlement theory and his opinion that the settlement was anticompetitive are inadmissible.

*First*, defendants take issue with Professor McGuire's alternative settlement theory, where he uses a bargaining model to opine that, if the brand defendants and Lupin behaved competitively and had not included a reverse payment in their agreement, the date of generic entry would have been between January and April 2014 (*id.* at ¶¶ 143–165, Tbl. 3).  Professor McGuire's bargaining model assumes a split of gains that matched the actual settlement agreement (97.3% of the gains to the brand defendants), which defendants argue runs contrary to the academic literature (Br. 8–9).  Professor McGuire's report contains several supporting citations sufficient to show a reliable foundation for his assumption (McGuire Rep. ¶ 161).  Defendants' citation to one contrary article does not render Professor McGuire's opinion

29

deficient.   Defendants also primarily argue that Professor McGuire relies on inadmissible opinions from plaintiffs' patent-law expert, Attorney Lentz.  Specifically, defendants focus on Attorney Lentz's opinions on Lupin's prospects of success in the patent litigation (Br. 10–13). This order addresses (and rejects) those arguments in its analysis of defendants' motion to exclude Attorney Lentz's testimony.

Defendants contend that, due to his reliance on Attorney Lentz's report, Professor McGuire's testimony contradicts the undisputed evidence, but then try to preempt any counterargument that Professor McGuire may testify on but-for scenarios:  "In constructing the but-for world, everything except the alleged misconduct must be held constant.  That means, of course, keeping constant the actual parties and their actual beliefs and expectations" (Br. 12). Defendants thus conclude:  "Permitting Dr. McGuire to opine on the parties' expectations based on the unsupported extrapolation of Lupin's odds of success in the patent litigation, while ignoring the actual evidence of Lupin's actual subjective expectations, would mislead the jury" (*id.* at 13).  But defendants here go too far, as the summary judgment order made clear:

> "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created" . . . [O]ur actors have no reason to contemplate action they might have taken in the but-for world *which never came to pass*

(Summary Judgment Order 22, citing *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946)).  That the numbers input into Professor McGuire's model did not, to defendants' eyes, align with contrary evidence will be grounds for cross-examination but not exclusion.  The ultimate resolution of the patent litigation on the merits never happened, and defendants have not demonstrated that Professor McGuire's but-for analysis has not provided a reasoned deviation from the record, or that his alleged failure to input some contrary datapoints renders Professor McGuire's model unreliable (*id.* at 26).  The same reasoning applies and forecloses on defendants' later argument to exclude Dr. McGuire's opinion that the settlement agreement was anticompetitive to the extent it addressed Lupin's intentions or expectations (Br. 20–21).

30

Defendants' last argument regarding Professor McGuire's alternate settlement model concerns the shift of the estimated Sun generic entry date from May 1, 2015 (in Professor McGuire's class-certification report) to April 1, 2014 (in his instant expert report). Defendants say that this revised datapoint, when input into Professor McGuire's model, shifts the estimated Lupin generic entry six months, which may profoundly impact damages given the timeline for price increase in the actual world (Br. 15–17). Plaintiffs argue that Attorney Lentz's report provides the data that prompt the revised date for Sun's likely generic entry, and that the datapoint shifts the date of the Lupin/brand defendants' settlement up by only two months (Opp. 19 n. 78). In their reply, Defendants conflate the shift in the estimated Sun settlement date with the resulting shift in the model's proposed entry for Lupin's generic, which muddles their argument (Reply Br. 7–8). This order finds that the shift in a datapoint in between class certification and final expert reports, apparently made in light of new data from other experts, does not render Professor McGuire's opinion here unreliable.

*Second*, similar to their argument regarding Professor Leffler, defendants argue that Professor McGuire's opinion that the settlement agreement is anticompetitive should be excluded as contrary to law. Professor McGuire, in relevant part, opines that the no-AG clause and cash payment constituted an anticompetitive reverse payment with an estimated worth of $28.6 million, that the value of the reverse payment induced a delay in Lupin's introduction of a generic Glumetza product, and that jumps in Santarus and Depomed's stock prices upon the announcement of the settlement signaled that the agreement stimulated unanticipated profit flows that validate the conclusion that the agreement was anticompetitive (McGuire Rep. ¶ 5).

To reach his conclusion that the reverse payment was anticompetitive, Professor McGuire describes and considers the "*Actavis* inference":

> The logic of the inference goes like this. The litigation (competitive) route yields an expected profit to the brand, recognizing that the patent may or may not be found by the court to be valid and infringed. This is the expected profit associated with following through with litigation. Litigation requires the brand to pay its litigation costs. If the reverse payment exceeds any avoided litigation costs, we can infer that the brand must be getting higher profits from the settlement than it would with litigation (because if the brand expected higher profits with

> litigation, it would litigate).  The only way for the brand's profits
> to be greater through a reverse payment settlement than through
> continued litigation is if the length of the monopoly retained by the
> brand under a reverse payment settlement is greater than the length
> of the monopoly it could expect to retain by continuing to litigate
> through trial and appeals

(*id.* at ¶ 79).  Professor McGuire here explains his understanding of the economic logic of

*Actavis*.  Defendants argue Professor McGuire's inference misrepresents *Actavis* because it

states that a large reverse payment *necessarily* indicates an anticompetitive effect (Br. 19).

     *Actavis* held that reverse-payment settlements can *sometimes* violate antitrust laws.

*Actavis*, 570 U.S. at 141.  Here, again, the language from *Actavis*:

> [T]he likelihood of a reverse payment bringing about
> anticompetitive effects depends upon its size, its scale in relation to
> the payor's anticipated future litigation costs, its independence
> from other services for which it might represent payment, and the
> lack of any other convincing justification. The existence and
> degree of any anticompetitive consequence may also vary as
> among industries. These complexities lead us to conclude that the
> [plaintiff] must prove its case as in other rule-of-reason cases

*Id.* at 159.  Professor McGuire cites this exact portion of *Actavis* in his report, and plaintiffs

argue that he makes no statement that a reverse payment is *per se* anticompetitive, pointing to

several qualifying statements in his report, such as (italics added):

> In other words, when the reverse payment exceeds the expected
> future litigation costs of the brand, *and in the absence of any other
> explanation for the payment*, the brand's exclusivity period
> obtained under the agreement must exceed the expected entry date
> with litigation, and is therefore anticompetitive.

(McGuire Rep. ¶ 80).  Professor McGuire also provides an analysis of procompetitive benefits

to the agreement, although he unsurprisingly finds none (McGuire Rep. ¶¶ 139–42).

     All that being said, Professor McGuire cannot insert mere cosmetic qualifiers to show he

comports with *Actavis* — his actual analysis must also align.  Professor McGuire opines that

the "*Actavis* Inference is an if-then condition, or equivalently, a *sufficient* condition to

conclude that the agreement was a pay-for-delay and anticompetitive" (*Id.* at ¶ 80 n. 154).

This order finds statements like this run afoul of the Supreme Court's opinion.  *Cf. In re*

*Intuniv Antitrust Litig.*, 2020 WL 5995326, at *20–21 (D. Mass. Oct. 10, 2020) (Judge Allison

United States District Court
Northern District of California

United States District Court
Northern District of California

1   D. Burroughs).  Accordingly, Professor McGuire shall not testify that a large reverse payment

2   *necessarily* means that the agreement was a pay-for-delay and anticompetitive.

3        Defendants next attack Professor McGuire's stock-price analysis.  Professor McGuire

4   conducts a stock price analysis and opines that "the Depomed and Santarus stock price jumps

5   imply that unanticipated profit flows were created because of the payment in the Lupin

6   Agreement (at the expense of purchasers) and that the payment in the Agreement was

7   anticompetitive" (McGuire Rep. ¶ 136, Fig. 6).  Defendants say that the stock-price analysis is

8   not reliable and should be excluded.

9        On reliability, defendants argue that the alleged increase in Depomed's stock price was

10  not statistically significant (which Professor McGuire acknowledges in his report) and that the

11  increase in Santarus' stock price was too short-lived to be evidence of increased revenues (Br.

12  22).  These criticisms do not go to reliability or the robustness of Professor McGuire's

13  methodology, they address the weight the analysis should be given by a jury.  This order also

14  finds that analysis not too disconnected from the issues in the case to be excluded on a *Daubert*

15  motion.  As *defendants* state in their reply brief, *Actavis* "makes clear that all facts and

16  circumstances . . . must be considered in the [rule-of-reason] analysis" (Reply Br. 10).

17  Professor McGuire also does not use his stock analysis as a substitute for the rule-of-reason

18  investigation, he includes it as further evidence supporting his analysis (McGuire Rep. ¶ 136).

19  Defendants point to caselaw where the Court of Appeals for the First Circuit affirmed the

20  exclusion of Professor McGuire's stock price study — but admit that the Professor McGuire

21  offered that study for a completely different purpose than he offered it here (Br. 23, citing *In re*

22  *Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 52 (1st Cir. 2016)).  That argument

23  accordingly fails to persuade.

24       *Third*, and finally, defendants argue that Professor McGuire cannot provide a factual or

25  legal narrative.  This order addresses this argument (made in several of defendants' *Daubert*

26  motions) in its discussion of the motion to exclude Dr. Leffler's testimony, below.  In short,

27  this argument is not appropriate for a *Daubert* motion.

28

In sum, to the extent stated, defendants' motion to exclude Professor McGuire's opinions is **GRANTED IN PART** and **DENIED IN PART**.

### 9. DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT DR. LEFFLER.

Next is defendants' motion to exclude the expert opinion testimony of Professor Keith Leffler (Dkt. Nos. 443, 469, 487). Professor Leffler has a Ph.D. in economics from UCLA and is an emeritus associate professor of economics at the University of Washington (Leffler Rep. ¶¶ 1–3, Dkt. No. 445-3). Professor Leffler opines on the following: whether the brand defendants exercised market power; the economic effects of the brand defendants' reverse payments; the value of the no-AG provision to Lupin and its cost to brand defendants; whether it would have been economically rational for defendants to agree to an alternate settlement with an earlier entry date absent the no-AG reverse payment; and the amount of overcharge damages suffered by the retailer plaintiffs (Leffler Rep. ¶ 10).

Defendants argue that Professor Leffler fails to apply the correct legal standard for evaluating the anticompetitive effects of the settlement agreement (Br. 2, 11–14). As this order explains in its analysis of the motion to exclude Professor McGuire's report, *Actavis* held that reverse-payment settlements can *sometimes* violate antitrust laws. *Actavis*, 570 U.S. at 141. Throughout his report, Professor Leffler improperly states that a large reverse payment is *necessarily* an anticompetitive effect. For example, Professor Leffler states (italics added): "The presence of a large payment above the brand's avoided litigation cost, whether in cash or some other form, *indicates* a 'payment for delay'" (Leffler Rep. ¶ 73). He repeats this again a several paragraphs later: "Consequently, a significant payment from the patent holder to the challenger, like that here, moves the settlement entry date to a later, more anticompetitive, and more inefficient date" (*id.* at ¶ 83).

In response, plaintiffs argue Professor Leffler's statement in paragraph 73 is vindicated by context, and that the whole paragraph addresses delay of *expected* generic entry (Br. 14–15). This order finds this over-fastidious justification insufficient. Plaintiffs also contend that Professor Leffler's testimony does not contain the conditional "if-then" statement excluded in

34

*Intuniv*, 2020 WL 5995326, at *21.  If Professor Leffler's opinions are not explicit "if-then statements," then they are close enough to make no difference and would confuse the jury. Accordingly, Professor Leffler shall not testify that a large reverse payment *necessarily* means that the agreement was a payment for delay and anticompetitive.

Defendants next move to exclude Professor Leffler's opinions to the extent they rely on the opinions of another of plaintiffs' experts, Attorney Lentz.  This order addresses (and rejects) those in its analysis of defendant's motion to exclude Attorney Lentz's testimony.

Defendants finally request to exclude any testimony from Professor Leffler regarding plaintiffs' "preferred view" of the factual narrative, arguing that he cannot be a "human highlighter" (Br. 3).  It is common, indeed required, under Rule 26(a)(2), for an expert to summarize the facts and data considered in their report.  Professor Leffler's testimony at trial must remain tethered to the expert opinions he provides, but he must be allowed to discuss facts apropos to those opinions.  This order finds Defendants' concerns here improper for a *Daubert* motion and best raised as an objection at trial (should one be necessary).

In sum, to the extent stated, defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

### 10.   DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS PROFESSOR CONTI AND DR. LEITZINGER

The final remaining *Daubert* is defendants' motion to exclude the testimony of both Dr. Jeffrey Leitzinger and Professor Rena Conti, damages experts for Humana and direct-purchaser plaintiffs, respectively (Dkt Nos. 446, 471, 477, 485).  A February 2021 order denied Humana leave to file a second amended complaint, thereby extinguishing its indirect-purchaser claims and mooting defendants' primary argument here to exclude Professor Conti's calculation of indirect-purchaser damages (Dkt. No. 460).  In their reply brief, defendants reiterate their secondary argument that Professor Conti and Dr. Leitzinger's testimony should be excluded because their but-for assumptions are incorrect and misleading (Reply Br. 2–6).

Humana's expert Professor Conti is associate professor of markets, public policy and law at the Questrom School of Business at Boston University, as well as an academic affiliate of

Greylock Mckinnon Associates (Conti Rep. ¶ 6, Dkt. No. 447-1).  In her report, Professor Conti opines that:  if the delay in generic entry of Glumetza by defendants occurred, then it resulted in injury in the form of antitrust overcharges to Humana; and that the aggregate amount of overcharges damages may be calculated using standard economic methods and, depending on the but-for assumptions provided by counsel, direct purchase damages range from $5.24 to $5.32 million (*id.* at ¶ 2).  Direct-purchaser plaintiffs' expert Dr. Leitzinger is the founding and managing director of the economic research and consulting firm Econ One Research (Leitzinger Rep. ¶ 1, Dkt. No. 447-9).  In his report, Dr. Leitzinger opined, in relevant part, that under a series of alternative entry scenarios, aggregate overcharges range from $1.9 to $2.0 billion (*id.* at ¶ 9e).

Defendants do not contest Professor Conti's methodology in constructing an economic model to assess damages.  Rather, defendants take issue with three but-for scenarios for generic entry dates counsel provided to Professor Conti to set the parameters of her calculation. For example, in scenario one:  "A Lupin generic, as well as an authorized generic, would have entered the market in or around December 2012.  A third generic would have entered the market before February 2016, and a fourth generic in or around May 2017" (Conti Rep. ¶ 48). Defendants say these but-for assumptions are imagined and contradicted by facts in the record, and that Professor Conti "did not consider possible later but-for entry dates" (Reply Br. 3).

But Professor Conti does not opine on when generic entry will occur, she leaves that up to the jury:  "My damages methodology is flexible and can be adjusted to accommodate whatever factual findings the jury makes on the number of generic entrants, the time of entry, and whatever inputs are deemed to be relevant" (Conti Rep. ¶ 49).  The parties' dispute over whether Lupin would lose the underlying patent litigation, and whether Sun and Watson could have launched their generic products as early as February 2016 will be put to the jury, and those dates can then be input into Professor Conti's model — a model whose methodology and rigor defendants do not otherwise contest.  "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  *Bigelow*, 327 U.S. at 265.  As the May 2021 order denying summary

36

judgment explained, "[o]ur jury will craft the but-for world, in which defendants acted rationally and lawfully, based on measured deviation from the record" (Summary Judgment Order 22).  Defendants' arguments are proper for cross-examination, and do not merit exclusion of Professor Conti's opinions.

The same reasoning applies and requires rejection of defendants' argument to exclude Dr. Leitzinger's opinions.  As the summary judgment order made clear, Lupin's generic entry date was not set in stone, and fact issues abound (*id.* at 23–25).  In sum, defendants' motion is **DENIED**.

## CONCLUSION

For the reasons stated above, the parties' *Daubert* motions are **GRANTED IN PART** and **DENIED IN PART**.  This does not foreclose individual objections to specific testimony at trial.

**IT IS SO ORDERED.**

Dated: August 25, 2021

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE