Thomas M. Sobol (admitted *pro hac vice*)
Lauren G. Barnes (admitted *pro hac vice*)
Jessica R. MacAuley (admitted *pro hac vice*)
Rochella T. Davis (admitted *pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
tom@hbsslaw.com
lauren@hbsslaw.com
jessicam@hbsslaw.com
rochellad@hbsslaw.com

Shana E. Scarlett (SBN 217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Fax: (510) 725-3001
shanas@hbsslaw.com

*Co-Lead Counsel for the Direct Purchaser Class*

*Additional counsel on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| *IN RE GLUMETZA ANTITRUST LITIGATION* | Case No.: 3:19-cv-05822-WHA (Consolidated) |
| This Document Relates To: <br><br> *Meijer, Inc. et al. v. Bausch Health Companies, Inc. et al.*, No. 3:19-cv-05822-WHA <br><br> *Bi-Lo, LLC et al. v. Bausch Health Companies, Inc. et al.*, No. 3:19-cv-06138-WHA <br><br> *KPH Healthcare Services, Inc. v. Bausch Health Companies, Inc. et al.*, No. 3:19-cv-06839-WHA | **DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES** <br><br> Date: January 20, 2022 <br> Time: TBD <br> Courtroom: 12, 19th Floor <br> Before: William Alsup |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 20, 2022, at 8:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable William Alsup, United States District Judge, in Courtroom 12 of the United States District Court for the Northern District of California in San Francisco, California, plaintiffs Meijer, Inc., Meijer Distribution, Inc., BI-LO, LLC, Winn-Dixie Logistics, Inc., and KPH Healthcare Services, Inc. ("Plaintiffs"), on behalf of themselves and the direct purchaser class previously certified by this Court (the "Direct Purchaser Class" or "Class"), will move the Court pursuant to Federal Rule of Civil Procedure 23(e) for entry of an Order approving the following payments from the settlement fund:

1.  Direct purchaser class counsel's request for reimbursement of their reasonable litigation expenses incurred in the prosecution of this action, totaling $2,413,688.60; and

2.  An attorneys' fee award of 25% of the settlement fund, net of reimbursed litigation expenses and estimated settlement expenses, $112,817,643.00, plus any interest on that amount that may accrue prior to distribution.

This Motion is based on the accompanying Memorandum of Points and Authorities, the Declaration of Co-Lead Counsel Lauren G. Barnes, declarations of the class counsel firms, Declaration of Robert A. Zagrodny CPA, Inc. and supporting exhibits filed herewith, and all other papers and records on file in this matter, and upon such argument as may be presented to the Court at the hearing on this Motion. The direct purchasers will submit a proposed order to the Court with their motion for final approval of the settlements and entry of final judgment, due January 11, 2022.

This motion and all supporting materials will be posted today on the website established for this settlement (www.GlumetzaAntitrustLitigation.com) for review by class members.

i

DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES
3:19-cv-05822-WHA

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................ 2

    A.   The direct purchasers file a new case alleging antitrust violations concerning brand and generic Glumetza and the case takes off with a bang. .................................................................................................. 3

    B.   Most of the case proceeds during the COVID pandemic; despite this, class counsel persisted, litigated determinedly, and met every deadline. ............................ 4

    C.   The plaintiffs prepare for trial and settle the case just weeks before trial. ................. 5

III.   ARGUMENT ................................................................................................. 6

    A.   Where, like here, "the benefit to the class is easily quantified," courts regularly use the percentage-of-the-fund method for calculating fees with a lodestar cross-check. ............................ 6

    B.   A fee award of 25% of the settlement fund is reasonable and appropriate under the *Vizcaino* factors. ............................ 9

        1.   Class counsel achieved an exceptional result—$453.85 million—for the class. ............................ 10

        2.   Class counsel faced a risk of zero recovery. ........................ 12

        3.   Class counsel's performance generated benefits beyond the settlement fund. ............................ 15

        4.   A 25% fee award is less than the one-third fee routinely approved in generic delay pharmaceutical antitrust cases generally and the percentages previously awarded in such cases in this district. ............................ 16

        5.   Class counsel expended significant time and effort in litigating this case. ............................ 19

        6.   The wholly contingent nature of the representation yielded an outcome resulting in the class recovering a net recovery greater than the opt-outs' gross recovery. ............................ 20

    C.   A lodestar cross-check confirms the reasonableness of the requested fee award. ............................ 22

    D.   The litigation expenses advanced were reasonable and necessary to secure the benefit obtained. ............................ 24

IV.   CONCLUSION ............................................................................................ 25

APPENDIX A: ATTORNEYS' FEE AWARDS IN DIRECT PURCHASER GENERIC DELAY PHARMACEUTICAL ANTITRUST CASES ............................ A-1

ii

DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES
3:19-cv-05822-WHA

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aggrenox Antitrust Litig.*,
　2017 WL 11636126 (D. Conn. Dec 19, 2017) ............................................... 17

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
　2015 WL 5918273, (E.D.N.Y. Oct. 9, 2015) ............................................... 13

*Alexander v. FedEx Ground Package Sys., Inc.*,
　2016 WL 3351017, (N.D. Cal June 15, 2016) ............................................... 11

*In re Animation Workers Antitrust Litig.*,
　2016 WL 6663005 (N.D. Cal. Nov. 11, 2016) ............................................... 24

*In re Anthem, Inc. Data Breach Litig.*,
　2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ............................................... *passim*

*In re Apple Inc. Device Performance Litig.*,
　2021 WL 1022866 (N.D. Cal. Mar. 17, 2021) ............................................... *passim*

*Beaver v. Tarsadia Hotels*,
　2017 WL 4310707 (S.D. Cal. Sept. 28, 2017) ............................................... 15

*In re Bluetooth Headset Prods. Liab. Litig.*,
　654 F.3d 935 (9th Cir. 2011) ............................................... 7, 9, 23

*Boeing Co. v. Van Gemert*,
　444 U.S. 472 (1980) ............................................... 6, 7

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
　2016 WL 721680 (N.D. Cal. Jan. 28, 2016) ............................................... 13, 20

*Ching v. Siemens Indus., Inc.*,
　2014 WL 2926210 (N.D. Cal. June 27, 2014) ............................................... 20

*CollegeNet, Inc. v. Common Application, Inc.*,
　355 F. Supp. 3d 926 (D. Or. 2018) ............................................... 15

*In re Credit Default Swaps Antitrust Litig.*,
　2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ............................................... 19, 22

*Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*,
　3 F.3d 1568 (D.C. Cir. 1993) ............................................... 8

*Edwards v. Nat'l Milk Producers Fed'n*,
　2017 WL 3623734 (N.D. Cal. June 26, 2017) ............................................... 13

iii

*In re Facebook Biometric Info. Priv. Litig.,*
    522 F. Supp. 3d 617 (N.D. Cal. 2021)................................................................7

*Fischel v. Equitable Life Assur. Soc'y of U.S.,*
    307 F.3d 997 (9th Cir. 2002) ..............................................................................22

*In re Flonase Antitrust Litig.,*
    951 F. Supp. 2d 739 (E.D. Pa. 2013)..................................................................13

*FTC v. Phoebe Putney Health Sys., Inc.,*
    568 U.S. 216 (2013) ............................................................................................22

*In re Glumetza Antitrust Litig.,*
    2021 WL 1817092 (N.D. Cal. May 6, 2021)..................................................14, 15

*Gutierrez v. Wells Fargo Bank, N.A.,*
    2015 WL 2438274 (N.D. Cal. May 21, 2015)..................................................11, 25

*Hayes v. Harmony Gold Mining Co.,*
    509 F. App'x 21 (2d Cir. 2013) ............................................................................8

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) .........................................................................................8, 10

*In re High-Tech Emp. Antitrust Litig.,*
    2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ......................................................23

*King Drug Co. of Florence v. Cephalon, Inc. (Provigil),*
    2015 WL 12843830 (E.D. Pa. Oct. 8, 2015) ...........................................18, 19, 22

*In re: Lamictal Direct Purchaser Antitrust Litig.,*
    2021 WL 2349828 (D.N.J. June 7, 2021) ............................................................21

*Larsen v. Trader Joe's Co.,*
    2014 WL 3404531 (N.D. Cal. July 11, 2014) ......................................................15

*In re Lidoderm Antitrust Litig.,*
    2018 WL 11375216 (N.D. Cal. Sept. 20, 2018)...................................................17

*In re Lithium Ion Batteries Antitrust Litig.,*
    2020 WL 7264559 (N.D. Cal. Dec. 10, 2020)......................................................13

*Meijer, Inc. v. Abbott Labs. (Norvir),*
    2011 WL 13392313 (N.D. Cal. Aug. 11, 2011) ...................................................17

*Moyle v. Liberty Mut. Ret. Benefit Plan,*
    2018 WL 1141499 (S.D. Cal. Mar. 2, 2018) ..................................................16, 23

*In re Namenda Direct Purchaser Antitrust Litig.,*
    2020 WL 3170586 (S.D.N.Y. June 15, 2020) ...........................................17, 18, 22

iv

*In re NCAA Grant-in-Aid Cap Antitrust Litig.,*
    2017 WL 6040065 (N.D. Cal. Dec. 6, 2017),.............................................................*passim*

*Nwabueze v. AT&T Inc.,*
    2014 WL 324262 (N.D. Cal. Jan 29, 2014) ...............................................................7

*In re Omnivision Techs., Inc.,*
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...........................................................10, 25

*In re Online DVD-Rental Antitrust Litig.,*
    779 F.3d 934 (9th Cir. 2015) ..................................................................7, 23, 25

*In re Optical Disk Drive Prods. Antitrust Litig.,*
    2016 WL 7364803 (N.D. Cal. Dec. 19, 2016)...........................................................13

*In re Optical Disk Drive Prods. Antitrust Litig.,*
    959 F.3d 922 (9th Cir. 2020) .........................................................8, 9, 10, 23

*Paul, Johnson, Alston & Hunt v. Graulty,*
    886 F.2d 268 (9th Cir. 1989) ...................................................................1, 2, 9

*Perez v. Rash Curtis & Assocs.,*
    2021 WL 4503314, (N.D. Cal. Oct. 1, 2021)..........................................................25

*Perkins v. LinkedIn Corp.,*
    2016 WL 613255 (N.D. Cal. Feb. 16, 2016) ............................................................9

*Rainbow Bus. Sols. v. MBF Leasing LLC,*
    2017 WL 6017844 (N.D. Cal. Dec. 5, 2017) ..........................................................24

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) .................................................................................22

*Reyes v. Experian Info. Sols., Inc.,*
    856 F. App'x 108 (9th Cir. 2021)......................................................................1

*Rodriguez v. W. Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ........................................................................17

*In re Se. Milk Antitrust Litig.,*
    2013 WL 2155379, (E.D. Tenn. May 17, 2013) .......................................................21

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) .........................................................................8

*Steiner v. Am. Broad. Co.,*
    248 F. App'x 780 (9th Cir. 2007).....................................................................25

*Stop & Shop Supermarket Co. v. Smithkline Beecham Corp. (Paxil),*
    2005 WL 1213926 (E.D. Pa. May 20, 2015) .........................................................17

DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES
3:19-cv-05822-WHA

*In re Superior Beverage/Glass Container Consol. Pretrial,*
    133 F.R.D. 119 (N.D. Ill. 1990) ................................................................. 13

*Vincent v. Hughes Air W.,*
    557 F.2d 759 (9th Cir. 1977) ..................................................................... 25

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043 (9th Cir. 2002) ............................................................*passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
    396 F.3d 96 (2d Cir. 2005) ........................................................................ 13

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
    19 F.3d 1291 (9th Cir. 1994) ...............................................................1, 2, 10

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class,*
    868 F.3d 132 (3d Cir. 2017) ...................................................................... 21

**Other Authorities**

Fed. R. Civ. P.  54(d) ...........................................................................................6

Fed. R. Civ. P. 23(h) ...........................................................................................6

John Leubsdorf, *The Contingency Factor in Attorney Fee Awards,* 90 Yale L.J. 473, 480
    (1981) ......................................................................................................... 20

*Manual for Complex Litigation, Fourth* § 14.121 .................................................8

Press Release, *A.G. Schneiderman Files Groundbreaking Lawsuit to Block Pharmaceutical
    Manufacturer From Manipulating Alzheimer's Patients* (Sept. 16, 2014),
    https://ag.ny.gov/press-release/2014/ag-schneiderman-files-groundbreaking-
    lawsuit-block-pharmaceutical-manufacturer ............................................ 17

William B. Rubenstein, *Newberg on Class Actions* (2021 ed.) ............................. 17

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Having advocated on behalf of the direct purchaser class for the past several years, class counsel now seek an award of fees and reimbursement of expenses from the fund they created.

As to our approach in this brief, we acknowledge our self-interested bias, and that fee submissions often bend toward self-aggrandizing, one-sided brags that can be of little help to the Court. Here, on the law, we aspire to be honest brokers. On the facts, the supporting declaration follows with precision the applicable local and specific rules; this brief presents the facts with few adverbs and hyperbolic adjectives. We recognize, as the Ninth Circuit teaches, that at this stage "the relationship between the [the class] and [its] attorneys turns adversarial . . . [such that] the district court must assume the role of fiduciary for the class plaintiffs."[1] This Court has so acted throughout the proceedings, noting at the pretrial conference, for example, its responsibility to "protect the class against shenanigans."[2] While class counsel's interests do diverge with the class on this particular motion, we believe our request is consistent with the law, is fair and, most importantly, aligns with the present and future interests of direct drug purchaser recoveries.

As to the merits, this Court enjoys almost unbounded discretion; a wide range of percentage recoveries are within the power of this Court.[3] We are of the view that the facts here—from class counsel's creation of the case to its feverish prosecution to its settlement—warrant an exercise of that discretion at the presumptively reasonable 25% level. Class counsel found this fraud committed on purchasers; counsel did not rip this case from the headlines or follow in the footsteps of governmental or other investigations. Class counsel litigated this case aggressively, on a pace

---

[1] *In re Wash. Pub. Power Supply Sys. Sec. Litig.* ("*WPPSS*"), 19 F.3d 1291, 1302 (9th Cir. 1994).

[2] Pretrial Conference Tr. (Day 1) 9:15-16.

[3] Our research shows that, if a district court has an adequate record and articulates its reasoning, the Ninth Circuit has only twice found an abuse of discretion when applying the percentage-of-the-fund approach. *See WPPSS*, 19 F.3d at 1301, 1305 (district court abused discretion in refusing to award risk multiplier, among other errors); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989) (holding a "paltry seven percent" to be an unreasonable award); *cf. Reyes v. Experian Info. Sols., Inc.*, 856 F. App'x 108, 110 (9th Cir. 2021) (reversing an award of 16.67%, finding the "explanation for departing from the 25% 'benchmark' insufficient").

rarely seen for these cases in other courts, in the midst of the COVID pandemic, and against numerous (and changing) defense counsel determined to fight at every turn. And class counsel secured $453.85 million for the class, one of the largest recoveries in a pharmaceutical antitrust case, and one that dwarfs the recovery of non-class direct purchasers.

While what other courts did in other situations only goes so far, this Court might find it informative that other courts overseeing pharmaceutical antitrust direct purchaser class cases routinely award fees equal to one-third of the settlement fund.[4] Despite a typical one-third recovery, class counsel move this Court, in its role as fiduciary for the class, for fees equal to 25% of the class's recovery (after payment of approved litigation expenses).[5] We recognize, as the Ninth Circuit has acknowledged, that "picking a percentage without reference to all the circumstances of the case, including the size of the fund, would be like picking a number out of the air."[6] Yet the Ninth Circuit set 25% as "a proper benchmark figure" for fees more than thirty years ago, permitting courts to "adjust upward or downward to fit the individual circumstances of the case."[7] At bottom, courts are "guided by the fundamental principle that fee awards out of common funds be '*reasonable under the circumstances.*'"[8] While 25% here results in a large whole number, when considered in light of the work performed and the results achieved, we submit such an award to be fair, reasonable, and appropriate under all the circumstances.

## II.   BACKGROUND

With trial in this complex, antitrust pay-for-delay case originally set for January 2021, counsel worked at breakneck speed, pushing aside other work to meet the Court's deadlines. Shortly into the case, COVID effectively shut down much of the country, changing how counsel

---

[4] Our research shows 34 prior fee awards in direct purchaser generic impairment cases; other federal courts awarded a one-third fee in 28 of the 34 cases. We address this in more detail later.

[5] Counsel also seek reimbursement of their reasonable out-of-pocket expenses incurred in the prosecution of this case, totaling $2,413,688.60.

[6] *WPPSS*, 19 F.3d at 1297.

[7] *Graulty*, 886 F.2d at 273.

[8] *WPPSS*, 19 F.3d at 1296 (quoting *State of Fla. v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990)).

could litigate the case. Throughout, against three defendants and their talented counsel, plaintiffs encountered new and difficult legal issues, including one defendant waiving privilege while the others did not and proving the date when three different companies would have launched an authorized generic version of Glumetza. And class counsel pursued the case on a contingent basis, with no guarantee of recovery. A brief summary of this high-stakes litigation follows, with references to the accompanying declaration of Co-Lead Counsel Lauren G. Barnes ("¶__"), which provides the more detailed history of the litigation.

**A.     The direct purchasers file a new case alleging antitrust violations concerning brand and generic Glumetza and the case takes off with a bang.**

On August 29, 2019, class counsel filed the first complaint alleging that Assertio, Bausch, and Lupin violated Sections 1 and 2 of the Sherman Act when they agreed to delay entry of lower-cost generic versions of the diabetes drug Glumetza for up to four years, during which time the brand price skyrocketed. (¶ 9). The alleged delay caused hundreds of millions in overcharges by direct purchasers. No headline event or governmental or other investigation preceded the filing of this case; rather, direct purchaser counsel discovered, investigated, and worked up the complaint independently. (¶¶ 5-6). On November 25, 2019, class counsel filed the first consolidated amended complaint. (¶ 14). Independent retailer actions followed.[9] (¶ 17).

On December 5, 2019, the Court directed the parties to propose a schedule with a January 2021 trial date (just 13 months later) and adopted plaintiffs' proposal on December 19, 2019. (¶ 18).

On December 23, 2019, the defendants jointly and Assertio independently moved to dismiss the direct purchasers' complaint. (¶ 24). On March 5, 2020, the Court denied the motions. (¶ 23).

By that point, discovery was well underway. The plaintiffs served discovery in December 2019. (¶ 28). By February 6, 2020, the defendants produced 252,579 documents that class counsel had to review, analyze, and organize. (¶ 32). Intense review of these productions began in mid-February at a four-day document review meeting aimed at kickstarting organization, review, and

---

[9] Indirect purchasers also filed suit in the fall of 2019 but voluntarily dismissed their complaints after the Court largely granted the motion to dismiss their claims in March 2020. (*See* ¶ 23.)

analysis of the documents and the next phase of building the evidence for the case. (¶ 33). Over the coming weeks and months, and following numerous discovery battles, the defendants produced more than 300,000 more documents, totaling millions of pages. (¶ 32).

The defendants produced privilege logs with tens of thousands of entries; the direct purchasers led efforts to review the logs and challenge thousands of entries. (¶35). Lupin purported to effect a selective waiver of privilege but improperly attempted to limit the scope of its waiver, holding back thousands of documents. (¶ 35). Magistrate Judge Robert Illman found "Lupin is splitting hairs and is indeed attempting to rely on the attorney-client privilege as both a sword and a shield," and ordered production of scores more documents, including communications between Lupin and its counsel on whether and on what terms they would agree to delay their generic launch. (¶ 46). Combined, the privilege log challenges and fights over Lupin's selective waiver resulted in the production of thousands more documents. (¶ 47). (Amid these fights, Lupin changed counsel for the first time, bringing in Lowenstein Sandler. (¶ 46).) The plaintiffs also negotiated discovery from five non-parties, including generic manufacturers Sun and Teva. (¶¶ 34, 50).

**B.      Most of the case proceeds during the COVID pandemic; despite this, class counsel persisted, litigated determinedly, and met every deadline.**

Amid this, just weeks before fact witness depositions were to begin, COVID effectively shut down the country. Like everyone else, class counsel had to adapt to the challenges of working from hastily crafted home offices (in between sanitizing groceries with Lysol wipes and playing teacher to kids at home)—and figure out how to complete discovery, including preparing for and taking all depositions and working with all experts in a virtual environment. (¶¶ 36-37). Counsel attended trainings, identified new vendors, negotiated a detailed remote deposition protocol, and conferred with opposing counsel on fact stipulations to reduce the number of depositions. (¶ 37).

Between May and July 2020, and largely in the span of three weeks, the plaintiffs deposed 13 fact witnesses, 1 non-retained expert witness, and 1 non-party witness. (¶ 55). Direct purchaser counsel served as lead questioner for nearly every deposition. (¶ 55). Concurrently, in the spring of 2020, the direct purchasers moved for class certification. On August 15, 2020, the Court certified a

class of eighty-one direct purchasers. (¶ 59). During this time, the direct purchasers also retained and worked closely with ten experts, spanning areas of expertise from health care economics to patent litigation to pharmaceutical manufacturing, submitting ten opening reports and four rebuttal reports and responding to reports from eight defense experts. (¶ 57).

As the summer of 2020 ended, and with the January 2021 trial date still on the calendar, plaintiffs were focusing on deposing the defendants' experts, presenting our own expert witnesses, and beginning work on *Daubert* and summary judgment briefing, due to be filed in October 2020. (¶¶ 54-58). The January 2021 trial date stood until September 2020, when, because of public health concerns amid the COVID pandemic, the Court rescheduled trial for October 4, 2021. (¶¶ 61,81).

In early 2021, the parties litigated *Daubert* and summary judgment motions. (¶ 71). Class counsel moved to exclude the partial or full opinions of six defense experts and opposed the defendants' three *Daubert* motions. (¶¶ 72-73). At the same time, the plaintiffs filed a partial motion for summary judgment on the issue of market power and defended against three defense motions for summary judgment. (¶¶ 75-76). Amid this, Bausch retained new counsel from Cravath, Swaine & Moore to work alongside Arnold & Porter. (¶ 79). The Court denied all motions for summary judgment on May 6, 2021 and reserved on the *Daubert* motions until August 25, 2021. (¶¶ 72,82).

## C.     The plaintiffs prepare for trial and settle the case just weeks before trial.

Following the brief reprieve to the trial schedule necessitated by the pandemic, class counsel resumed extensive preparation for trial in the spring of 2021. Continuing into the summer and early fall, this preparation included identifying key trial exhibits; negotiating trial stipulations and joint submissions with the defendants; drafting witness examination outlines, jury instructions, motions *in limine* (and oppositions), and proposed pretrial orders; preparing expert witnesses and demonstratives; analyzing and preparing the order of proof; and engaging in overall case evaluation and analysis (*i.e.*, working with focus groups, identifying challenging parts of the case, and streamlining the story and presentation for the jury). (¶¶ 83-95). The defendants twice tried to exclude the testimony of Dr. Kinam Park, an effort this Court called "ridiculous." (¶¶ 73, 89). The *Daubert* and summary judgment briefing, along with negotiations and materials exchanged with

defense counsel in the lead-up to trial, made clear that the defendants all sought to rely on Lupin's waiver of attorney-client privilege while refusing to waive their own, a situation never confronted in these types of actions. (¶ 88). And along the line, Lupin changed counsel again, bringing in Kirkland & Ellis to work alongside Lowenstein Sandler. (¶ 46).

Between early August and mid-September 2021, class counsel entered settlements in principle with each of the three defendants, following mediations conducted by Magistrate Judge Donna Ryu. (¶¶ 96-104). In the negotiations, class counsel refused to settle without assurances that class members would do as well as or better than opt-outs from the class, on a percent-of-purchases basis, and stuck to their word; the parties made these most favored nations (MFN) conditions explicit following the Court's directives at the pretrial conference. (¶¶ 101-103). (¶¶ 101-05). The class settled with Bausch for $300 million (¶ 101); the independent retailers settled with Bausch for far less.[10] The class settled with Lupin for $150 million; the independent retailers settled with Lupin for $98 million. (¶¶ 104-05).[11]

On September 22, 2022, the Court preliminarily approved the settlements.[12]

## III.   ARGUMENT

**A.   Where, like here, "the benefit to the class is easily quantified," courts regularly use the percentage-of-the-fund method for calculating fees with a lodestar cross-check.**

Federal Rules of Civil Procedure 23(h) and 54(d) permit courts overseeing class actions to award reasonable attorneys' fees and costs. The Supreme Court has long recognized that a lawyer who recovers a "common fund" on behalf of a class is entitled to reasonable attorneys' fees and expenses from the fund.[13] The "guiding principle" for the common fund doctrine is "'the equitable

---

[10] Although class counsel does not know the precise amount of the independent retailers' settlement, Bausch represented to the Court that its settlement with the retailers did not come close to triggering the MFN in the class settlement. (¶105).

[11] The class settled with Assertio for $3.85 million, given its precarious financial situation. Assertio's settlement with the retailers complies with the MFN in the class settlement. (¶103).

[12] Order Granting Preliminary Approval of Class Action Settlements, ECF No. 663.

[13] *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

1   notion that those who benefit from the creation of the fund should share the wealth with lawyers

2   whose skill and effort helped create it.'"[14]

3        In the Ninth Circuit, where a settlement produces a common fund for the benefit of the

4   entire class, district courts may employ two different methods to calculate reasonable attorneys'

5   fees: (1) the "lodestar" method, which multiplies the number of hours reasonably expended on the

6   litigation by reasonable hourly rates, or (2) the "percentage-of-recovery" method, which uses 25%

7   of the common fund as the benchmark for a reasonable fee award.[15] "[C]ourts have discretion to

8   choose which calculation method they use," but "their discretion must be exercised so as to achieve

9   a reasonable result."[16] Despite the discretion, though, a clear pattern emerges: while the lodestar

10  method "is appropriate in cases where there is no way to gauge the net value of the settlement or

11  any percentage thereof," such as injunctive relief cases, the percentage-of-recovery method is the

12  prevailing approach "in cases where the benefit to the class is easily quantified."[17]

13       The benefits of the percentage-of-recovery method in this context are threefold. First, it

14  "reduc[es] the burden on the courts that a complex lodestar calculation requires," permitting

15  courts to instead "focus on showing that a fund conferring benefits on a class was created through

16  the efforts of plaintiffs' counsel."[18] Second, employing the percentage-of-recovery method

---

17  [14] *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 630 (N.D. Cal. 2021) (quoting
18  *WPPSS*, 19 F.3d at 1300); *see also Boeing*, 444 U.S. at 478 ("persons who obtain the benefit of a
    lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense").

19  [15] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011); *Vizcaino v.
20  Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *In re Online DVD-Rental Antitrust Litig.*, 779
    F.3d 934, 949 (9th Cir. 2015).

21  [16] *Bluetooth*, 654 F.3d at 942.

22  [17] *Nwabueze v. AT&T Inc.*, 2014 WL 324262, at *2-3 (N.D. Cal. Jan 29, 2014) (internal
    quotation marks omitted). The Ninth Circuit further explained in *Bluetooth* that "[t]he lodestar
23  method is appropriate in class actions brought under fee-shifting statutes . . ., where the relief
    sought—and obtained—is often primarily injunctive in nature and thus not easily monetized." 654
24  F.3d at 941; *see also In re Apple Inc. Device Performance Litig.*, 2021 WL 1022866, *2 (N.D. Cal. Mar.
25  17, 2021) (fact that fee request was based on "fixed, certain, and non-reversionary" settlement
    amount "supports application of the percentage-of-the-fund method").

26  [18] *Apple*, 2021 WL 1022866, at *2 (internal quotation marks omitted). As the Supreme Court
27  has cautioned, requests for attorney's fees "should not result in a second major litigation." *Hensley v.
    Eckerhart*, 461 U.S. 424, 437 (1983).

28

incentivizes counsel to take cases on behalf of classes because it is consistent "with contingency fee calculations in the private market[.]"[19] Third, and most importantly, by tying the fee award to the size of the class's recovery, the percentage-of-recovery method ensures that "Class Counsel's interests are aligned with the Class, and Class Counsel are incentivized to achieve the best possible result."[20] The Ninth Circuit has observed that the lodestar method, in contrast, "creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee[.]"[21]

So-called "megafund" cases (generally, those exceeding $100 million[22]) are no exception, with courts applying the percentage-of-recovery method and recognizing that this approach "rewards Class Counsel for assuming the risks of the litigation . . . and for prosecuting the case to obtain a benefit proportional to the Class's injury."[23] In all cases (megafund or not), the Ninth

---

[19] *Apple*, 2021 WL 1022866, at *2; *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018) (quoting 5 *Newberg on Class Actions* § 15:62 (5th ed. 2018) for the proposition that "many courts utilize a percentage approach, which approximates the manner in which plaintiff contingent fee lawyers undertake work outside the class action context"); *see also Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003) ("Common fund fees are essentially an equitable substitute for private fee agreements where a class benefits from an attorney's work.").

[20] *Anthem*, 2018 WL 3960068, at *5; *see also Hayes v. Harmony Gold Mining Co.*, 509 F. App'x 21, 24 (2d Cir. 2013) ("[T]he prospect of a percentage fee award from a common settlement fund . . . aligns the interests of class counsel with those of the class."); *Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm'n*, 3 F.3d 1568, 1573 (D.C. Cir. 1993) ("The percentage of the fund approach helps to align more closely the interests of the attorneys with the interests of the parties.").

[21] *Vizcaino*, 290 F.3d at 1050 n.5; *see also Anthem*, 2018 WL 3960068, at *5 (noting "the lodestar method has sometimes been criticized because it encourages counsel to bill time and create opportunities to bill time" (citing 5 *Newberg on Class Actions* § 15:65 (5th ed. 2018))); *Manual for Complex Litigation, Fourth* § 14.121 at 188 ("In practice, the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation. In addition, the lodestar creates inherent incentive to prolong the litigation until sufficient hours have been expended." (citing *Court Awarded Attorney Fees: Report of the Third Circuit 1985 Task Force*, 108 F.R.D. 237, 248 (1985))).

[22] *See, e.g., In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 932 (9th Cir. 2020) (while Ninth Circuit has "not identified a bright-line definition for 'megafund,'" there is "no question" a $124.5 million common fund qualifies).

[23] *Anthem*, 2018 WL 3960068, at *5.

Circuit "encourage[s] courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable."[24]

**B.    A fee award of 25% of the settlement fund is reasonable and appropriate under the *Vizcaino* factors.**

The Ninth Circuit has long considered an award of 25% of the common fund "a proper benchmark figure," with courts permitted to "adjust upward or downward to fit the individual circumstances of [a] case."[25] But the 25% benchmark is only a starting point, and the Ninth Circuit has cautioned that it "'is of little assistance' in megafund cases."[26] This is in part because "'in many instances the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'"[27] Yet, the Ninth Circuit has also repeatedly declined to require the use of sliding-scale fee awards or mandate that the percentage of an award decrease as the size of the fund increases, instead emphasizing that "fund size is one relevant circumstance to which courts must refer."[28] One reason for rejecting the sliding-scale approach is "the perverse incentives that may result by following such a formulaic approach": "If courts award class counsel 30% of any settlement under $100 million but only 20% of any settlement over $100 million, then class counsel will prefer to settle cases for $90 million (i.e., a $27 million fee award) instead of $125 million (i.e., a $25 million fee award)."[29] At bottom, because "courts cannot rationally apply any

---

[24] *Optical Disk*, 959 F.3d at 930.

[25] *Graulty*, 886 F.2d at 273; *Anthem*, 2018 WL 3960068, at *4 (noting 25% is "a presumptively reasonable amount of attorneys' fees"); *Bluetooth*, 654 F.3d at 942 (departure from 25% is appropriate where "special circumstances" justify); *Perkins v. LinkedIn Corp.*, 2016 WL 613255, *14 (N.D. Cal. Feb. 16, 2016) ("Upward departures may be warranted in particular circumstances, while downward departures may be warranted where there is no 'realistic risk of nonrecovery.'" (quoting *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1257–58 (C.D. Cal. 1997))).

[26] *Optical Disk*, 959 F.3d at 933; *see also Vizcaino*, 290 F.3d at 1048 ("The 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases.").

[27] *Optical Disk*, 959 F.3d at 933 (quoting *Bluetooth*, 654 F.3d at 943).

[28] *Vizcaino*, 290 F.3d at 1047; *Optical Disk*, 959 F.3d at 933 (reiterating that the Ninth Circuit has "already declined to adopt a bright-line rule requiring the use of sliding-scale fee awards for class counsel in megafund cases").

[29] *Anthem*, 2018 WL 3960068, at *15.

particular percentage—whether 13.6 percent, 25 percent or any other number—in the abstract, without reference to all the circumstances of the case," courts "should be guided by the fundamental principle that fee awards out of common funds be '*reasonable under the circumstances.*'"[30]

The Ninth Circuit has identified several factors courts may consider when determining a reasonable percentage:

> (1) the extent to which class counsel achieved exceptional results for the class; (2) whether the case was risky for class counsel; (3) whether counsel's performance generated benefits beyond the cash settlement fund; (4) the market rate for the particular field of law; (5) the burdens class counsel experienced while litigating the case; and (6) whether the case was handled on a contingency basis.[31]

This list is not exhaustive: "Ultimately, district courts must ensure their fee awards are 'supported by findings that take into account all of the circumstances of the case.'"[32]

Here, class counsel submit that the *Vizcaino* factors justify an upward adjustment to the 25% benchmark. However, recognizing the megafund status of the case, class counsel request an award of 25% of the net settlement fund to compensate their efforts on behalf of the class.

### 1. Class counsel achieved an exceptional result—$453.85 million—for the class.

The "overall result and benefit to the class" is "the most critical factor in granting a fee award."[33] By any measure, the settlements here are an excellent outcome for the direct purchaser class. The three settlements combined constitute, in terms of the overall dollar amount, the third largest recovery ever for a direct purchaser class in a Hatch-Waxman generic delay pharmaceutical antitrust case.[34] Perhaps more significantly, the recovery is the equivalent of 50 to 90 percent of the

---

[30] *WPPSS*, 19 F.3d at 1296, 1298 (quoting *Dunne*, 915 F.2d at 545); *see also Vizcaino*, 290 F.3d at 1048 ("Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case.").

[31] *Optical Disk*, 959 F.3d at 930 (citing *Vizcaino*, 290 F.3d at 1048–50).

[32] *Id.* (quoting *Vizcaino*, 290 F.3d at 1048).

[33] *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008); *see also Hensley*, 461 U.S. at 436 ("most critical factor" in determining reasonableness of attorney fee request is "the degree of success obtained"); *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019).

[34] *See* Appendix 1, *infra*.

-10-

DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES
No. 3:19-cv-05822-WHA

direct purchaser class's claimed aggregate single damages[35]—making it perhaps the highest

percentage recovery ever obtained in a settlement of a generic delay pharmaceutical antitrust

case.[36] In this district, "[f]ar lesser results (with 20% recovery of damages or less) have justified

upward departures from the 25% benchmark."[37]

Notably, counsel prevailed in obtaining a recovery for the class that substantially exceeded

the class's percentage of total overcharges. The independent retailers' portion of damages was

nearly double that of the class but class counsel ensured that the class would receive a minimum of

55% of each settlement (and, in fact, the class received an even greater percentage), thus recovering

an amount far in excess of what would have been recovered on a standard percentage-of-overcharge

basis.[38] Further, unlike megafunds for classes numbering in the hundreds or thousands, here, class

counsel secured the net settlement fund on behalf of a 68-member class, underscoring that the

exceptional result was the result of class counsel's skill and tenacity rather than a mere function of

the size of the class.[39] (And the size of the recovery guarantees handsome payments for all.) Class

notice was previously successfully mailed and emailed to all class members (identified through

defendants' sales records), and settlement notice has been disseminated to all class members

---

[35] *See* ¶ 107.

[36] *See* ¶ 107 & accompanying chart.

[37] *NCAA*, 2017 WL 6040065, at *3 (citing cases); *Anthem*, 2018 WL 3960068, at *10 (finding that $115 million settlement representing 14.5% of estimated damages "compares favorably to Plaintiffs' valuation of their own claims").

[38] Although explicit MFN provisions were later added to the settlement agreements, the terms had been previously negotiated and agreed-to. (*See* ¶¶ 101-05).

[39] *See Apple*, 2021 WL 1022866, at *8 (finding no upward adjustment from 25% benchmark warranted for megafund "where the size of the Settlement is a function of the number of devices at issue, estimated to be 90 million"); *Alexander*, 2016 WL 3351017, at *1 (N.D. Cal June 15, 2016) (explaining that percentage awards are often lower in megafund cases because "in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel" (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 339 (3d Cir. 1998))); *Gutierrez v. Wells Fargo Bank, N.A.*, 2015 WL 2438274, at *8 (N.D. Cal. May 21, 2015) (lodestar method "may be more appropriate" where "the large size of the recovery is due to the large size of the class rather than counsel's specialized skill and efforts").

without issue. (¶ 109). Class counsel are therefore confident that every class member that desires to do so will be able to submit a claim form and receive its *pro rata* share of the settlement fund.

Class counsel's skill and perseverance, amid a pandemic, led to this result. As detailed in the Barnes Declaration, class counsel discovered the case and litigated doggedly on behalf of the class throughout. The defendants fought consistently, filing multiple motions to dismiss the case (at both the Rule 12 and Rule 56 stages), disqualify experts, and exclude evidence at trial. Lupin waived attorney-client privilege, yet continued to withhold documents relevant to its advice of counsel defense, a battle the plaintiffs won before Magistrate Judge Illman. Subsequently, all defendants sought to rely on Lupin's waiver while refusing to waive themselves, thrusting the parties into uncharted territory the plaintiffs had to navigate. The Court recognized the novel nature of this dispute[40] and ultimately agreed with plaintiffs that "it is unfair for the defendants to make that argument and prevent the jury from knowing or the plaintiffs from pointing out to the jury that the jury has not been shown what the other defendants thought about the case."[41]

Despite these challenges and the uncompromising schedule, plaintiffs met every deadline, successfully defended against all substantive motions, including against experts, and stood ready for trial this fall. Class counsel's hard work and ability led directly to this significant recovery for the class. Accordingly, this factor strongly weighs in favor of awarding the requested fee.

### 2. Class counsel faced a risk of zero recovery.

Antitrust class actions are "arguably the most complex action[s] to prosecute," as the "legal and factual issues involved are always numerous and uncertain in outcome."[42] In antitrust cases, "[t]he 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no

---

[40] *See* Sept. 9, 2021 Hr'g Tr. at 48, ECF No. 642 ("This is a unique problem. . . .we have a unique situation here where the alleged conspirators violated the antitrust laws, and an issue is who would have won the litigation, and one of them stepped forward to open their files and waive the privilege and it would benefit all three. That's an unusual circumstance. . . . ").

[41] *Id.*

[42] *In re Optical Disk Drive Prods. Antitrust Litig.*, 2016 WL 7364803, *4 (N.D. Cal. Dec. 19, 2016) (overruled on other grounds) (quoting *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004)).

1   damages. None of these risks should be underestimated."[43] This is because "'[a]ntitrust litigation in

2   general, and class action litigation in particular, is unpredictable.'"[44] "Indeed, the history of

3   antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability,

4   but recovered no damages, or only negligible damages, at trial, or on appeal."[45]

5   In this field in particular, class counsel must constantly map new contours to catch up with

6   pharmaceutical manufacturers' creative new ways to skirt the law.[46] This case was no exception.

7   The issues in this case were complex, and the defendants asserted vigorous defenses to each and

8   every aspect of the direct purchasers' claims.[47]

9   For example, proving causation, *i.e.*, that one or more less-expensive versions of generic

10  Glumetza could and would have been available earlier, presented significant obstacles for a variety

11  of reasons. Sun encountered scale-up issues when it began preparing for launch, but it delayed

12  resolving them, raising questions in this case about whether and how Sun might have surmounted

13  those issues in the but-for world. In addition, brand Glumetza and the rights to launch an

14  authorized generic Glumetza moved from Santarus, to Salix, to Bausch during the class period,

---

[43] *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990); *see also In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 743 (E.D. Pa. 2013) ("Antitrust class actions are particularly complex to litigate and therefore quite expensive."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 WL 5918273, at *6 (E.D.N.Y. Oct. 9, 2015) (price-fixing conspiracy claim required "complex expert analysis and review of mountains of documents").

[44] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 721680, at *17 (N.D. Cal. Jan. 28, 2016) (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998)).

[45] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (quoting *NASDAQ Market-Makers*, 187 F.R.D. at 476).

[46] *See, e.g., In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020) (finding "sheer scale" of antitrust overcharge case "required extensive coordination among Class Counsel and the supporting firms" due to, *inter alia*, "the scope and length of the conspiracy alleged" and "the complexity associated with proving the existence of overcharges"); *Edwards v. Nat'l Milk Producers Fed'n*, 2017 WL 3623734, at *6 (N.D. Cal. June 26, 2017) (fact that antitrust class actions are "arguably the most complex action[s] to prosecute" demonstrated in case "where the untested antitrust immunities at issue, defendants' scorched-earth strategies, and the complex econometrics posed significant challenges for plaintiffs.").

[47] *See Anthem*, 2018 WL 3960068, at *13 ("This Court and other courts within this district have recognized that litigating complex matters, especially unprecedented issues, is a circumstance that points in favor of a larger percentage.").

-13-

requiring class counsel to prove, solely through expert testimony, that all three Bausch entities would have been incentivized to launch an authorized generic. Lupin further complicated the analysis, suggesting at the 11th hour (through the addition of multiple surprise witnesses) that it faced issues coming to market. (¶ 88).

Class counsel faced risks on the patent front as well. Two federal courts (with three different judges) had concluded that other challengers failed to demonstrate that any of the asserted claims of the two foundational patents was invalid.[48]  And those patents had also withstood seven *inter partes* review challenges before the Patent Trial and Appeal Board.[49]

The fact that Lupin waived privilege to assert an advice-of-counsel defense, but the other defendants did not was, in the words of this Court, a "ploy present[ing] a facially incomplete record."[50]  At trial, the purchasers would face conveying to the jury that there was no evidence about what the other defendants *thought* about winning or losing the case and that Lupin's waiver is not Bausch's or Assertio's waiver. There was a danger that the jury may not grasp that *Lupin's* beliefs about the merits of the underlying patent litigation were not Bausch's or Assertio's beliefs.[51]

This case involved protracted disputes concerning monopoly power and relevant market, with the Court leaving these issues to the jury.[52] Absent the settlement, the direct purchasers would have had to obtain a jury verdict in the purchasers' favor (and defend that verdict in an inevitable appeal to the Ninth Circuit), which also involved significant risk. Counsel for the direct purchasers have sometimes lost cases analogous to this one, at points in time ranging from motions to dismiss to jury verdict, recovering nothing.

---

[48] *See* ECF No. 466.

[49] *Id.*

[50] *In re Glumetza Antitrust Litig.*, 2021 WL 1817092, *12 (N.D. Cal. May 6, 2021).

[51] The waiver of privilege by a single defendant itself was unique. Class counsel are aware of no other case where only one defendant of several so waived.

[52] *Glumetza*, 2021 WL 1817092, at *5-8; *see also CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 956–57 (D. Or. 2018) ("'The question of whether, and if so in what market, [the defendant] has monopoly power is complex, nuanced, and fact dependent.'") (quoting *CollegeNET v. The Common Application, Inc.*, 711 F. Appx 405, 407 (9th Cir. 2017)).

Finally, the defendants in this matter—themselves large, multi-national companies—were represented by six well-respected, national law firms, with an army of resources at their disposal.[53] Courts recognize "the quality of opposing counsel as a measure of the skill required to litigate the case successfully" and that this factor "weighs in favor of a fee award" of the size requested here.[54]

**3.    Class counsel's performance generated benefits beyond the settlement fund.**

This factor examines whether counsel's performance generated some non-monetary or public policy benefit beyond the creation of the fund, such as adding to novel or undeveloped areas of law, clarifying a point of law, or obtaining a ruling on a significant issue.[55] Counsel for the direct purchasers evoked decisions by this Court that advanced the law in several respects. For example, issues of privilege and attempts to use it as a sword and shield abound in these cases and Judge Illman's order on the plaintiffs' motion to compel concerning Lupin's privilege waiver provides a helpful guide for future actions. (¶ 46). Likewise, the Court's rulings that it would be unfair to prevent the jury from learning that the other defendants did not waive privilege will benefit class members, and others in multi-defendant cases, in the future.[56] Class counsel were either principally or substantially responsible for the briefing leading to these developments in the law. (¶¶ 35, 89).

Counsel's efforts also benefitted the public by deterring future misconduct by pharmaceutical manufacturers. Here, there were no governmental investigations or enforcement actions (¶ 2); but for class counsel's decision to file and prosecute this case, the defendants' conduct would have gone unchecked, possibly emboldening future misconduct. Accordingly, this factor supports the requested fee.

---

[53] *Apple*, 2021 WL 1022866, at *6 ("Here, Class Counsel faced a company with significant financial and legal resources. … Apple was represented in this case by two national, highly respected law firms . . . which weighs in favor of a fee award.").

[54] *Apple*, 2021 WL 1022866, at *6.

[55] *See, e.g.*, *Vizcaino*, 290 F. 3d at 1049 (litigation caused defendant to change its employee benefit practices); *Larsen v. Trader Joe's Co.*, 2014 WL 3404531, at *9 (N.D. Cal. July 11, 2014) (Trader Joe's stopped using the label at issue because of the litigation); *Beaver v. Tarsadia Hotels*, 2017 WL 4310707, at *11-12 (S.D. Cal. Sept. 28, 2017) (class counsel clarified a statute of limitations issue and obtained a Ninth Circuit decision on other significant issues).

[56] *See* Sept. 9, 2021 Hr'g Tr., ECF No. 642.

1
2

**4.     A 25% fee award is less than the one-third fee routinely approved in generic delay pharmaceutical antitrust cases generally and the percentages previously awarded in such cases in this district.**

3

The fourth *Vizcaino* factor examines whether class counsel's requested fee is in line with

4

awards for similar representations.[57] The most apt comparison is to other Hatch-Waxman delayed

5

generic entry pharmaceutical antitrust cases litigated by classes of direct purchasers. Such cases are

6

distinctive in that they (1) occur against a uniquely complicated regulatory and economic

7

background, (2) implicate and demand a facility with complex subject areas ranging from antitrust,

8

patent, and administrative law to pharmaceutical market dynamics and medicine, (3) require

9

enormous expenditures on specialized experts in multiple disciplines, (4) pose highly complex and

10

often novel legal issues, and (5) are typically protracted, requiring years to litigate.

11

As Appendix A shows, courts overwhelmingly approve fee awards of one-third of the net or

12

gross settlement funds in such cases. In 28 of 34 generic delay cases, the court awarded fees of one-

13

third of the net or gross settlement fund.[58] In two others, counsel only sought 27.5%, requests

14

those courts granted. In only 3 of 34 did the court award less than 27.5%. Notably, the fee awards

15

approved in the two generic delay cases previously litigated in this district—*Lidoderm* and

16

*Norvir*—both exceeded the 25% benchmark, reflecting a recognition by this Court that the

17

complexity and high-risk nature of these cases and the skill of class counsel warrant an upward

18

adjustment. The *Lidoderm* court found an award of 27.5% of the $166 million settlement was "fair

19

and reasonable,"[59] and the *Norvir* court stated that one-third of the gross settlement amount "fairly

20

compensate[d] Class Counsel for their respective contributions in the prosecution of" that action.[60]

21

[57] *Moyle v. Liberty Mut. Ret. Benefit Plan*, 2018 WL 1141499, at *9 (S.D. Cal. Mar. 2, 2018).

22

23

24

25

[58] A 25% fee award would also be lower than or roughly equivalent to the averages for broader categories of cases: A recent empirical analysis of fee awards in class actions from 2006 to 2011 found that the mean average of percentage awards in common fund cases generally was 26.9%; the average of those awarded in the Ninth Circuit was 24.5%; and the average in antitrust cases was 25.2%. *See* William B. Rubenstein, *Newberg on Class Actions* § 15:83 tbls. 1–3 (2021 ed.) (citing William B. Rubenstein & Rajat Krishna, *Class Action Fee Awards: A Comprehensive Empirical Study* (draft on file with author)).

26

[59] *In re Lidoderm Antitrust Litig.*, 2018 WL 11375216, at *3 (N.D. Cal. Sept. 20, 2018).

27

[60] *Meijer, Inc. v. Abbott Labs. (Norvir)*, 2011 WL 13392313, at *2 (N.D. Cal. Aug. 11, 2011).

28

The outliers are readily distinguished from this case. *Aggrenox* and *Paxil*, both resulting in 20% fee awards, settled atypically early. In *Aggrenox*, the parties settled for $146 million before completing class certification and summary judgment briefing and after taking only a few preliminary depositions.[61] *Paxil* settled for $100 million almost before it even got underway; the 20% fee awarded in that case still amounted to a 15.6 multiplier.[62]

*Namenda* is also distinguishable. There, the class case followed significant investigation and work by the New York Attorney General,[63] unlike here where "there were no government coattails for the class to ride."[64] In *Namenda*, counsel for the class initially requested attorneys' fees of 27.5% of the $750 million settlement fund, totaling $206.25 million.[65] Despite having supported a similar request in 2015 in *Provigil*, the so-called "Big Three" national wholesalers (AmerisourceBergen, McKesson, and Cardinal Health) that make up the vast majority of purchases objected in *Namenda*, calling the fee request "inappropriate and unreasonable," criticizing, *inter alia*, the fact that class counsel has "negated all risk by choosing to settle this case at a very sharp discount—less than five percent of potentially recoverable damages."[66] Following negotiations with the Big Three and

---

[61] *In re Aggrenox Antitrust Litig.*, 2017 WL 11636126 (D. Conn. Dec 19, 2017).

[62] *Stop & Shop Supermarket Co. v. Smithkline Beecham Corp. (Paxil)*, 2005 WL 1213926, at *9, *10–11 (E.D. Pa. May 20, 2015).

[63] *See, e.g.*, Press Release, *A.G. Schneiderman Files Groundbreaking Lawsuit to Block Pharmaceutical Manufacturer From Manipulating Alzheimer's Patients* (Sept. 16, 2014), https://ag.ny.gov/press-release/2014/ag-schneiderman-files-groundbreaking-lawsuit-block-pharmaceutical-manufacturer.

[64] *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009).

[65] It is also worth noting that in *Namenda*, the direct purchaser class settled for $750 million, with no opt-outs or independently litigating retailers. *See* Mem. Decision & Order at 69–82, 99, ECF No. 570; Decl. of Notice Administrator Regarding Transmission of Notice to Direct Purchaser Class ¶ 5, ECF No. 679. Had the situation been the same here, the class settlements grossed up exceed $825 million.

[66] Class Members Cardinal Health, Inc., AmerisourceBergen Drug Corp. & McKesson Crop's Obj. & Notice of Intent to Appear in Opp'n to Class Counsel's Mot. for Attys.' Fees at 4–5, 7, *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488 (S.D.N.Y. Mar. 30, 2020), ECF No. 932. As they pointed out in their objection, the Big Three had been class members in dozens of prior Hatch-Waxman generic delay cases and had "never previously objected to an attorneys' fee request in these cases"; to the contrary, in several such cases, they "submitted letters supporting Class Counsel's requested attorneys' fee amount." *Id.* at 4.

withdrawal of their objections, counsel for the class revised their fee request to $157.5 million, equivalent to 21% of the settlement fund.[67] But the court rejected the revised request, instead granting a 2X multiplier for a fee of $69,538,016.70 or 9.3% of the fund. The court found, after requesting and reviewing the firms' time records, that multiple firms "repeatedly engaged in duplicative work—or, in some cases, triplicate or quadruplicates work."[68] It criticized the class counsel firms (none of which are class counsel here) for billing "hundreds of thousands of dollars" for wasteful and inefficient work in a "routine" case involving few novel legal issues.[69]

By contrast, in *Provigil*, another megafund direct purchaser case, counsel sought and the court awarded fees of 27.5% of the $512 million settlement fund, the second largest recovery in a direct purchaser case.[70] Like *Namenda*, the class's case and recovery followed significant investigation and work by others, this time the FTC and a litigating generic manufacturer.[71] Granting class counsel's request and awarding a $140.8 million fee equating to a 4.12 multiplier, the *Provigil* court recognized that the fee award was lower than those routinely granted in like cases and less than the fee that would have been negotiated had the case been subject to a private contingent fee agreement.[72] Ten class members, including the Big Three, submitted letters or declarations expressing their support for and urging the court to approve counsel's fee request.[73]

Rewarding class counsel for notable victories and ensuring the uniformity of fee awards in these cases promotes the important public policy of encouraging talented litigators, who may

---

[67] *In re Namenda Direct Purchaser Antitrust Litig.*, 2020 WL 3170586, at *1 (S.D.N.Y. June 15, 2020).

[68] *Id.* at *3.

[69] *Id.* at *3–4. For example, the court noted a deposition of a 30(b)(6) witness that three of the six class counsel firms billed for attending and four billed more than $10,000 for preparing for. *Id.* at *3.

[70] *See King Drug Co. of Florence v. Cephalon, Inc. (Provigil)*, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 8, 2015).

[71] *See FTC v. Cephalon, Inc.*, E.D. Pa. Case No. 08-cv-2141; *Apotex, Inc. v. Cephalon, Inc.*, E.D. Pa. Case No. 06-cv-2768.

[72] *Id.*

[73] *Id.* at *2.

1  otherwise be deterred by the complexity, risk, and substantial investment of resources required, to

2  pursue such cases.[74]

3  **5.    Class counsel expended significant time and effort in litigating this case.**

4  Class counsel expended significant time and effort, more than 34,000 hours, investigating

5  and prosecuting this case over the course of just over two years.[75] As detailed in the Barnes

6  Declaration, class counsel, *inter alia*: (a) discovering and investigating the claim (with no prior

7  government investigation or action) (¶2); (b) successfully defeated the defendants' motions to

8  dismiss (¶¶24–27); (c) reviewed and analyzed 578,790 documents, totaling millions of pages,

9  produced by the defendants and non-parties (¶32); (d) served as lead questioner at 19 depositions of

10  defendants' fact and expert witnesses (¶¶55,62); (e) consulted with and retained 10 expert

11  witnesses, and defended the majority at deposition (¶¶56,62); (f) engaged in substantial motion

12  practice on various issues (¶¶23-27, 71-82, 89-90); (g) obtained certification of the class (¶¶39-

13  42); (h) defeated defendants' motions for summary judgment (¶¶76-82); (i) engaged in intensive

14  trial preparation (¶¶83-95); and (j) prepared for and participated in multiple mediation sessions

15  (¶¶96-104).This does not include the significant number of uncompensated hours class counsel

16  will expend in connection with securing approval of and administering the settlements. (¶131)[76]

17

18  [74] *See In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *18 (S.D.N.Y. Apr. 26,

19  2016) ("It is important to encourage top-tier litigators to pursue challenging antitrust cases . . .
[because] [o]ur antitrust laws address issues that go to the heart of our economy."); *Newberg on

20  Class Actions* § 15:77 (criticizing the use of multifactor tests to assess fee requests because they

21  "generate uncertainty by not setting forth a fee rate *ex ante*," which "can deter lawyers–who are
investing their own resources into the case with the promise of some return on that investment—

22  from becoming involved").

23  [75] *See NCAA*, 2017 WL 6040065, at *8 (over $11 million in professional time and over $3
million in expenses represented a significant "commitment of time, personnel and money to the

24  classes"); *Apple*, 2021 WL 1022866, at *8 (finding 68,731 hours expended by Class Counsel over 3-
year litigation "reasonable and necessary, taking into consideration the amount of substantive

25  litigation activity")

26  [76] *See, e.g.*, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 721680, at *44
(acknowledging that "Lead Counsel and a handful of other firms have and will invest many

27  hundreds of uncompensated hours . . . in obtaining approval of the settlement, administering the
distribution of funds, . . . and other post-settlement tasks . . . .").

28  -19-

Class counsel also invested nearly $2.5 million of their own money in necessary out-of-pocket litigation costs. (¶¶ 129-131). Making this significant financial burden heavier, direct purchaser counsel diverted resources—time, personnel, and money—from other work while litigating this action. Accordingly, this factor strongly supports the requested fee.

### 6. The wholly contingent nature of the representation yielded an outcome resulting in the class recovering a net recovery greater than the opt-outs' gross recovery.

Courts "have long recognized that the public interest is served by rewarding attorneys who assume representation on a contingent basis with an enhanced fee to compensate them for the risk that they might be paid nothing at all for their work."[77] "This mirrors the established practice in the private legal market of rewarding attorneys for taking the risk of nonpayment by paying them a premium over their normal hourly rates for winning contingency cases."[78] As the *NCAA* court recently summed up,

> In short, contingent fees are good for clients and the public alike. In exchange for increased predictability, decreased bean counting, and unlimited protection against downside risks—including the risk of a zero[-]dollar recovery—a client agrees to pay its attorneys an enhanced fee if and only if the client recovers. And because contingent fees are almost always determined as a percentage of the client's recovery, such fees are necessarily aligned with and proportional to the results achieved for that client—in short, the client only pays for what it gets. Lest contingent fees disappear altogether, the law must recognize both sides of the bargain—namely, a significant upside fee for successful contingent representations.[79]

Class counsel litigated this case purely on a contingency fee basis—with no upfront retainer fees or allowance for expenses. Counsel faced the very real risk that they may ultimately receive

---

[77] *Ching v. Siemens Indus., Inc.*, 2014 WL 2926210, at *8 (N.D. Cal. June 27, 2014).

[78] *Vizcaino*, 290 F.3d at 1051; *see also* John Leubsdorf, *The Contingency Factor in Attorney Fee Awards*, 90 Yale L.J. 473, 480 (1981) ("A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.").

[79] *NCAA*, 2017 WL 6040065, at *4.

nothing for their hard work and long hours, nor recover the millions of dollars in cash outlays.[80]

"All litigation poses such risks of course but antitrust litigation especially so."[81] Plaintiffs in

pharmaceutical antitrust cases, and class counsel, have lost analogous cases.[82]

Class counsel's willingness to pursue Hatch-Waxman pharmaceutical antitrust cases on a

contingent basis in the face of such risk advances the important public policy goal of incentivizing

private challenges to violations of the federal antitrust laws to uphold the "fundamental national

values of free enterprise and economic competition" they embody.[83] Adequate compensation

ensures that competent counsel are attracted to such work and not deterred by bearing the risk

(and sometimes the reality) of loss.[84]

Incentivizing private challenges to antitrust violations is particularly compelling where, as

here, class counsel and their clients were solely responsible for the investigation and development

of the case. Although antitrust class actions are often litigated alongside government enforcement

---

[80] *Id.* at *5 ("[C]ounsel for the classes have spent more than three years investigating and litigating this case, without receiving any compensation to do so. Such burdens are significant, even for law firms of the stature of plaintiffs' counsel").

[81] *In re Se. Milk Antitrust Litig.*, 2013 WL 2155379, at *4 (E.D. Tenn. May 17, 2013).

[82] *See, e.g., In re Nexium Antitrust Litig.*, No. 12–md–02409 (D. Mass. Dec. 8, 2014), ECF No. 1374 (verdict returned in favor of the defendants in pharmaceutical antitrust class action on behalf of direct purchasers); *Louisiana Wholesale Drug Co. Inc. v. Sanofi-Aventis, et al.*, Case No. 07-7343 (S.D.N.Y. Dec. 9, 2008) ("Arava"), ECF No. 280 (verdict returned in favor of the defendants in pharmaceutical antitrust class action on behalf of direct purchasers). *See also, e.g., In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 169 (3d Cir. 2017) (affirming the district court's grant of summary judgment to the defendants in reverse payment case); *In re: Lamictal Direct Purchaser Antitrust Litig.*, 2021 WL 2349828, at *21 (D.N.J. June 7, 2021) (denying class certification after reversal on remand in reverse payment action).

[83] *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013); *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) ("Congress created the treble-damages remedy . . . precisely for the purpose of encouraging *private* challenges to antitrust violations. These private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations."); *Credit Default*, 2016 WL 2731524, at *18 ("It is important to encourage top-tier litigators to pursue challenging antitrust cases . . . [because] [o]ur antitrust laws address issues that go to the heart of our economy.").

[84] *See Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) (awarding enhanced fees in contingency cases "provides the 'necessary incentive for attorneys to bring actions to protect individual rights and to enforce public policies' (quoting *In re "Agent Orange Prods. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987))).

-21-

1   actions (such as in *Namenda* and *Provigil*), class counsel were the first to file, and proceeded to

2   litigate without the benefit of any concurrent governmental prosecutions.

3        Moreover, in the face of this significant risk, class counsel stood their ground in settlement

4   negotiations, and ensured that class members would be treated as well as or better, on a percent of

5   purchases basis, than any opt-out from the class. Even with a fee award of 25%, class members will

6   net more from the Lupin settlement than the independent retailers *and their counsel* grossed.[85]

7        Class counsel also worked with a high degree of proficiency and efficiency, obtaining a

8   settlement with the last defendant two years following the filing of this matter. Antitrust pay-for-

9   delay class action are complex cases that typically remain pending on a court's docket for a much

10  longer period of time. Class counsel respectfully submit that this efficiency—and the dedication of

11  counsel that it made it possible—should be rewarded, not penalized. Accordingly, this factor

12  strongly supports the requested fee.

13  **C.    A lodestar cross-check confirms the reasonableness of the requested fee award.**

14       The Ninth Circuit "encourage[s] courts using the percentage-of-recovery method to

15  perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery

16  amount is reasonable."[86] A lodestar cross-check can "confirm that a percentage of [the] recovery

17  amount does not award counsel an exorbitant hourly rate."[87]

18       "The lodestar figure is calculated by multiplying the number of hours the prevailing party

19  reasonably expended on the litigation (as supported by adequate documentation) by a reasonable

20  hourly rate for the region and for the experience of the lawyer."[88]  First, a court determines

21

22      [85] A 25% fee on the $150 million Lupin settlement nets $112.5 million for class members, which

23  exceeds the $98 million gross recovery by the independent retailers and their counsel. Though the
    size of the independent retailers' settlement with Bausch has not been publicly disclosed, Bausch

24  counsel represented that it was "not close" between the class and the retailers' recovery, suggesting
    that a similar net/gross relationship may apply to the Bausch settlements.

25      [86] *Optical Disk*, 959 F.3d at 930. *See Vizcaino*, 290 F.3d at 1050.

26      [87] *Online DVD*, 779 F.3d at 949 (citation and internal quotation marks omitted).

27      [88] *Bluetooth*, 654 F.3d at 941; *In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5158730, at *9
    (N.D. Cal. Sept. 2, 2015) (same).

28

whether counsel's hourly rates are reasonable considering their experience, skill and reputation.[89] Second, a court determines whether the number of hours worked on the case is reasonable.[90] In performing the cross-check, "a court need not exhaustively catalogue and review counsel's hours, but can instead focus on the general question of whether the fee award appropriately reflects the degree of time and effort expended by the attorneys."[91]

Here, class counsel's requested percentage-of-recovery fee award is reasonable when analyzed in light of a lodestar crosscheck.[92] First, class counsel's rates, found in Appendix A to the declarations of each firm representing the direct purchaser class,[93] are well within the range that have been approved as reasonable by courts in this judicial district.[94] Class counsel have significant experience litigating complex drug antitrust cases; no other group of lawyers in the country shares the same level of expertise and experience in this highly specialized area. Second, the number of hours class counsel worked on this case was reasonable. As detailed in the Barnes Declaration, class counsel aggressively litigated this case through the eve of trial. That the proposed settlements only occurred at this stage of the litigation, despite prior unsuccessful attempts at settlement, demonstrates that it was the hard work and long hours put in by class counsel that positioned the case for the excellent results obtained through settlement.

In addition, as detailed in the Barnes Declaration and accompanying firm declarations, to satisfy this Court's desire to have counsel cut back arguably unneeded time entries, class counsel

---

[89] *Id.* at *29–30.

[90] *Id.* at *30.

[91] *Moyle*, 2018 WL 1141499, at *11 (internal quotation marks omitted).

[92] *See* ¶ 111 (lodestar).

[93] *See* Barnes Decl. at Exs. 1-7.

[94] *See, e.g.*, *NCAA*, 2017 WL 6040065, at *9 (reputable survey of 2015 rates for California attorneys showed range of $200 to $1,080); *Rainbow Bus. Sols. v. MBF Leasing LLC*, 2017 WL 6017844, at *2 (N.D. Cal. Dec. 5, 2017) (finding class counsel's rates ranging from $275 to $950 per hour "are reasonable and commensurate with those charged by attorneys with similar experience who appear in this Court[]" three years ago); *In re Animation Workers Antitrust Litig.*, 2016 WL 6663005, at *6 at *20 (N.D. Cal. Nov. 11, 2016) (hourly rates ranging from $275 to $1,200 were "fair, reasonable, and market-based, particularly for the 'relevant community' in which counsel work" four years ago).

1   reviewed and cut back the more than twenty thousand detailed time entries, deleting potentially

2   duplicative, less-efficient, or non-compensable time. (Counsel also cut—or never initially billed

3   for—time that is properly compensable, including attendance at hearings by junior lawyers and

4   other members of the team, work by timekeepers that had limited hours in the case, etc.) These cuts

5   resulted in the removal of nearly 2,000 hours and almost $1,000,000 in lodestar, for a total of

6   $22,786,167.00. Again, in our view we staffed and conducted the case in an overall efficient manner;

7   these cuts were undertaken to achieve the goals espoused by this Court. Even in doing so, we

8   recognize that the review may miss some time entries that might be considered duplicative or

9   inefficient, so counsel suggest that the Court use $22,586,167.00, a further reduction of $200,000, as

10  the lodestar figure.

11          The requested fee award of 25% would equate to a lodestar multiplier of 4.99, well within

12  the range of lodestar multipliers routinely awarded by courts in this Circuit.[95]

13  **D.      The litigation expenses advanced were reasonable and necessary to secure the benefit
            obtained.**

14

15          Counsel who have created a common fund for the benefit of a class are entitled to be

16  reimbursed for out-of-pocket expenses reasonably incurred in creating the fund.[96] As the Ninth

17  Circuit has recognized, in class actions litigated on a wholly contingent basis, "litigation expenses

18  make the entire action possible."[97] Here, class counsel's unreimbursed expenses were reasonably

19  incurred and necessary for the litigation of the case. (¶¶ 119-32). Class counsel advanced these

20  expenses, described in detail in the Barnes Declaration, interest free, and with no assurance that

---

[95] *See, e.g., Steiner v. Am. Broad. Co.,* 248 F. App'x 780, 783 (9th Cir. 2007) (multiplier of 6.85, while high, fell "well within the range of multipliers that courts have allowed"); *Perez v. Rash Curtis & Assocs.,* 2021 WL 4503314, at *5 (N.D. Cal. Oct. 1, 2021) (approving fees of 37% of the settlement fund, a lodestar multiplier of 4.8); *Gutierrez,* 2015 WL 2438274, at *7 (approving multiplier of 5.5 "on account of the fine results achieved on behalf of the class," "the risk of non-payment," and "the superior quality of [class counsel's] efforts").

[96] *See Vincent v. Hughes Air W.,* 557 F.2d 759, 769 (9th Cir. 1977); *Omnivision,* 559 F. Supp. 2d at 1048 ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters.") (citing *Harris v. Marhoefer,* 24 F.3d 16, 19 (9th Cir. 1994)).

[97] *Online DVD,* 779 F.3d at 953.

-24-

DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES
No. 3:19-cv-05822-WHA

they would ever be reimbursed. (¶ 119). Expert witnesses constitute the largest expenditures while other notable expenses include the creation and maintenance of an electronic document database, shared among the groups of plaintiffs, which hosted the voluminous discovery produced in this litigation; deposition costs; and trial-related vendors. Class counsel retained an accountant, at no expense to the class, to ensure proper documentation and the reasonableness of all expenses for which counsel seek reimbursement. (¶ 122, Ex.8).

Accordingly, class counsel respectfully request that the Court approve reimbursement of counsel for their reasonable litigation expenses in full, to be deducted from the gross settlement fund prior to the Court-approved amount of attorneys' fees.

## IV.   CONCLUSION

For the foregoing reasons, Class Counsel respectfully request that the Court enter an Order awarding attorneys' fees totaling 25% of the settlement fund, net of reimbursed litigation expenses and estimated settlement expenses, ($112,817,643.00), plus any interest on that amount that may accrue prior to distribution and reimbursement of their litigation expenses totaling $2,413,688.60.

Dated: December 1, 2021                    Respectfully submitted,

                                           /s/ *Lauren G. Barnes*
                                           Thomas M. Sobol (admitted *pro hac vice*)
                                           Lauren G. Barnes (admitted *pro hac vice*)
                                           Jessica R. MacAuley (admitted *pro hac vice*)
                                           Rochella T. Davis (admitted *pro hac vice*)
                                           **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                           55 Cambridge Parkway, Suite 301
                                           Cambridge, MA 02142
                                           Telephone: (617) 482-3700
                                           Facsimile: (617) 482-3003
                                           tom@hbsslaw.com
                                           lauren@hbsslaw.com
                                           jessicam@hbsslaw.com
                                           rochellad@hbsslaw.com

                                           Shana E. Scarlett (SBN 217895)
                                           **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                           715 Hearst Avenue, Suite 202
                                           Berkeley, CA 94710
                                           Telephone: (510) 725-3000

Facsimile: (510) 725-3001
shanas@hbsslaw.com

/s/ *Steve D. Shadowen*

Steve D. Shadowen (admitted *pro hac vice*)
Richard Brunell (admitted *pro hac vice*)
Tina J. Miranda (admitted *pro hac vice*)
Matthew C. Weiner (admitted *pro hac vice*)
**HILLIARD & SHADOWEN LLP**
1135 W. 6th Street, Suite 125
Austin, TX 78703
Telephone: (855) 344-3298
steve@hilliardshadowenlaw.com
rbrunell@hilliardshadowenlaw.com
tmiranda@hilliardshadowenlaw.com
matt@hilliardshadowenlaw.com

/s/ *Joseph M. Vanek*

Joseph M. Vanek (admitted *pro hac vice*)
David P. Germaine (admitted *pro hac vice*)
Eamon P. Kelly (admitted *pro hac vice*)
Daniel Shmikler (admitted *pro hac vice*)
Alberto Rodriguez (admitted *pro hac vice*)
John P. Bjork (admitted *pro hac vice*)
Robert D. Cheifetz (admitted *pro hac vice*)
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
jvanek@sperling-law.com
dgermaine@sperling-law.com
ekelly@sperling-law.com
dshmikler@sperling-law.com
arodriguez@sperling-law.com
jbjork@sperling-law.com
robc@sperling-law.com

*Co-Lead Counsel for Direct Purchaser Class*

DIRECT PURCHASER CLASS PLAINTIFFS' MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES
No. 3:19-cv-05822-WHA

**CERTIFICATE OF SERVICE**

I, Lauren G. Barnes, certify that, on this date, I served the foregoing document on the CM/ECF system, which sends a notification to all counsel of record.

Dated: December 1, 2021                                    /s/ *Lauren G. Barnes*
                                                                          Lauren G. Barnes


**FILER'S ATTESTATION**

Pursuant to Local Rule 5-1(i)(3) of the Northern District of California, regarding signatures, I, Lauren G. Barnes, attest that concurrence in the filing of this document has been obtained.

Dated: December 1, 2021                                    /s/ *Lauren G. Barnes*
                                                                          Lauren G. Barnes

**APPENDIX A: ATTORNEYS' FEE AWARDS IN DIRECT PURCHASER GENERIC DELAY PHARMACEUTICAL ANTITRUST CASES**

| | Case | Settlement Amount | Fee Awarded (%) |
|---|---|---|---|
| 1 | *In re Intuniv Antitrust Litig.*, No. 18-cv-12653, 2020 WL 8373393 (D. Mass. Dec. 9, 2020) | $19.9M | $5.91M* (33⅓%) |
| 2 | *In re Restasis (Cyclosporine Opthalmic Emulsion) Antitrust Litig.*, No. 18-md-2819, 2020 WL 6193857 (E.D.N.Y. Oct. 7, 2020) | $51.25M | $16.42M* (33⅓%) |
| 3 | *In re Loestrin 24 Fe Antitrust Litig.*, No. 13-md-2472, 2020 WL 5203323 (D.R.I. Sept. 1, 2020) | $120M | $38.68M* (33⅓%) |
| 4 | *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488, 2020 WL 3170586 (S.D.N.Y. June 15, 2020) | $750M | $69.54M (9.3%) |
| 5 | *In re Lidoderm Antitrust Litig.*, No. 14-md-2521, 2018 WL 11375216 (N.D. Cal. Sept. 20, 2018) | $166M | $45M* (27.5%) |
| 6 | *In re Solodyn Antitrust Litig.*, No. 14-md-2503, 2018 WL 7075881 (D. Mass. July 18, 2018) | $72.5M | $24.16M (33⅓%) |
| 7 | *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 14-cv-351, 2018 WL 2382091 (E.D. Va. Apr. 18, 2018) | $94M | $30.72M* (33⅓%) |
| 8 | *In re K-Dur Antitrust Litig.*, No. 01-cv-1652, 2017 WL 11636125 (D.N.J. Oct. 5, 2017) | $60M | $20M (33⅓%) |
| 9 | *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2017 WL 11636126 (D. Conn. Dec. 19, 2017) | $146M | $29.2M (20%) |
| 10 | *In re Asacol Antitrust Litig.*, No. 15-cv-12730, 2017 WL 11475275 (D. Mass. Dec. 7, 2017) | $15M | $5M (33⅓%) |
| 11 | *King Drug Co. of Florence, Inc. v. Cephalon, Inc.* (*Provigil*), No. 06-cv-1797, 2015 WL 12843830 (E.D. Pa. Oct. 15, 2015) | $512M | $140.8M (27.5%) |
| 12 | *In re Prograf Antitrust Litig.*, No. 11-md-2242, 2015 WL 13908415 (D. Mass. May 20, 2015) | $98M | $32.67M (33⅓%) |
| 13 | *In re Prandin Direct Purchaser Antitrust Litig.*, No. 10-cv-12141, 2015 WL 1396473 (E.D. Mich. Jan. 20, 2015) | $19M | $6.33M (33⅓%) |
| 14 | *In re Neurontin Antitrust Litig.*, No. 02-cv-1830, 2014 WL 12962880 (D.N.J. Aug. 6, 2014) | $190M | $63.33M (33⅓%) |

| 15 | *Mylan Pharm., Inc. v. Warner Chilcott plc* (*Doryx*), No. 12-cv-3824, 2014 WL 12778314 (E.D. Pa. Sept. 15, 2014) | $15M | $5M (33⅓%) |
|----|----|----|----|
| 16 | *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 12-md-2343, 2014 WL 2946459 (E.D. Tenn. June 30, 2014) | $73M | $24.33M (33⅓%) |
| 17 | *In re Flonase Antitrust Litig.*, No. 08-cv-3149, 2013 WL 12471207 (E.D. Pa. June 14, 2013) | $150M | $50M (33⅓%) |
| 18 | *In re Wellbutrin XL Antitrust Litig.*, No. 08-cv-2431, 2012 WL 13224382 (E.D. Pa. Nov. 7, 2012) | $37.5M | $12.5M (33⅓%) |
| 19 | *Rochester Drug Co-Op., Inc. v. Braintree Labs., Inc.* (*MiraLax*), No. 07-cv-142, 2012 WL 13224508 (D. Del. May 31, 2012) | $17.25M | $5.75M (33⅓%) |
| 20 | *In re Metoprolol Succinate Antitrust Litig.*, No. 06-cv-52, 2012 WL 13224509 (D. Del. Feb. 21, 2012) | $20M | $6.67M (33⅓%) |
| 21 | *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-cv-2237, 2011 WL 12627961 (S.D.N.Y. Nov. 28, 2011) | $20.25M | $6.75M (33⅓%) |
| 22 | *In re Wellbutrin SR Antitrust Litig.*, No. 04-cv-5525, 2011 WL 13392296 (E.D. Pa. Nov. 21, 2011) | $49M | $16.33M (33⅓%) |
| 23 | *Meijer, Inc. v. Abbott Labs.* (*Norvir*), No. 07-cv-5985, 2011 WL 13392313 (N.D. Cal. Aug. 11, 2011) | $52M | $17.33M (33⅓%) |
| 24 | *In re Nifedipine Antitrust Litig.*, No. 03-mc-223, 2011 WL 13392312 (D.D.C. Jan. 31, 2011) | $35M | $11.67M (33⅓%) |
| 25 | *In re OxyContin Antitrust Litig.*, No. 04-md-1603, 2011 WL 13392314 (S.D.N.Y. Jan. 25, 2011) | $16M | $5.33M (33⅓%) |
| 26 | *In re TriCor Direct Purchaser Antitrust Litig.*, No. 05-cv-340, 2009 WL 10744518 (D. Del. Apr. 23, 2009) | $250M | $83.33M (33⅓%) |
| 27 | *Meijer, Inc. v. Barr Pharm., Inc.* (*Ovcon*), No. 05-cv-2195, 2009 WL 10744520 (D.D.C. Apr. 20, 2009) | $22M | $7.33M (33⅓%) |
| 28 | *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-cv-85, 2005 WL 8181042 (D.N.J. Nov. 9, 2005) | $75M | $25M (33⅓%) |
| 29 | *Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.* (*Paxil*), No. 03-cv-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2015) | $100M | $20M (20%) |
| 30 | *In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-md-1317, 2005 WL 8181045 (S.D. Fla. Apr. 20, 2005) | $72.5M | $24.17M (33⅓%) |

| 31 | *N. Shore Hematology-Oncology Assoc., P.C. v. Bristol-Myers Squibb Co.* (*Platinol*), No. 04-cv-248, 2004 WL 7348048 (D.D.C. Nov. 30, 2004) | $50M | $16.28M* (33⅓%) |
|---|---|---|---|
| 32 | *In re Relafen Antitrust Litig.*, No. 01-cv-12239, 231 F.R.D. 52 (D. Mass. 2005) | $175M | $58.33M (33⅓%) |
| 33 | *In re Buspirone Antitrust Litig.*, No. 01-cv-7951, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003) | $220M | $70.33M (33⅓%) |
| 34 | *In re Cardizem CD Antitrust Litig.*, No. 99-md-1278 & No. 99-cv-73259, ECF No. 86 (E.D. Mich. Nov. 26, 2002) | $110M | $33.16M (30%) |

* = Fee calculated as a percentage of the *net* settlement fund (i.e., after first deducting reimbursed litigation expenses) rather than as a percentage of the gross settlement fund.