Thomas M. Sobol (admitted *pro hac vice*)
Lauren G. Barnes (admitted *pro hac vice*)
Jessica R. MacAuley (admitted *pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Fax: (617) 482-3003
Tom@hbsslaw.com
Lauren@hbsslaw.com
JessicaM@hbsslaw.com

Shana E. Scarlett (SBN 217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Fax: (510) 725-3001
shanas@hbsslaw.com

*Co-Lead Counsel for the Direct Purchaser Class*

*Additional counsel on signature page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ***IN RE GLUMETZA ANTITRUST LITIGATION*** | Case No. 03:19-cv-5822-WHA |
| THIS DOCUMENT RELATES TO: | **PURCHASERS' REPLY IN SUPPORT OF** |
| ALL ACTIONS | **PURCHASERS' *DAUBERT* MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENDANTS' EXPERT DR. CATHERINE TUCKER** |

1

# **TABLE OF CONTENTS**

2
**Page(s)**

3

INTRODUCTION..................................................................................................... 1

4

ARGUMENT ............................................................................................................ 2

5

I.      DEFENDANTS MISCONSTRUE THE RULE OF REASON TO

6
SUPPORT THE ADMISSIBILITY OF DR. TUCKER'S OPINION. ...... 2

7

      A.     *Actavis* and Decades of Supreme Court Jurisprudence Require
Defendants to Offer Procompetitive Justifications of the

8
Challenged Anticompetitive Restraint. .................................................. 2

9

      B.     Defendants Do Not Demonstrate How the Marketing
Commitment Explains the No–AG Provision in Any Respect. ....... 7

10

      C.     Defendants Do Not Dispute that Dr. Tucker Failed to Consider
that Depomed and Santarus Previously Agreed to Marketing

11
Commitments Exceeding Those in the Lupin Settlement................ 8

12

II.     DEFENDANTS DO NOT IDENTIFY ANY SUPPORT FOR DR.
TUCKER'S OPINION ON SUN'S PROBABILITY OF SUCCESS IN

13
THE PATENT LITIGATION.......................................................................... 10

14

CONCLUSION ....................................................................................................... 11

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# <u>TABLE OF AUTHORITIES</u>

2

3

**Cases**                                                                                                          **Page(s)**

4

*Arista Networks, Inc. v. Cisco Systems, Inc.,*
   No. 16-cv-00923-BLF, 2018 WL 8949299 (N.D. Cal. June 15, 2018)................................9, 11

5

*Estate of Gonzales v. Hickman,*
   No. ED CV 05-660, 2007 WL 3237727 (C.D. Cal. May 30, 2007)...........................................9

6

*FTC v. Actavis, Inc.,*
   570 U.S. 136 (2013) ...........................................................................................................2, 3, 6

7

*FTC v. Ind. Fed'n of Dentists,*
   476 U.S. 447 (1986) ...................................................................................................................7

8

*Hosp. Corp. of Am. v. FTC,*
   807 F.2d 1381 (7th Cir. 1986) ...................................................................................................7

9

10

*In re Impax Labs., Inc.,*
   No. 9373, 2019 WL 1552939 (F.T.C. Mar. 28, 2019) ...........................................................6, 7

11

*In re Commercial Fin. Servs., Inc.,*
   No. 98-05166-R, 2005 WL 6499290 (Bankr. N.D. Okla. Sept. 14, 2005) .............................11

12

*In re Glumetza Antitrust Litig.,*
   336 F.R.D. 468 (N.D. Cal. 2020).............................................................................................2

13

*In re Lidoderm Antitrust Litig.,*
   No. 14-MD-0251-WHO, 2018 WL 7814761 (N.D. Cal. Feb. 7, 2018) .....................................6

14

15

*In re Lipitor Antitrust Litig.,*
   868 F.3d 231 (3d Cir. 2017) .....................................................................................................6

16

*In re Loestrin 24 Fe Antitrust Litig.,*
   433 F. Supp. 3d 274 (D.R.I. 2019) ........................................................................................5, 6

17

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.,*
   958 F.3d 1239 (9th Cir. 2020)...................................................................................................7

18

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,*
   No. 14-md-02503, 2018 WL 734655 (D. Mass. Feb. 6, 2018) ..................................................6

19

20

*Kansas Gas & Elec. Co. v. United States,*
   95 Fed. Cl. 257 (2010) ............................................................................................................11

21

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.,*
   791 F.3d 388 (3d Cir. 2015) .....................................................................................................6

22

*McGlinchy v. Shell Chem. Co.,*
   845 F.2d 802 (9th Cir. 1988) .....................................................................................................9

23

24

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents,*
   468 U.S. 85 (1984).................................................................................................................3, 4

25

*O'Bannon v. NCAA,*
   802 F.3d 1049 (9th Cir. 2015) ...................................................................................................4

26

*Robertson v. Sea Pines Real Estate Cos.,*
   679 F.3d 278 (4th Cir. 2012) .................................................................................................4, 5

27

*See In re Wellbutrin XL Antitrust Litig.,*

28

868 F.3d 132 (3d Cir. 2017) ............................................................................................ 6

*W. Parcel Express v. United Parcel Serv. of Am., Inc.,*
    65 F. Supp. 2d 1052, 1060 (N.D. Cal. 1998) ................................................................ 9

1

## **INTRODUCTION**

2      Purchasers' motion demonstrated that the Court should exclude two of the opinions of

3  defendants' economic expert, Dr. Catherine Tucker. Nothing in defendants' opposition changes

4  that result.

5      *First*, purchasers demonstrated that Dr. Tucker's opinion about the procompetitive

6  effects of the marketing commitment in the settlement agreement is contrary to *Actavis* and

7  settled rule-of-reason case law. In their opposition, defendants make no attempt to explain how

8  the marketing commitment justified the no-AG provision as anything other than a payment to

9  avoid the risk of litigation. Nor do they contradict Dr. Tucker's admission that she had no

10  opinion regarding any procompetitive benefits of the no-AG provision that purchasers

11  challenge. Instead, defendants claim that Dr. Tucker's opinion is admissible because the rule of

12  reason permits consideration of the competitive effects of the settlement as a whole. Defendants'

13  interpretation of the law is contrary to *Actavis* and decades of rule-of-reason jurisprudence that

14  requires procompetitive justifications to relate to the challenged restraint. Because defendants

15  rest their opposition on an incorrect legal proposition, Dr. Tucker's opinion must be excluded.

16      *Second*, purchasers demonstrated that Dr. Tucker should not be permitted to offer

17  opinions concerning Sun's chances of success in the patent litigation. Defendants claim that Dr.

18  Tucker "merely assumes different percentage likelihoods that Sun would prevail in the litigation

19  to show that Dr. McGuire's and Dr. Leffler's models are sensitive to these inputs."[1] But any

20  model is sensitive to its inputs; otherwise, the inputs could be ignored. The issue is whether

21  there is reason to believe that alternative input values have a reasonable basis in the evidence

22  that will be presented to the jury at trial. Here, there is no such basis for Dr. Tucker's opinions.

23  Dr. Tucker herself does not have the expertise to evaluate the merits of the Sun litigation, and

24  defendants have not identified any technical or patent law expert with an opinion on the

25  alternative values that Dr. Tucker uses. Absent such an evidentiary basis, Dr. Tucker's

26  alternative calculations based on her assumed chances of success for Sun should be excluded.

27

28

---

[1] Defendants' Joint Opp'n to Plaintiffs' Motion to Exclude Certain Opinions of Defendants' Expert Catherin Tucker, Ph.D. ("Def. Opp,"), ECF No. 476 at 3.

1

2

3

## ARGUMENT

**I.     Defendants Misconstrue the Rule of Reason to Support the Admissibility of Dr. Tucker's opinion.**

4       Defendants do not dispute that the brand defendants' marketing commitments for

5   Glumetza do not explain the no-AG provision as anything other than a payment to Lupin to

6   avoid the risk of losing the patent litigation and facing competition. Dr. Tucker herself admitted

7   that she had not identified any "logical nexus" between the no-AG provision and the marketing

8   commitment, and she had not identified any "trade-off between them."[2] Instead, defendants

9   argue that no such nexus is required because the rule of reason considers the settlement

10  agreement as a whole. Defendants' argument is contrary to *Actavis* and years of Supreme Court

11  rule-of-reason jurisprudence.

12

13

**A.     *Actavis* and decades of Supreme Court jurisprudence require defendants to offer procompetitive justifications of the challenged anticompetitive restraint.**

14      As purchasers demonstrated in their motion, *Actavis* unambiguously held that a

15  defendant seeking to rebut a term challenged as a reverse payment must justify "the presence of

16  the challenged *term* and show☐ the lawfulness of *that term* under the rule of reason."[3] This

17  Court also recognized that the central inquiry under the rule of reason is whether "the

18  'restraint's harm to competition outweighs its procompetitive effects.'"[4] Here, the challenged

19  restraint is the no-AG provision, and Dr. Tucker's opinion that another term in the settlement

20  agreement (the marketing commitment) was procompetitive in no way justifies the no-AG

21  provision. Defendants respond by claiming that *Actavis* cannot mean what it quite clearly holds.

22      *First*, defendants assert that purchasers' interpretation of *Actavis* must be wrong because

23  it would exclude the justifications that the Supreme Court itself identified in *Actavis* because

24

25

[2] *See* Plaintiff's Motion to Exclude Certain Opinions of Defendants' Expert Dr. Catherine Tucker ("Mot."), ECF No. 440-5 at 4.

26  [3] *FTC v. Actavis, Inc.*, 570 U.S. 136, 156 (2013) (emphasis added).

27  [4] *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468, 475 (N.D. Cal. 2020) (quoting *NCAA v. Bd. of Regents of Univ. Okla.*, 468 U.S. 85, 103-04 (1984)).

28

those justifications "may not appear in the same clause as the challenged reverse payment term."[5] But neither purchasers nor *Actavis* suggested that a procompetitive justification must appear in the same clause as the reverse payment. What *Actavis* said is that the procompetitive justification must show the lawfulness of the reverse payment term under the rule of reason.[6] Defendants claim *Actavis* did not require a procompetitive benefit/reverse payment nexus because the Court "contemplated that a justification could be 'services' that are performed, 'such as distributing the patented item or helping to develop a market for that item . . . .'"[7] But Defendants edited out the nexus with their selective quoting: "That *payment* may reflect compensation for other services that the generic has promised to perform – such as distributing the patented item or helping to develop a market for that item."[8] The Court drew a direct connection between the challenged term—the payment—and its possible explanation as compensation for services provided by the generic manufacturer. This is the kind of procompetitive justification that *Actavis* requires. General assertions like Dr. Tucker's that provisions in the agreement entirely separate from the reverse payment may have value do not provide any such justification.

   *Second*, defendants claim that long-standing rule-of-reason cases from the Supreme Court and the lower federal courts are inconsistent with a reading of *Actavis* that would limit defendants to justifying the challenged restraint. But each of defendants' cases is in fact consistent with precisely that reading. For instance, in *NCAA v. Board of Regents*,[9] plaintiffs challenged a television plan imposed by the NCAA on its member universities that limited the total amount of televised intercollegiate football games and the number of games that any one college could televise.[10] As one procompetitive justification, the NCAA asserted that the

---

[5] Def. Opp, at 5.

[6] *Actavis*, 570 U.S. at 156.

[7] Def. Opp, at 5 (quoting *Actavis*, 570 U.S. at 156).

[8] *Actavis*, 570 U.S. at 156 (emphasis added).

[9] 468 U.S. 85 (1984).

[10] *Id.* at 94.

restrictive television plan furthered the NCAA's legitimate interest in maintaining competitive balance among the member teams.[11] The Supreme Court rejected the justification because it was unrelated to the restraints imposed by the television plan: the television plan imposed a restriction on a source of revenues, but did not regulate the money that any football program could spend or the way that colleges could use revenues generated by their football programs.[12]

Similarly, in *O'Bannon v. NCAA*,[13] plaintiffs challenged as an unlawful restraint those aspects of the NCAA's amateurism rules prohibiting the compensation of student athletes. Defendants suggest that the procompetitive benefits offered by the NCAA do not appear to be connected in any way with the restraint on compensating student athletes.[14] That is incorrect.[15] Although it ultimately held that the restraint was not sufficiently tailored to achieve the justification, the court found a direct connection between the restraint and the procompetitive justification offered by the NCAA. It concluded that "the NCAA's compensation rules serve the two procompetitive purposes identified by the district court: integrating academics with athletics, and 'preserving the popularity of the NCAA's product by promoting its current understanding of amateurism.'"[16]

Nor does *Robertson v. Sea Pines Real Estate Cos.* support defendants' argument that defendants can justify a particular restraint by pointing to other provisions of a defendants' agreement.[17] In *Robertson*, the challenged restraint concerned bylaws of a real estate multiple listing service ("MLS") that plaintiffs alleged were adopted to exclude innovative, lower-priced

---

[11] *Id.* at 117.

[12] *Id.* at 118-19 ("The television plan is not even arguably tailored to serve such an interest.").

[13] 802 F.3d 1049 (9th Cir. 2015).

[14] Def. Opp, at 8.

[15] *See* 802 F.3d at, e.g., 1058 ("the NCAA proffered four procompetitive purposes for its rules prohibiting athletes from receiving compensation"); 1072 ("we fail to see how the restraint at issue in this particular case—*i.e.*, the NCAA's limits on student-athlete compensation—makes college sports more attractive to recruits").

[16] *Id.* at 1073.

[17] 679 F.3d 278 (4th Cir. 2012).

competitors.[18] That case explained: "Under the rule of reason, the reasonableness of *a restraint* is evaluated based on its impact on competition as a whole within the relevant market. This evaluation requires a showing of anticompetitive effect, resulting from the agreement *in restraint of trade*," meaning the restraint itself.[19] The Fourth Circuit made it clear that any procompetitive benefits that defendants offered would have to stem from the challenged MLS rules themselves. While it recognized that the MLS was a joint venture with possible procompetitive justifications,[20] those general procompetitive justifications were not what the merits of the rule of reason analysis would turn on.[21] Rather, the issue was whether the specific challenged rules caused anticompetitive harms which outweighed any procompetitive justification. In response to any such showing by the plaintiffs, the court recognized that the defendants had to "raise potential legitimate business purposes that may justify *the rules* as promoting competition within the relevant real estate markets."[22] Thus, *Robertson* further demonstrates that procompetitive justifications must relate to the challenged restraint.

       *Third*, post-*Actavis* precedent does not support defendants' claim that procompetitive justification for the settlement as a whole may offset the anticompetitive effects of the reverse payment in the rule-of-reason analysis. *Loestrin*, defendants' principal post-*Actavis* case, does not address the issue at all. It concerned whether "the entire deal, taken as a whole, amounted to a large and unjustified reverse payment," not whether a justification for the settlement as a whole could justify the reverse payment in the rule-of-reason analysis.[23] The entire rule-of-reason analysis in *Wellbutrin*, including the district court's rule of reason analysis of the settlement "as a

---

[18] *Id.* at 283.

[19] *Id.* at 290 (emphasis added, citations and quotations omitted).

[20] *Id.* at 291.

[21] *Id.* at 292 ("At this early stage of the litigation, we are not in position to weigh the alleged anticompetitive risks of the MLS rules *against their procompetitive justifications*.") (emphasis added).

[22] *Id.* at 291-92 (emphasis added).

[23] *In re Loestrin 24 Fe Antitrust Litig.*, 433 F. Supp. 3d 274, 322 (D.R.I. 2019) (internal citation omitted).

1   whole," was reversed on appeal in an opinion in which the Third Circuit correctly focused on the

2   need to justify the no-AG agreement, not the settlement as a whole.[24] The appellate ruling was

3   consistent with other Third Circuit precedent clearly holding that the defendant must justify

4   the reverse payment in the rule-of-reason analysis.[25] The remainder of defendants' cases

5   cursorily address the issue without any real analysis of what is required to justify an

6   anticompetitive restraint under Supreme Court precedent.[26]

7         Defendants are wrong that *In re Impax Labs., Inc.*,[27] which comprehensively rebuts

8   defendants' claim that procompetitive justification need not explain the reverse payment,

9   "applies an entirely different legal standard than is applicable here."[28] *Actavis* itself was an FTC

10  case brought pursuant to section 5 of the FTC Act and section 1 of the Sherman Act.[29] While

11  acts of unfair competition under the FTC Act may be broader than acts that violate the Sherman

12  Act, the FTC in *Impax* explained that it was applying *Actavis* and developing "the rule of reason

13  analysis that it directs."[30] Thus, the FTC  limited its decision to a section 1 theory of unfair

---

14  [24] *See In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 161-63 (3d Cir. 2017) (noting that "[t]he
15  'payment,' i.e., the no-AG agreement, could also be said to be unjustified in the sense of being
    unexplained").

16  [25] *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 256 (3d Cir. 2017); *King Drug Co. of Florence, Inc.
17  v. SmithKline Beecham Corp.*, 791 F.3d 388, 412 (3d Cir. 2015) (procompetitive justification must
    explain "'the presence of the challenged term'" (quoting *Actavis*, 570 U.S. at 156)).

18  [26] *In re Lidoderm Antitrust Litig.*, No. 14-MD-0251-WHO, 2018 WL 7814761, at *2 (N.D. Cal.
19  Feb. 7, 2018) (addressing the issue in a sentence); *In re Solodyn (Minocycline Hydrochloride) Anti-
    trust Litig.*, No. 14-md-02503, 2018 WL 734655, at *4 (D. Mass. Feb. 6, 2018) (addressing the
20  issue in a paragraph).

21  [27] No. 9373, 2019 WL 1552939 (F.T.C. Mar. 28, 2019).

    [28] Def. Opp, at 6.

22  [29] *Actavis*, 570 U.S. at 145.

23  [30] *Impax*, 2019 WL 1552939, at *3; *see also FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986)
24  (holding that where FTC found unfair method of competition under section 5 of the FTC Act
    based on violation of section 1 of the Sherman Act, the only legal question for the court was
25  whether evidence supported violation of section 1). In addition, courts should defer to interpre-
    tations of the law within the FTC's expertise.  *See id.* ("courts are to give some deference to the
26  Commission's informed judgment that a particular commercial practice is to be condemned as
    'unfair.'"); *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) (noting that "[o]ne of
27  the main reasons for creating the Federal Trade Commission . . . was that Congress distrusted
    judicial determination of antitrust questions" and "thought the assistance of an administrative

28

1   competition, identical to the one governing this case.[31]

2        *Finally*, defendants' claim that procompetitive justifications may include evidence

3   without any nexus to the challenged restraint would make the rule-of-reason unworkable.

4   Under the three-step framework of the rule of reason: (1) plaintiffs have the initial burden of

5   showing the restraint to be anticompetitive; (2) if they carry that burden, the defendant "must

6   come forward with evidence of the restraint's procompetitive effects"; and (3) if defendants do so,

7   plaintiffs "must then show that any legitimate objectives can be achieved in a substantially less

8   restrictive manner."[32] If defendants were permitted to offer procompetitive justifications

9   unrelated to the specific challenged restraint, such justifications would have to be dismissed at

10  the third step since justifications unrelated to the restraint could obviously be obtained without

11  the restraint. Thus, defendants' insistence on offering procompetitive justifications without any

12  nexus to the reverse payment would only extend and unnecessarily confuse the jury's rule-of-

13  reason analysis.

14       **B.    Defendants do not demonstrate how the marketing commitment explains
15              the no-AG provision in any respect.**

16       As purchasers demonstrated, Dr. Tucker made no attempt to show that the marketing

17  commitment explained the no-AG provision in any way and conceded that the procompetitive

18  benefits of the marketing commitment were relevant only if the Lupin settlement is considered

19  "as a whole."[33] Defendants assert, without any support from Dr. Tucker's report or deposition,

20  that the marketing commitment has "both has a 'logical nexus' to the challenged provisions of

21  the Settlement Agreement . . . and is responsive to Dr. McGuire's opinion" that the marketing

22

23  ─────────────────────

24  body would be helpful in resolving such questions") (Posner, J.).

25  [31] *Impax*, 2019 WL 1552939, at *14–15 ("To determine whether this conduct violates Section 5
    of the FTC Act, we follow case law that has developed under Section 1 of the Sherman Act.").

26  [32] *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1256 (9th Cir. 2020), *cert.
    granted*, 2020 WL 7366281 (Dec. 16, 2020) (quoting *O'Bannon*, 802 F.3d at 1070).

27  [33] Mot. at 4.

28

commitment was a form of payment.[34] Defendants make no attempt to explain the logical nexus between the marketing commitment and the challenged no-AG provision. As Dr. McGuire explained, the marketing commitment was at most an *additional* payment to Lupin because it protected the size of the Glumetza market by requiring promotion during the time that Lupin agreed to delay its entry into that market.[35]

However, purchasers have not challenged the marketing commitment as a payment.[36] Thus, not only do defendants fail to identify any way in which the marketing commitment explains the no-AG provision, they fail to identify any link between the marketing commitment and any conduct challenged as illegal. As a result, any procompetitive benefits of the marketing commitment are entirely irrelevant to any issue in this case.

**C.    Defendants do not dispute that Dr. Tucker failed to consider that Depomed and Santarus previously agreed to marketing commitments exceeding those in the Lupin settlement.**

Purchasers further demonstrated that Dr. Tucker's opinion that the Lupin settlement benefitted consumers should be excluded because she failed to take into account that, prior to the Lupin settlement, Depomed and Santarus had already agreed to marketing commitments for Glumetza that exceeded those in the Lupin settlement.[37] Defendants' opposition does not deny that there were preexisting marketing commitments for Glumetza, that those commitments exceeded those in the Lupin settlement, or that Dr. Tucker failed to consider the preexisting commitments in any respect in forming her opinions.[38] Defendants do not rebut purchasers' showing that Dr. Tucker failed to consider a critical undisputed fact: the marketing commitments in the Lupin settlement were entirely unnecessary because the brand defendants

---

[34] Def. Opp, at 9.

[35] Mot. at 5.

[36] *Id.*

[37] *Id.* at 6.

[38] Def. Opp, at 11 ("Moreover, that Dr. Tucker did not opine on a particular fact goes to the weight of her opinion, not its admissibility.").

1   were already subject to more stringent marketing requirements.

2          Defendants cite nothing from Dr. Tucker's report or deposition showing that she

3   considered the preexisting marketing commitment. They cite nothing because nothing exists.

4   This is not a mere "failure to consider certain factors," as defendants would have it. When an

5   opinion "has *no* basis in the record," it is "speculation" that is properly excluded.[39] At the heart of

6   Dr. Tucker's opinion that the Lupin marketing commitment had procompetitive effects is her

7   speculation that, absent the marketing provision in the Lupin settlement agreement, the

8   marketing for Glumetza might have ended a year earlier than with the settlement.[40] This

9   speculation is *refuted* by the undisputed preexisting marketing commitments to which the brand

10  defendants were subject.

11         Defendants attempt to create a factual basis for Dr. Tucker's opinion based on evidence

12  from various executives of defendants.[41] But nowhere do defendants show that Dr. Tucker cited

13  or otherwise relied on that testimony. Accordingly, she cannot rely on those facts at trial to try

14  to retroactively rehabilitate her opinions in light of her failure to consider crucial undisputed

15  facts. Such a side show to prop up Dr. Tucker's critically flawed opinion would be even more

16  prejudicial than originally addressed in connection with purchasers' motion.[42]

---

[39] *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (emphasis added); *see also Estate of Gonzales v. Hickman*, No. ED CV 05-660, 2007 WL 3237727, at *3 n.34 (C.D. Cal. May 30, 2007) (collecting cases); *cf. W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1060 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) ("When expert opinions are not supported by sufficient facts, or when the indisputable record contradicts or otherwise renders the opinions unreasonable, they cannot be relied upon."). Defendants' reliance on *Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 16-cv-00923-BLF, 2018 WL 8949299 (N.D. Cal. June 15, 2018), is misplaced. There, the court permitted testimony only because the expert *had* considered the facts in question (albeit not some of the *documents*), and confirmed the rule that an expert's opinions are inadmissible unless they are "sufficiently tied to the facts of this case." *Id.* at *8.

[40] Ex. 3005 to the Declaration of Jessica R. MacAuley in Support of Plaintiffs' Daubert Motions (ECF No. 439), Expert Report of Catherine Tucker, Ph.D., ¶ 131.

[41] Even this effort fails. The quoted executives merely described the general desirability of Glumetza marketing. None of them disputed the preexisting Santarus marketing commitment. *See* Def. Opp, at 10 and sources cited therein.

[42] *See* Mot. at 6-7.

## II.    DEFENDANTS DO NOT IDENTIFY ANY SUPPORT FOR DR. TUCKER'S OPINION ON SUN'S PROBABILITY OF SUCCESS IN THE PATENT LITIGATION.

Purchasers' demonstrated that Dr. Tucker improperly opined on Sun's chances of success in the patent litigation and recalculated the results of the economic entry date models of Prof. McGuire and Dr. Leffler using probabilities of success for Sun that had no support in the record.[43] Defendants do not dispute that Dr. Tucker lacks expertise in patents, patent construction, or patent litigation, and is unqualified to opine on a patent litigant's chances of success. Instead, defendants argue that (i) the testimony of purchasers' expert Mr. Lentz regarding Sun's chances of success may be excluded or wrong; and (ii) Dr. Tucker offers nothing but a "sensitivity analysis," which she is qualified to offer. Neither of these attempts saves Dr. Tucker's plainly inadmissible speculation.

*First*, that defendants moved to exclude Mr. Lentz's opinions on the patent merits neither transforms Dr. Tucker into an expert on patent litigation, nor excuses her lack of any experience or methodology. She cannot opine on Sun's chances of success in patent litigation because she is not qualified to do so. Period. She also cannot opine that Sun's chances may have been 70%, 60%, or 50% because, as she admitted, those numbers are entirely arbitrary. Defendants had ample opportunity to find a qualified expert, utilizing a reliable methodology, to opine on Sun's chances in its litigation with Depomed, but they failed to do so. Dr. Tucker does not have the expertise to offer such opinions.

*Second*, Dr. Tucker's opinions are not admissible as a "sensitivity analysis."[44] Dr. Tucker

---

[43] *Id.* at 7.

[44] Defendants' citation of *Arista Networks* is unavailing. The court there allowed the expert's testimony, despite her lack of qualifications with respect to patents, because it found that she was not "testifying about designing around patents as a technical matter, which is a field [in which] she does not have expertise. Rather, [she] is opining on the economic effects of patent lawsuits. . . ." 2018 WL 8949299, at *11. Here, Dr. Tucker *is* seeking to testify directly about a field in which she has no expertise, *i.e.*, the likely outcome of patent litigation. Even worse, defendants claim that *Arista Networks* makes Dr. Tucker's lack of qualifications a matter of the "weight of the evidence." (Def. Opp, at 12 n.7). This is directly contrary to the court's holding which, in a different portion of the opinion, *excluded* the opinions of "a highly qualified economist" that were outside of her expertise. 2018 WL 8949299, at *9.

admits that she is offering more than a sensitivity analysis. In her report, she stated that she

assumed the percentages she invented were reasonable.[45] Nor can an expert provide

"conjectural" opinions in the guise of a "sensitivity analysis" – such analyses must be based on

"reliable data or assumptions."[46] A sensitivity analysis simply showing that outputs change

when the inputs change (as Dr. Tucker offers here) is of no aid to the jury. As one court noted,

in rejecting an attack on an expert for failure to perform a sensitivity analysis, when dealing

with large numbers, large changes will inevitably result from changes to inputs, but this is not

the relevant question: "A more relevant concern is whether ⌈the expert⌉ is able to articulate a

reasonable basis in fact for choosing a particular variable, not whether changing the variable

may alter the result (it always will)."[47]

      In any event, as set forth in the Motion, Dr. Tucker's "sensitivity analysis" in this case is

subject to exclusion per Rule 403: Dr. Tucker's use of precise estimates of Sun's chances is

unduly prejudicial by giving the impression that some basis for those percentages exists when,

by her own admission, none does.

## **CONCLUSION**

      For the foregoing reasons and those in purchasers' Motion, purchasers respectfully

request that the Court grant purchasers' Motion to Exclude Certain Opinions of Dr. Catherine

Tucker.

Dated: February 26, 2021

                                 Respectfully submitted,

                                 */s/   Lauren G. Barnes*
                                 Thomas M. Sobol (admitted *pro hac vice*)
                                 David S. Nalven (admitted *pro hac vice*)
                                 Lauren G. Barnes (admitted *pro hac vice*)
                                 Kristen A. Johnson (admitted *pro hac vice*)

---

[45] *See* Mot. at 9-10 & nn.40, 43.

[46] *Kansas Gas & Elec. Co. v. United States*, 95 Fed. Cl. 257, 290 (2010), *rev'd in part on other grounds*, 685 F.3d 1361 (Fed. Cir. 2012) ("Dr. Murphy's sensitivity analysis was a conjectural, abstract measure, detached from any reliable data or assumptions.").

[47] *In re Commercial Fin. Servs., Inc.*, No. 98-05166-R, 2005 WL 6499290, at *23 (Bankr. N.D. Okla. Sept. 14, 2005) (parenthetical in original).

Jessica R. MacAuley (admitted *pro hac vice*)
Rochella T. Davis (admitted *pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Fax: (617) 482-3003
Tom@hbsslaw.com
Davidn@hbsslaw.com
Lauren@hbsslaw.com
Kristenj@hbsslaw.com
JessicaM@hbsslaw.com
RochellaD@hbsslaw.com

Shana E. Scarlett (SBN 217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Fax: (510) 725-3001
shanas@hbsslaw.com

Steve D. Shadowen (admitted *pro hac vice*)
Richard Brunell (admitted *pro hac vice*)
Tina J. Miranda (admitted *pro hac vice*)
Matthew C. Weiner (admitted *pro hac vice*)
**HILLIARD & SHADOWEN LLP**
1135 W. 6th Street, Suite 125
Austin, TX 78703
Telephone: (855) 344-3298
steve@hilliardshadowenlaw.com
rbrunell@hilliardshadowenlaw.com
tmiranda@hilliardshadowenlaw.com
matt@hilliardshadowenlaw.com

Joseph M. Vanek (*admitted pro hac vice*)
David P. Germaine (*admitted pro hac vice*)
Eamon P. Kelly (*admitted pro hac vice*)
Daniel Shmikler (*admitted pro hac vice*)
Alberto Rodriguez (*admitted pro hac vice*)
John P. Bjork (*admitted pro hac vice*)
Robert D. Cheifetz (admitted pro hac vice)
**SPERLING & SLATER**
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
jvanek@sperling-law.com
dgermaine@sperling-law.com
ekelly@sperling-law.com
dshmikler@sperling-law.com

arodriguez@sperling-law.com
jbjork@sperling-law.com
robc@sperling-law.com

*Co-Lead Counsel for Direct Purchaser Class*

Anna T. Neill (SBN 270858)
Scott E. Perwin (*admitted pro hac vice*)
Lauren C. Ravkind (*admitted pro hac vice*)
**KENNY NACHWALTER P.A.**
Four Seasons Tower, Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
sperwin@knpa.com
lravkind@knpa.com

*Counsel for Walgreen Co., Kroger Co., Albertsons Companies, Inc., Hy-Vee, Inc., and H-E-B LP*

Barry L. Refsin (*admitted pro hac vice*)
Alexander J. Egerváry (*admitted pro hac vice*)
Chelsea M. Nichols (*admitted pro hac vice*)
Caitlin V. McHugh (*admitted pro hac vice*)
**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 496-7031
brefsin@hangley.com
aegervary@hangley.com
cnichols@hangley.com
cmchugh@hangley.com

Monica L. Kiley (*admitted pro hac vice*)
Eric L. Bloom (*admitted pro hac vice*)
**HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**
2805 Old Post Road, Suite 100
Harrisburg, PA 17110
(717) 364-1030
mkiley@hangley.com
ebloom@hangley.com

*Counsel for Rite Aid and CVS Pharmacy*

Peter D. St. Phillip (admitted *pro hac vice*)
Uriel Rabinovitz (admitted *pro hac vice*)
**LOWEY DANNENBERG, P.C..**
44 South Broadway, Suite 1100

White Plains, NY 10601
Telephone: (914) 997-0500
PStPhillip@lowey.com
URabinovitz@lowey.com

Todd M. Schneider
Jason H. Kim
Matthew S. Weiler
**SCHNEIDER WALLACE COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
TSchneider@schneiderwallace.com
JKim@schneiderwallace.com
MWeiler@schneiderwallace.com

*Counsel for Plaintiff Humana Inc.*

**CERTIFICATE OF SERVICE**

I, Lauren G. Barnes, certify that, on this date, I served the foregoing document on counsel for Defendants Bausch Health Companies, Inc., Salix Pharmaceuticals, Ltd., Salix Pharmaceuticals, Inc., Santarus, Inc., Assertio Therapeutics, Inc., Lupin Pharmaceuticals, Inc. and Lupin Ltd. Inc., by causing this document to be filed with the Court via the Court's electronic case file (or "ECF") system and by electronic mail.

Dated: February 26, 2021                                /s/ *Lauren Guth Barnes*
                                                         Lauren Guth Barnes

**FILER'S ATTESTATION**

Pursuant to Local Rule 5-1(i)(3) of the Northern District of California, regarding signatures, I, Lauren G. Barnes, attest that concurrence in the filing of this document has been obtained.

Dated: February 26, 2021                                /s/ *Lauren Guth Barnes*
                                                         Lauren Guth Barnes